**Case No. 26-60007**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

U.S. COURT OF APPEALS
RECEIVED
Mar 16, 2026
FIFTH CIRCUIT

OMOKHODION ALFRED ERIAKHA,

PLAINTIFF - APPELLANT

v.

UNIVERSITY OF MISSISSIPPI; YI YANG, DOCTOR, CHAIR, DEPARTMENT OF PHARMACY ADMINISTRATION; MARIE BARNARD, DOCTOR, GRADUATE PROGRAM COORDINATOR, PHARMACY ADMINISTRATION; ANNETTE KLUCK, DOCTOR, DEAN OF THE GRADUATE SCHOOL,

DEFENDANTS - APPELLEES

---

EHIREMEN BENNARD ERIAKHA,

PLAINTIFF – APPELLANT, PRO SE

v.

UNIVERSITY OF MISSISSIPPI; YI YANG, DOCTOR, CHAIR, DEPARTMENT OF PHARMACY ADMINISTRATION; MARIE BARNARD, DOCTOR, GRADUATE PROGRAM COORDINATOR, PHARMACY ADMINISTRATION; ANNETTE KLUCK, DOCTOR, DEAN OF THE GRADUATE SCHOOL; YINAN HUANG, DOCTOR, FACULTY MEMBER,

DEFENDANTS - APPELLEES

1

ON APPEAL FROM THE

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF MISSISSIPPI, OXFORD DIVISION

CIVIL ACTION NO. 3:25-CV-00226-MPM-JMV (LEAD CASE)

(CONSOLIDATED WITH CIVIL ACTION NO. 3:25-CV-00250-DMB-RP)

**APPELLANT EHIREMEN BENNARD ERIAKHA'S OPENING BRIEF**

EHIREMEN BENNARD ERIAKHA

PLAINTIFF-APPELLANT, PRO SE

1802 JACKSON AVE. W., APT. 83

OXFORD, MS 38655

TEL: (662) 281-4676

EMAIL: ERIAKHABERNARD@GMAIL.COM

**<u>CERTIFICATE OF INTERESTED PARTIES</u>**

*Ehiremen Bennard Eriakha v. University of Mississippi et al., No. 26-60007*

The undersigned Plaintiff-Appellant, Ehiremen Bennard Eriakha, appearing *pro se*, certifies that the following listed persons and entities as described in ***Fifth Circuit Rule 28.2.1*** have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant**
Ehiremen Bennard Eriakha, *pro se*

**Defendants-Appellees**
University of Mississippi
Dr. Yi Yang, Chair, Department of Pharmacy Administration
Dr. Marie Barnard, Graduate Program Coordinator, Pharmacy Administration
Dr. Annette Kluck, Dean of the Graduate School
Dr. Yinan Huang, Faculty Member, Pharmacy Administration

**Counsel for Defendants-Appellees:**
Paul B. Watkins, Esq.
Brooke Jackson, Esq.
Mayo Mallette PLLC

**CORPORATE DISCLOSURE STATEMENT**

No publicly held corporation owns 10% or more of the stock of any party to this proceeding. No party is a subsidiary or affiliate of any publicly held corporation.

Respectfully submitted this 16th day of March, 2026,

/s/ Ehiremen Bennard Eriakha
Ehiremen Bennard Eriakha
Plaintiff-Appellant, *pro se*
1802 Jackson Ave. W., Apt. 83
Oxford, MS 38655
Tel: (662) 281-4676
Email: eriakhabernard@gmail.com

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellant does not request oral argument. The facts and legal issues are adequately presented in the briefs and the record, and the decisional process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES.................................................................... 3

STATEMENT REGARDING ORAL ARGUMENT ...................................................... 5

STATEMENT OF JURISDICTION ................................................................................ 9

STATEMENT OF ISSUES ............................................................................................. 9

STATEMENT OF THE CASE........................................................................................11

SUMMARY OF THE ARGUMENT ............................................................................ 14

STANDARD OF REVIEW ........................................................................................... 19

ARGUMENT .................................................................................................................. 20

CONCLUSION AND RELIEF REQUESTED ........................................................... 69

CERTIFICATE OF SERVICE ...................................................................................... 71

CERTIFICATE OF COMPLIANCE............................................................................. 72

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* ................................................................. 19

*Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998)* ............................................... 20

*Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997)* ................................ 22

*Catlin v. United States, 324 U.S. 229, 233 (1945)* ....................................................... 9

*Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)* ............................................ 54

*Frazier v. Garrison I.S.D., 980 F.2d 1514, 1531 (5th Cir. 1993)* ............................................ 19

*Hepperle v. Johnston, 544 F.2d 201, 202 (5th Cir. 1976)* .................................................. 25

*Hope v. Pelzer, 536 U.S. 730, 741 (2002)* ............................................................... 36

*In re Air Crash Disaster Near New Orleans, La., 767 F.2d 1151, 1155 (5th Cir. 1985)* ............ 19

*In re Katrina Canal Breaches Litig., 495 F.3d 191, 206 (5th Cir. 2007)* .................................. 19

*Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986)* ................................................. 25

*Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003)* ............................................. 19

*Mt. Healthy, 429 U.S. at 287* ........................................................................... 45

*Nevares v. San Marcos Consolidated Independent School District, 111 F.3d 25 (5th Cir. 1997)*

....................................................................................................... 56

*Raj v. La. State Univ., 714 F.3d 322, 328 (5th Cir. 2013)* ............................................... 19

*Roberts v. United States Jaycees, 468 U.S. 609 (1984)* .................................................. 46

*Saucier v. Katz, 533 U.S. 194, 201 (2001)* ............................................................. 34

*Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Iqbal, 556 U.S. at 678* ................. 49

*Woodard v. Andrus, 419 F.3d 348, 351 (5th Cir. 2005)* .................................................. 19

**Statutes**

*28 U.S.C. § 1291* ................................................................................................... 9

*28 U.S.C. § 1367* ................................................................................................... 9

*28 U.S.C. §§ 1331* and *1343* ............................................................................... 9

*42 U.S.C. § 1983* ................................................................................................... 9

*Rule 12(b)(1)* ...................................................................................................... 20

*Rule 12(b)(6)* ...................................................................................................... 20

*Rule 65* ............................................................................................................... 64

*Section 1367(c)(3)* .............................................................................................. 62

**Rules**

*Fed. R. App. P. 4(a)(1)(A)* .................................................................................... 9

*Federal Rules of Appellate Procedure 3 and 4* .................................................... 9

## STATEMENT OF JURISDICTION

The district court had jurisdiction under *28 U.S.C. §§ 1331* and *1343* over Appellant's federal claims under *42 U.S.C. § 1983* and the *First* and *Fourteenth Amendments*. It also had supplemental jurisdiction over Appellant's state-law claim under *28 U.S.C. § 1367*.

On January 7, 2026, the district court entered a final judgment dismissing the action and denying the pending motions as moot. *ROA.26-60007.887.* The judgment is final under *28 U.S.C. § 1291*. *Catlin v. United States, 324 U.S. 229, 233 (1945)*.

Appellant Ehiremen Bennard Eriakha filed a timely Notice of Appeal on January 9, 2026. *ROA.26-60007.921.*; *Fed. R. App. P. 4(a)(1)(A)*. This Court has jurisdiction under *28 U.S.C. § 1291* and *Federal Rules of Appellate Procedure 3 and 4*.

## STATEMENT OF ISSUES

1. Whether the district court violated *Rule 12(b)(6)* by resolving disputed factual characterizations and causation issues in Defendants' favor at the pleading stage.

2. Whether the district court erred by applying qualified-immunity standards to official-capacity claims for prospective relief after ruling that those claims were cognizable under *Ex parte Young*.

3. Whether the district court erred by characterizing the Abilities Transcript as a scholastic or program-completion requirement despite governing documents describing it as a developmental mentoring instrument that is "not a grading instrument."

4. Whether the *First Amendment* claims were properly dismissed where the court did not perform the threshold protected-speech inquiry and did not engage the governing doctrine of intimate association.

5. Whether the *Equal Protection* claim was properly dismissed for lack of comparator support where Appellant alleged cohort-based differential treatment and relied on ***Exhibit O*** as corroborating comparator evidence.

6. Whether the *due process* claims were properly dismissed where Appellant alleged deprivation of doctoral-program status, loss of a paid Graduate Research Assistantship, immigration-linked consequences, and failure to follow institutional procedures.

7. Whether the district court erred by dismissing the federal claims with prejudice and without leave to amend absent a finding of futility or that Appellant had pleaded his best case.

8. Whether the district court improperly denied the pending ***Rule 65*** motions as moot and whether consolidation prejudiced Appellant's emergency-motion posture by preventing adjudication of those motions on their merits.

## STATEMENT OF THE CASE

### A. The Parties and the Claims

Appellant Ehiremen Bennard Eriakha was a Black African international doctoral student enrolled in the Ph.D. program in the Department of Pharmacy Administration at the University of Mississippi on an F-1 visa and employed as a Graduate Research Assistant. Appellant's twin brother, Alfred Eriakha, was enrolled in the same doctoral program.

Appellant filed this action on August 25, 2025, alleging that Defendants—the University of Mississippi, Department Chair Dr. Yi Yang, Graduate Program Coordinator Dr. Marie Barnard, Dean of the Graduate School Dr. Annette Kluck, and faculty member Dr. Yinan Huang—violated his *First Amendment*, *equal protection*, and *due process* rights, and breached his *Mentor-Mentee Agreement*. *ROA.26-60007.1.*

The complaint alleged that, following Alfred's protected disability-related advocacy, Defendants unilaterally restructured Appellant's mentoring arrangement through a forced co-mentorship involving the Department Chair, treated the Abilities Transcript—a developmental mentoring instrument the governing documents describe as "not a grading instrument"—as a compliance mechanism, and imposed escalating adverse actions, including provisional status, termination of Appellant's

Graduate Research Assistantship, and ultimate non-degree reclassification with immediate F-1 visa consequences. *ROA.26-60007.1.*

## B. Emergency Motions and Non-Adjudication

Appellant filed emergency motions for a *temporary restraining order* and *preliminary injunction* on September 8, 2025. *ROA.26-60007.190.* Those motions were denied without prejudice on procedural grounds on September 11, 2025. *ROA.26-60007.339.* Appellant filed renewed *Rule 65* motions on September 18, 2025. *ROA.26-60007.427.* Defendants filed oppositions on October 2, 2025, and Appellant replied on October 9, 2025. *ROA.26-60007.681.; ROA.26-60007.748.* The renewed motions were fully briefed as of October 9, 2025.

Defendants moved to dismiss on October 1, 2025. *ROA.26-60007.657.* On October 2, 2025, the magistrate judge stayed discovery pending resolution of the motion to dismiss. *ROA.26-60007.680.* The stay did not adjudicate the *Rule 65* motions.

Appellant moved to expedite a ruling on those motions on November 3, 2025. *ROA.26-60007.818.* No ruling issued. On November 17, 2025, the district court consolidated this action with a related matter and reassigned the case to Senior District Judge Michael P. Mills. *ROA.26-60007.833.* Appellant objected to consolidation on the ground that it would prejudice the emergency-motion posture.

12

The consolidation order acknowledged that the renewed *Rule 65* motions remained pending. No interim relief issued before or after consolidation.

On December 12, 2025, Appellant filed notice in the district court identifying time-sensitive irreparable harms while the *Rule 65* motions remained pending. *ROA.26-60007.845.* The program-status change then took effect on December 15, 2025, while those motions remained unadjudicated. *ROA.26-60007.860.* Appellant moved for immediate adjudication of the pending *Rule 65* motions by January 5, 2026. *ROA.26-60007.860.* That deadline passed without a merits ruling.

By the time final judgment was entered, the renewed *Rule 65* motions had been fully briefed and pending for approximately ninety days. Defendants had represented by November 17 that the motions were ripe for decision on the papers *ROA.26-60007.830.*

**C. The District Court's Dismissal**

On January 7, 2026, at approximately 11:00 a.m., Appellant filed an emergency motion in this Court seeking interim relief tied to the time-sensitive harms identified in the district-court record. *See Exhibit. 01*. Later that day, at approximately 2:19 p.m., the district court entered its Memorandum Opinion and Final Judgment dismissing the action with prejudice and denying all pending motions, including the *Rule 65* motions, as moot. *ROA.26-60007.887.*; *See Exhibit. 02*.

The district court dismissed all federal claims under *Rule 12(b)(6)*, declined supplemental jurisdiction over the state-law breach-of-contract claim under *28 U.S.C. § 1367(c)(3)*, and denied the *Rule 65* motions as moot based on the merits dismissal. *ROA.26-60007.887.*

**D. Notice of Appeal and Current Posture**

Appellant filed a timely Notice of Appeal on January 9, 2026. *ROA.26-60007.921.* Appellant also filed a *Rule 10(b)* statement reflecting that no hearing transcript is required because the case was resolved on the papers. *ROA.26-60007.924.* This appeal followed.

## SUMMARY OF THE ARGUMENT

This appeal presents multiple independently reversible errors. Read as a whole, the opinion reveals a consistent pattern: the district court stated the correct legal standards, then applied different ones; accepted Defendants' characterizations of disputed facts at the *Rule 12* stage; and used those characterizations to collapse distinct constitutional claims into narrower and weaker versions of the case than Appellant actually pleaded.

First, the court recited the correct *Rule 12(b)(6)* and *pro se* standards, then abandoned them. It stated that well-pleaded facts must be accepted as true, the complaint liberally construed, and reasonable inferences drawn in Appellant's favor,

14

but then announced that it would accept Appellant's allegations only insofar as they did not "*contradict the record*." That qualification does not belong in **Rule 12(b)(6)** analysis. It allowed the court to adopt Defendants' competing narrative, resolve factual disputes against Appellant, and dismiss a *pro se* complaint based on citation sufficiency rather than factual plausibility.

Second, the court committed a structural *Ex parte Young* error. It expressly held that Appellant's official-capacity claims for prospective relief against Drs. Yang, Barnard, and Kluck were permitted under *Ex parte Young*. It also correctly defined qualified immunity as a defense to money damages. Yet it later dismissed those same official-capacity claims under the qualified-immunity "*clearly established law*" framework. Those rulings cannot coexist, and that contradiction independently requires reversal of the official-capacity dismissals.

Third, every major dismissal rests on a single load-bearing mischaracterization: the court treated the Abilities Transcript as a scholastic or program-completion requirement even though the governing materials describe it as a developmental mentoring instrument and expressly state that it is "*not a grading instrument*." That document-interpretation error is reviewed de novo and cannot be reconciled with the text of the governing materials. Once corrected, it undermines the opinion's treatment of the AT as academic failure, insubordination, neutral policy application, and scholastic deficiency.

15

Fourth, the *First Amendment* claims were not properly analyzed. The court cited *Kelleher's* insubordination principle without performing the threshold protected-speech inquiry *Kelleher* requires; quoted *Brady's* chronology standard without applying it to the pleaded retaliatory sequence; resolved Defendants' *Mt. Healthy same-decision* defense without evidence at the pleading stage; and dismissed the familial-association theory without engaging **Roberts v. United States Jaycees, 468 U.S. 609 (1984)**, the governing Supreme Court authority on intimate family association.

Fifth, the *equal protection* dismissal rests on material omission and a wrongly framed comparator standard. The opinion never addressed ***Exhibit O***—the Department's own cohort roster, submitted to the district court in support of Appellant's preliminary-injunction motion and present in the record—which shows that Appellant alone was subjected to the challenged co-mentorship structure within an identified doctoral cohort. The court then demanded a comparator who also "*refused*" the AT, thereby building Defendants' disputed characterization of the case into the comparator definition itself and rendering Appellant's actual comparator evidence irrelevant by definition.

Sixth, the *due process* analysis omitted governing authority and applied the wrong framework. The opinion never cited ***Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)***, even though Appellant pleaded loss of a paid Graduate

Research Assistantship as a distinct employment deprivation. The court analyzed enrollment status, assistantship loss, and visa-linked consequences through an academic-status lens, relied on inapposite authority, treated notice of possible consequences as though that exhausted *due process*, and never addressed *substantive due process* at all.

Seventh, the individual-capacity qualified-immunity analysis was independently defective. The court skipped Prong One for every claim, applied the most demanding "squarely governs" formulation without acknowledging ***Hope v. Pelzer, 536 U.S. 730 (2002)***, as an alternative, used summary-judgment burden language in a ***Rule 12*** case, treated four defendants collectively rather than defendant-specifically, and announced in writing that factual characterization was irrelevant to its analysis—the opposite of what ***Rule 12*** requires.

Eighth, the dismissal of the individual-capacity breach-of-contract claim is purely derivative. The district court declined supplemental jurisdiction only because it dismissed all federal claims. If any federal claim is reinstated, the ***§ 1367(c)(3)*** predicate disappears and the individual-capacity contract claim returns automatically.

Ninth, the mootness ruling was procedurally improper. The court denied nine motions as moot—including long-pending, fully briefed ***Rule 65*** motions ripe by

17

Defendants' own November 17 concession—by dismissing the merits claims first and then using that dismissal to eliminate the emergency motions without ever deciding them on the merits. The January 7 sequence—final judgment entered hours after Appellant sought emergency relief in this Court, following eighty-nine days of inaction on fully briefed emergency motions—warrants this Court's attention.

Tenth, dismissal with prejudice without leave to amend violated ***Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998)***. The court quoted the governing rule that a *pro se* complaint generally may not be dismissed with prejudice without an opportunity to amend unless amendment would be futile or the plaintiff had already pleaded his best case. It made neither finding. The deficiencies it identified were pleading-specificity matters of the sort amendment is designed to cure, not legal impossibilities.

Eleventh, consolidation prejudiced Appellant's emergency-motion posture. Appellant objected on the record, identified concrete prejudice, and warned that consolidation before adjudication of the pending ***Rule 65*** motions would neutralize his emergency-relief posture. That is what occurred. Although not the principal basis for reversal, the consolidation ruling is relevant procedural context for the mishandling of the emergency motions throughout the proceedings below.

For these reasons, the judgment should be reversed. At minimum, the with-prejudice federal dismissals should be vacated, the mootness denials set aside, the individual-capacity breach-of-contract claim reinstated alongside any reinstated federal claim, and the case remanded for proceedings under the correct *Rule 12*, *Ex parte Young*, qualified-immunity, and amendment standards.

## STANDARD OF REVIEW

This Court reviews de novo a dismissal under *Rule 12(b)(6)*, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Woodard v. Andrus, 419 F.3d 348, 351 (5th Cir. 2005)*. Whether the complaint states a plausible claim for relief is a question of law. *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)*.

This Court also reviews de novo the district court's legal rulings concerning *Ex parte Young* and qualified immunity. *Raj v. La. State Univ., 714 F.3d 322, 328 (5th Cir. 2013)*; *Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003)*.

Questions concerning interpretation of governing written instruments are reviewed de novo. *In re Katrina Canal Breaches Litig., 495 F.3d 191, 206 (5th Cir. 2007)*.

The district court's consolidation ruling and related case-management decisions are reviewed for abuse of discretion. *Frazier v. Garrison I.S.D., 980 F.2d 1514, 1531*

*(5th Cir. 1993)*; *In re Air Crash Disaster Near New Orleans, La., 767 F.2d 1151, 1155 (5th Cir. 1985)*.

The denial of leave to amend and dismissal with prejudice are reviewed for abuse of discretion. *Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998)*.

## ARGUMENT

### I.   THE DISTRICT COURT'S OWN STANDARD OF REVIEW EXPOSES THE RULE 12 VIOLATIONS

This Court reviews *Rule 12(b)(6)* dismissals de novo and must accept well-pleaded facts as true. *Woodard v. Andrus, 419 F.3d 348, 351 (5th Cir. 2005)*. The error here is straightforward: the district court correctly recited the *Rule 12(b)(6)* and *pro se* standards, then applied materially different ones. That departure is visible on the face of the opinion.

### 1.  The Court Imported Rule 12(b)(1) Fact-Resolution Logic Into the Rule 12(b)(6) Merits Analysis

The district court correctly described the *Rule 12(b)(1)* framework for jurisdictional challenges, including that "*courts may consider the complaint*," "*the complaint supplemented by undisputed facts evidenced in the record*," or "*the complaint supplemented by undisputed facts plus the court's resolution of disputed facts*," and

that a district court is "*free to weigh the evidence and resolve factual disputes*" when determining subject-matter jurisdiction. ***ROA.26-60007.890.***

That recitation is correct as to ***Rule 12(b)(1)***. But its significance here lies in what the court later did with it. The fact-resolution authority described in that passage belongs only to the jurisdictional inquiry. It does not carry over into the merits inquiry. Under ***Rule 12(b)(6)***, the court must accept well-pleaded factual allegations as true and draw reasonable inferences in the plaintiff's favor. ***Iqbal, 556 U.S. at 678***.

Once the jurisdictional questions were resolved, the court's authority to weigh evidence and resolve disputed facts was exhausted. The merits analysis had to proceed under ***Rule 12(b)(6)*** alone. Instead, the opinion carried forward a ***Rule 12(b)(1)***-style method into the ***Rule 12(b)(6)*** analysis. That was the foundational procedural error.

2. **The Court Correctly Quoted Iqbal—and Then Replaced the Standard It Quoted**

The district court correctly stated that to survive ***Rule 12(b)(6)***, "*a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.*" ***ROA.26-60007.891.***

But the court later announced a different rule: "*At this motion to dismiss stage, the Court will accept the allegations that Defendants violated his rights as he claims in his complaint, so long as it does not contradict the record*." ***ROA.26-60007.896.***

That qualification does not appear in *Iqbal*. It does not appear in *Twombly*. And it does not appear in ordinary ***Rule 12(b)(6)*** review. "*Accepted as true*" is not a provisional courtesy subject to withdrawal whenever the court believes "*the record*" points the other way. It is the operative command of pleading-stage review. By converting unconditional acceptance of well-pleaded facts into conditional acceptance filtered through "*the record*," the court replaced the ***Rule 12(b)(6)*** standard it had just recited.

### 3. The Court Reversed the Plaintiff-Favorable Inference Rule

The district court also correctly stated that plausibility turns on whether the complaint permits "*the reasonable inference that the defendant is liable for the misconduct alleged*." ***ROA.26-60007.891.*** At ***Rule 12***, those reasonable inferences must run toward the plaintiff.

The later analysis did the opposite. Appellant pleaded a chronology that included protected advocacy, written objections, escalating coercive actions, rapid status-related consequences, assistantship loss, and eventual program removal. ***ROA.26-60007.1.*** Such a chronology can support a plausible inference of retaliatory motive.

*Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997)*. The court nevertheless drew the opposite inference and then converted it into a factual finding: "*The Court finds that Mr. Bennard's failure to submit the Abilities Transcript is the motivating factor*." ***ROA.26-60007.901.***

That was not a plaintiff-favorable inference. It was a merits-stage causation determination against the pleader. And the same pattern recurs across the opinion. The court inferred "*failure to cooperate*" from conduct Appellant pleaded as documented objection; ***ROA.26-60007.900.***; "*academic decision*" from action Appellant pleaded as retaliatory and procedurally defective; ***ROA.26-60007.903.***; and "*scholastic standards*" from the use of a developmental instrument Appellant pleaded had been repurposed into a punitive compliance mechanism. ***ROA.26-60007.898.*** In each instance, the defendant-favorable inference prevailed over the plaintiff-favorable one.

### 4.  The Court Applied the Twombly Floor as a Ceiling

The district court correctly stated that "*detailed factual allegations are not required and that the complaint need only provide more than labels and conclusions*." ***ROA.26-60007.891.*** Properly applied, that standard sets a floor, not a demand for near-evidentiary precision at the pleading stage.

Appellant's complaint was not formulaic. It identified specific actors, dates, documents, institutional actions, and a detailed chronology linking those actions to the asserted constitutional injuries. ***ROA.26-60007.1.*** Yet the later analysis treated the pleading as though it had failed to clear the *Twombly* floor. The equal-protection discussion demanded comparator precision beyond what ***Rule 12*** ordinarily requires. The due-process discussion faulted Appellant for insufficiently developed legal mapping. And the qualified-immunity analysis repeatedly treated the complaint as though it had to anticipate and defeat later merits arguments in full.

That is not *Twombly* as written. It is the pleading floor treated as a ceiling.

## 5. The Court Stated the *Pro Se* Duty as Mandatory, Then Inverted It Into a Citation Requirement

The district court correctly stated: "*It is the duty of the trial judge to hold pro se complaints to less stringent standards than proper pleadings drafted by lawyers.*" ***ROA.26-60007.891.***

But the later analysis repeatedly faulted Appellant not for lack of factual content, but for lack of doctrinal precision and sufficiently analogous authority. The opinion discounted claims because Appellant relied on nonbinding authority, failed to cite a case "*squarely*" on point, or did not identify precedent placing the issue "*beyond*

24

*debate*." Those are criticisms of legal research and doctrinal fit, not of factual pleading.

That distinction matters. *Rule 12* asks whether the complaint contains sufficient factual matter to state a plausible claim. *Iqbal, 556 U.S. at 678*. It does not ask whether a *pro se* litigant has assembled the optimal body of authority to answer every immunity objection at the outset of the case. By turning *pro se* review into a citation screen, the court applied the duty recognized in *Hepperle v. Johnston, 544 F.2d 201, 202 (5th Cir. 1976)*, in reverse.

### 6. The Court Quoted the Amendment Rule, Made None of the Required Findings, and Dismissed With Prejudice Anyway

The district court correctly quoted *Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998)*, including that dismissal of a *pro se* complaint without an opportunity to amend is generally error unless the plaintiff has pleaded his best case or the dismissal is without prejudice. *ROA.26-60007.891.* It also cited *Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986)*, for the proposition that a plaintiff can be treated as having pleaded his best case only if he has had a "*fair opportunity to make out his case*." *ROA.26-60007.892.*

The court then made none of the required findings. It did not find that Appellant had pleaded his best case. It did not find that amendment would be futile. It did not

explain why Appellant had already enjoyed the fair opportunity *Jacquez* requires. Nor did it dismiss without prejudice. It simply dismissed all federal claims with prejudice.

That omission matters because the deficiencies the opinion identified were matters of specificity and legal framing, not legal impossibility. Those are the kinds of defects amendment is designed to cure.

### 7. The Court Made the Rule 12 Violation Explicit by Declaring Factual Characterization Irrelevant

The opinion ultimately removed any doubt about the method it was using:

> *"The majority of Mr. Bennard's response to the Defendants' qualified immunity defense pertained to issues he had with how Defendants portrayed the record and facts he presented. The manner the facts are presented are not relevant to the Court's qualified immunity analysis. As a result, the Court will limit its analysis to Mr. Bennard's response to the case law he cited to indicate that his violated rights were clearly established."* **ROA.26-60007.897.**

That statement is incompatible with *Rule 12*. At the pleading stage, factual characterization is central, not irrelevant. Whether Appellant's conduct is characterized as refusal or documented objection, whether the chronology is characterized as retaliatory or neutral, and whether the Abilities Transcript is treated as a developmental instrument or a scholastic requirement all bear directly on plausibility. The court had already recited standards requiring acceptance of

Appellant's well-pleaded facts as true, liberal construction of the complaint, and plaintiff-favorable inferences. This passage expressly disclaims those obligations.

The **Rule 12** problem here is therefore not implicit. The court announced it. A **Rule 12(b)(6)** analysis that excludes the plaintiff's factual characterization of the events, then dismisses the claims based on the defendants' characterization of those same events, is not applying the standard the court had just recited. It is applying a different one. Vacatur and remand are therefore required for application of the correct pleading framework.

## II.    OFFICIAL-CAPACITY CLAIMS UNDER *EX PARTE YOUNG*

### 1. The Court Correctly Stated the *Ex parte Young* Standard—Then Required Precisely What That Standard Does Not Require

The district court correctly recited the *Ex parte Young* framework:

> *"A third exception under Ex parte Young allows suit against a state official acting in his official capacity 'as long as the lawsuit seeks prospective relief to redress an ongoing violation of federal law.*
>
> *In determining whether the Ex parte Young exception applies, the district court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.*
>
> *Furthermore, a plaintiff must demonstrate that the state officer has some connection with the enforcement of the disputed act."* **ROA.26-60007.892.**

27

That paragraph is important because it states the scope of the inquiry in limiting terms. The phrase "*need only*" matters. It marks the *Ex parte Young* inquiry as complete once the court determines whether the complaint alleges an ongoing violation of federal law, seeks relief properly characterized as prospective, and names an official with the requisite enforcement connection.

It is equally important for what it does not say. The quoted standard does not ask whether the plaintiff cited "*clearly established law*," identified precedent that "*squarely governs*," or showed that the violation was "*beyond debate*." Those are qualified-immunity formulations. They govern individual-capacity claims for money damages, not official-capacity claims for prospective relief against ongoing violations of federal law.

But the later analysis required precisely what this standard does not require. The court faulted Appellant for not citing sufficiently specific authority, not identifying precedent that "*squarely governs*," and not showing that the alleged violations were established "*beyond debate*." Those requirements do not belong to the *Ex parte Young* inquiry the court had just correctly described.

That is the contradiction. The court stated a standard with no qualified-immunity component, then applied qualified-immunity requirements to the claims governed by that standard.

## 2. The Structural Error Appears on the Face of the Opinion

The contradiction requiring reversal can be seen by reading three passages of the opinion in sequence.

First, the court cleared the official-capacity claims under *Ex parte Young*:

> *"Mr. Bennard's § 1983 claims for prospective relief against Dr. Barnard, Dr. Yang, and Dr. Kluck in their official capacities is allowed under Ex parte Young."* **ROA.26-60007.894.**

At that point, the sovereign-immunity inquiry as to those claims was complete. The court had already concluded that the complaint alleged ongoing violations of federal law and sought prospective relief from the relevant state officials.

Second, the court correctly defined qualified immunity and identified the claims to which it applies:

> *"Defendants Dr. Yi Yang, Dr. Marie Barnard, Dr. Annette Kluck, and Dr. Yinan Huang (collectively 'The named Defendants') raised a qualified immunity defense in response to Mr. Bennard's claims against them in their individual capacities. Qualified immunity is a judicially created legal doctrine which 'shields federal and state officials from money damages.'"* **ROA.26-60007.894.**

That definition matters because it states both the scope and the target of the doctrine. Qualified immunity is a defense to individual-capacity claims for money damages. It is not a doctrine governing official-capacity claims for prospective relief.

Third, the court then applied the qualified-immunity "*clearly established law*" framework to the official-capacity claims it had just cleared under *Ex parte Young*. ***ROA.26-60007.899.***

Those three steps cannot be reconciled. The court first held that the official-capacity claims for prospective relief were allowed under *Ex parte Young*. It then correctly defined qualified immunity as an individual-capacity defense to money-damages claims. It then dismissed the cleared official-capacity claims under qualified-immunity standards.

This Court need not resolve the merits of the underlying constitutional claims to identify that error. The problem is antecedent to the merits. The First Amendment, equal protection, and due process official-capacity claims were not evaluated under the framework that governed them. They were evaluated under a different framework that the court itself had already described as belonging to a different category of claims and a different form of relief.

## 3. The Court Subjected the Official-Capacity Claims to Standards More Demanding Than Ordinary Plausibility Review

The district court also announced the following standard for the official-capacity claims:

*"The Fifth Circuit has recognized that Section 1983 claims against public officials are subject to a heightened pleading requirement; a plaintiff 'must do more than allege conclusions;' they must assert 'claims of specific conduct and actions giving rise to a constitutional violation.' Baker v. Putnal, 75 F.3d 190, 195 (5th Cir. 1996) (citing Schultea v. Wood, 47 F.3d 1427, 1434 (5th Cir. 1995) (en banc)). The Court will evaluate whether Mr. Bennard sufficiently stated a claim under this heightened standard."* **ROA.26-60007.899.**

That passage imposed a more demanding framework than ordinary **Rule 12** plausibility review on claims that had already been cleared for prospective-relief analysis under *Ex parte Young*.

First, *Schultea* and *Baker* arose in the qualified-immunity setting. Their concern was the level of specificity required when a public official raises qualified immunity against an individual-capacity claim. Whatever force that doctrine retains, its logic is tied to qualified immunity. It does not naturally extend to official-capacity claims for prospective relief, where qualified immunity does not apply and where the court had already determined that *Ex parte Young* supplied the relevant framework.

Second, the court's use of a "heightened" pleading standard is difficult to reconcile with the rest of its **Rule 12** discussion. Earlier in the opinion, the court correctly recited the ordinary plausibility framework under *Iqbal* and *Twombly*, including acceptance of well-pleaded facts as true, liberal construction, and plaintiff-favorable inferences. Once sovereign immunity was no longer an obstacle, the official-capacity claims should have been tested against that ordinary **Rule 12** standard.

31

Third, that move did not occur in isolation. By that point, the official-capacity claims had already been evaluated through standards borrowed from qualified immunity. The result was that claims seeking prospective official-capacity relief were not tested under ordinary plausibility review, but under a combination of standards more demanding than the one that should have governed them.

The problem, then, is not merely that the court cited *Baker* and *Schultea*. It is that the court used a qualified-immunity-linked specificity requirement to evaluate official-capacity prospective-relief claims that should have been analyzed under ordinary **Rule 12** plausibility once *Ex parte Young* cleared the sovereign-immunity obstacle.

## III.  INDIVIDUAL-CAPACITY CLAIMS AND QUALIFIED IMMUNITY

### 1.  The Court Applied a Summary-Judgment Burden in a Rule 12 Case

The district court framed qualified immunity as follows:

> *"The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct. The plaintiff, not the defendant, must do the majority of the work in the qualified immunity context."* **ROA.26-60007.895.**

That formulation is mismatched to the procedural posture of this case. "*Genuine issues of material fact*" is summary-judgment language. It presupposes an evidentiary record against which factual disputes can be measured. At **Rule 12(b)(6)**,

by contrast, the question is whether the complaint's well-pleaded factual allegations, accepted as true, plausibly state a claim. *Iqbal, 556 U.S. at 678*.

That distinction matters because the opinion did not merely quote a demanding standard in passing. It used that standard to frame the qualified-immunity analysis from the outset. Once the court treated Appellant as though he had to "*demonstrate genuine issues of material fact*," dismissal became easier to justify regardless of the sufficiency of the pleaded allegations. At that stage, Appellant had no discovery, no evidentiary record, and no access to internal materials that might later bear on motive, coordination, or institutional process. Requiring a showing calibrated to factual development before factual development had occurred raised the bar above what *Rule 12* permits.

The same problem appears in the court's statement that the plaintiff "*must do the majority of the work*." At *Rule 12*, that "*work*" consists of factual pleading, not evidentiary demonstration. The court blurred that distinction and effectively required Appellant to rebut immunity with something closer to proof than to plausible allegations.

## 2. The Court Announced the Two-Prong Framework, Then Bypassed Prong One

The district court correctly recited the basic qualified-immunity framework:

> *"To rebut a qualified immunity defense, the plaintiff must have alleged a violation of a constitutional right and whether the right at issue was clearly established at the time of the alleged violation. Cope v. Cogdill, 3 F.4th 198, 204 (5th Cir. 2021) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). The Supreme Court stated that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. Ashcroft, 563 U.S. at 735."*. **ROA.26-60007.895.**

That statement is correct. Qualified immunity requires two distinct inquiries: *whether the facts alleged make out a constitutional violation*, and *whether the right was clearly established at the time*. **Saucier v. Katz, 533 U.S. 194, 201 (2001)**. *Pearson* allows a court to choose the order of decision. It does not allow the court to collapse the framework into a single inquiry about whether the plaintiff cited enough authority.

Yet that is effectively what happened here. The court did not perform a clear, defendant-specific Prong One analysis. Instead, it moved quickly to whether Appellant had cited sufficiently governing precedent.

That shortcut became explicit when the court wrote:

> *"Even assuming the allegations in his complaint are sufficient to meet the first element, he has not cited sufficient case law to show that the rights violated were clearly established."* **ROA.26-60007.896.**

That phrase—"*even assuming*"—did substantial work. It allowed the court to avoid deciding whether the complaint plausibly alleged constitutional violations at all and to proceed directly to a citation-centered clearly-established-law inquiry. As a result,

there is no meaningful Prong One analysis for this Court to review if the Prong Two analysis proves defective. If this Court concludes that the clearly-established-law analysis was too rigid or otherwise flawed, remand is required for proper analysis of both prongs.

### 3. The Court Treated Four Defendants Collectively Rather Than Defendant-Specifically

The district court also stated:

> *"In this case, Defendants Dr. Yang, Dr. Barnard, Dr. Kluck, and Dr. Huang are all officials working for the University of Mississippi, a state agency. All of the named defendants are government officials whose positions involve the exercise of discretion, so they are able to raise a good faith qualified immunity defense. ... The burden has shifted to the plaintiff, Mr. Bennard, who has responded to Defendants' qualified immunity motion."* ***ROA.26-60007.895.***

The threshold proposition that the individual defendants may invoke qualified immunity is not the problem. The problem is what followed. Qualified immunity is a defendant-specific doctrine. It turns on what each defendant allegedly did and whether that specific conduct violated clearly established law. Yet the analysis that followed largely addressed "*the named Defendants*" collectively rather than separating Dr. Yang's alleged conduct from Dr. Barnard's, Dr. Kluck's, or Dr. Huang's.

That matters because the pleaded conduct was not identical across defendants. Qualified immunity cannot properly be resolved in the aggregate when the pleaded roles and acts differ.

### 4. The Court Applied the Most Demanding Clearly-Established-Law Formulation as Though It Were the Only One

The district court recited the clearly established law standard as follows:

> "Regarding the clearly-established-right prong, '[a] right is "clearly established" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."' Cope, 3 F.4th at 204 (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). 'Unless existing precedent "squarely governs" the conduct at issue, an official will be entitled to qualified immunity.' (citing Brosseau v. Haugen, 543 U.S. 194, 201 (2004) (per curiam))." **ROA.26-60007.896.**

It later added:

> "There is no clear indication on his part showing how the case law he cites classifies the named Defendants' particular actions as violations beyond debate. ... Clearly established law must not be defined at a high level of generality." **ROA.26-60007.897.**

Those formulations are doctrinally valid, but they are the most demanding versions of the clearly-established inquiry. The opinion applied them as though they were the only relevant formulations. It did not meaningfully engage the Supreme Court's fair-warning principle: *that officials may be on notice that their conduct is unlawful even without a prior case directly on point*. **Hope v. Pelzer, 536 U.S. 730, 741 (2002)**.

36

That mattered here. Under a rigid "*squarely governs*" approach, Appellant would need a prior case mirroring the precise combination of mentoring restructuring, Abilities Transcript conflict, provisional-status consequences, assistantship loss, and alleged retaliation. Under *Hope's* fair-warning approach, the question is different: whether existing First Amendment, equal protection, and due process law gave reasonable officials notice that the alleged conduct was unlawful even if no prior case replicated every factual detail. The opinion never seriously undertook that inquiry.

## 5. The Court Dismissed Recognizable Constitutional Precedents as "Too General" Without Explaining Why They Did Not Give Fair Warning

The district court addressed Appellant's cited authorities as follows:

> *"The named Defendants argue that Mr. Bennard has not cited a factually analogous case holding that the named Defendants' specific conduct was unconstitutional. The Court agrees with this assertion. Mr. Bennard cited some case law, but none of it 'squarely governs' Defendants' conduct at issue. ... Mr. Bennard is citing the following cases to show that his allegedly violated rights were clearly established, but he does so at a high level of generality: Pickering ... Dixon ... Goss ... Olech ...."* **ROA.26-60007.897.**

That treatment is analytically insufficient. The cited cases were not random invocations of broad constitutional values. They represented recognizable doctrinal lines: retaliation for protected speech, procedural protections for educational deprivations, and equal protection against unequal governmental treatment. The

37

opinion identified those precedents, labeled them too general, and moved on. What it did not do was explain why those precedents failed to place reasonable officials on notice that the alleged conduct here was unlawful.

That omission matters because the clearly-established inquiry is not answered merely by observing that a cited case arose in a different factual setting. Under *Hope*, the relevant question is whether existing law gave fair warning, not whether a prior case mirrored every factual detail of the present dispute. Once the district court identified *Pickering*, *Dixon*, *Goss*, and *Olech* as the authorities Appellant relied on, it had to do more than say they were cited at a "*high level of generality*." It had to explain why the doctrinal rules those cases established would not have alerted reasonable officials to the constitutional implications of the conduct alleged here.

The opinion never performed that analysis.

### 6. The Court Declared Factual Characterization Irrelevant Even Though Qualified Immunity at Rule 12 Depends on the Facts as Pleaded

The district court described its own method as follows:

> *"The majority of Mr. Bennard's response to the Defendants' qualified immunity defense pertained to issues he had with how Defendants portrayed the record and facts he presented. The manner the facts are presented are not relevant to the Court's qualified immunity analysis. As a result, the Court will limit its analysis to Mr. Bennard's response to the case law he cited to indicate that his violated rights were clearly established."*
> ***ROA.26-60007.897.***

That statement is incompatible with ***Rule 12***. At the pleading stage, factual characterization is central to qualified immunity, not irrelevant. The inquiry asks whether the facts alleged, taken as true, state a violation of clearly established law. Whether conduct is characterized as insubordination or as documented policy-based objection determines which doctrinal framework applies. A court cannot decide whether existing law gave fair warning without first deciding what conduct it is evaluating—and at ***Rule 12***, it must evaluate the conduct as the plaintiff plausibly alleges it, not as the defendants prefer to describe it.

That error was not harmless. The opinion's *First Amendment*, *equal protection*, and *due process* analysis all depended on defendant-favorable characterizations of the conduct: refusal rather than objection, insubordination rather than advocacy, and neutral academic consequence rather than retaliatory or procedurally defective action. Once the court announced that it would not consider Appellant's competing factual characterizations, the later legal analysis became largely predetermined.

That is why the qualified-immunity analysis cannot stand. The court applied a summary-judgment-inflected burden in a ***Rule 12*** case, bypassed meaningful Prong One analysis, treated four defendants collectively, applied the most demanding clearly-established-law formulation without engaging *Hope's* fair-warning principle, dismissed recognizable constitutional authorities as too general without explanation, and then declared factual characterization irrelevant. Each error independently

weakens the analysis. Together they require vacatur and remand for application of the correct qualified-immunity framework.

## IV. THE FIRST AMENDMENT CLAIMS WERE NOT PROPERLY ANALYZED

### 1. The Court Never Performed the Threshold Protected-Speech Analysis; It Assumed the Answer From Defendants' Labels

The district court framed Defendants' First Amendment argument as follows:

> *"Defendants argue that Mr. Bennard did not adequately raise a First Amendment retaliation claim because he did not plausibly allege that he was placed on provisional status due to activity protected by the First Amendment. 'Whether speech is entitled to First Amendment protection is a question of law.' The Defendants argue that there is no case law establishing a student's refusal to accept department instructions related to his academic program, such as Mr. Bennard's refusal to submit the Abilities Transcript, as protected activity under the First Amendment.* **ROA.26-60007.900.**

> *Mr. Bennard's communications are not protected speech because he failed to cooperate with the Defendants' requirement to submit his Abilities Transcript. See Kelleher, 761 F.2d at 1084. The actions taken by Defendants in response to this unprotected speech are not actionable."* **ROA.26-60007.900.**

That framing identified the correct threshold question: whether Appellant's conduct was protected by the First Amendment. But the court never performed that analysis. Instead, it adopted Defendants' labels—"*refusal*," "*failure to cooperate*," and "*insubordination*"—and used them to answer the legal question before analyzing it.

That reversed the required sequence. Whether Appellant's conduct was protected advocacy or unprotected insubordination was itself the issue the court had to decide. Appellant's verified complaint did not describe his conduct as bare refusal to follow academic instructions. It described formal written objections to what he alleged was an unauthorized restructuring of a signed mentoring arrangement, together with policy-based challenges to the way the Abilities Transcript process was being administered. ***ROA.26-60007.1.*** On Appellant's pleaded facts, the question was not whether bare noncompliance is protected, but whether formal written objections and documented complaints about allegedly unlawful or procedurally defective institutional conduct constitute protected speech or petitioning activity.

The court never asked that question. It framed the inquiry around "*refusal to accept department instructions,*" which effectively predetermined the result. The First Amendment analysis therefore went wrong at the threshold: the court converted a disputed characterization into a legal premise and used Defendants' labels to do the constitutional work the court itself was required to do.

2. **The Court Required Appellant to Disprove Defendants' Labels Instead of Evaluating His Well-Pleaded Speech as True**

The district court later stated:

> "*Mr. Bennard argues that his downgrade in status occurred because he complained about the unilateral alteration of his mentorship agreement and that his complaints were merely*

*legitimate requests to force the faculty to adhere to University policy, rather than acts of insubordination.* **ROA.26-60007.900.**

*Mr. Bennard did not cite to any law establishing this communication as protected, and how it differs from insubordination.* **ROA.26-60007.900.**

*He characterizes his communications as 'professional' and 'evidence-based,' but does not refute that he refused to submit his Abilities Transcript despite requests from faculty."* **ROA.26-60007.900.**

That passage contains three errors. First, it demanded legal citation where **Rule 12** required factual allegations. At the pleading stage, Appellant's burden was to allege facts that, accepted as true, plausibly stated a *First Amendment* claim. **Iqbal, 556 U.S. at 678**. The court instead faulted him for not citing authority "establishing" that his communications were protected and different from insubordination.

Second, the court did not meaningfully engage Appellant's factual characterization of his communications. As pleaded, "professional" and "evidence-based" described formal written objections, policy-based complaints, and documented challenges to asserted procedural irregularities. **ROA.26-60007.1.** Those factual descriptions bore directly on whether the conduct resembled protected advocacy or petitioning rather than unprotected insubordination.

Third, the court stated the burden backwards when it said Appellant "*does not refute that he refused.*" "*Refused*" was Defendants' contested characterization of the conduct, not a neutral fact Appellant had to disprove. At **Rule 12**, the court was

required to assess the complaint under Appellant's well-pleaded version of events, drawing reasonable inferences in his favor. Instead, it treated Defendants' label as the default account and Appellant's alleged failure to negate it as confirmation.

### 3. Kelleher Required a Protected-Speech Analysis; the Court Replaced It With an Insubordination Label

The district court quoted Kelleher as follows:

> *"'To prove a retaliation claim cognizable under the First Amendment, the plaintiff must show that her speech was constitutionally protected and that it was a substantial or motivating factor in the defendant's decision.' Kelleher v. Flawn, 761 F.2d 1079, 1083 (5th Cir. 1985) (quoting Mt. Healthy City Sch. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).* **ROA.26-60007.899.**

> *They even argue that, in the public employment context, the First Amendment does not shield speech and conduct amounting to insubordination directed at school officials." (quoting Kelleher, 761 F.2d at 1084).* **ROA.26-60007.900.**

That quotation identifies the sequence the court had to follow: first determine whether the speech was protected; then determine whether it was a substantial or motivating factor in the adverse action. The court did not follow that sequence. It treated "*insubordination*" as the answer to the first question without performing the protected-speech analysis the first question required.

The problem is compounded by doctrinal fit. *Kelleher* arose in the public-employment context. Appellant pleaded a hybrid role: doctoral student, Graduate

43

Research Assistant, and party to an executed Mentor-Mentee Agreement. ***ROA.26-60007.1.*** Before importing *Kelleher's* employment-derived insubordination principle wholesale, the court needed to ask whether that framework fit a dispute over mentoring structure, academic process, and status-related consequences. The opinion never analyzed that doctrinal fit.

## 4. The Court Quoted Brady's Chronology Rule but Replaced It With a Mt. Healthy Finding for Defendants

The district court recited the Brady causation standard as follows:

> *"The plaintiff may meet this burden with direct evidence or through 'a chronology of events from which retaliation may be plausibly inferred.' Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997)."* ***ROA.26-60007.899.***

Appellant pleaded exactly that kind of chronology: Alfred's protected advocacy preceded the co-mentor directive; Appellant's objections followed; formal warnings escalated; provisional-status action followed; and assistantship loss and later status degradation occurred in close temporal sequence. ***ROA.26-60007.1.*** At ***Rule 12***, the court had to ask whether that chronology, accepted as true and construed in Appellant's favor, plausibly supported a retaliatory inference under *Brady*.

It did not. Instead, it replaced the Brady inquiry with a same-decision finding:

> *"The Court finds that Mr. Bennard's failure to submit the Abilities Transcript is the motivating factor for his provisional status, and the record supports the Defendants'*

44

*contention that even if Mr. Alfred never made complaints about the graduate program, they still would have assigned Mr. Bennard provisional student status for failing to complete his Abilities Transcript. See Mooney, 538 F. App'x at 455."* **ROA.26-60007.901.**

That was error. Once a plaintiff plausibly alleges retaliatory action motivated by protected conduct, the same-decision defense is Defendants' burden. ***Mt. Healthy, 429 U.S. at 287***. But instead of asking whether Appellant had plausibly alleged retaliatory causation, the court moved directly to its own finding that AT non-submission was the motivating factor. That is not a ***Rule 12*** plausibility determination. It is a factual resolution of motive in Defendants' favor.

By stating that "*the record supports Defendants' contention*" and that "*even if Mr. Alfred never made complaints,*" the same action would have occurred, the court made an actual causation finding, treated Defendants' competing explanation as the record-supported account, and answered the *Mt. Healthy* counterfactual in Defendants' favor before discovery. That inverted the burden.

5. **The Court Reduced a Roberts-Based Familial-Association Theory to an Adler Citation Problem**

The district court framed the familial-association theory as follows:

*"Mr. Bennard asserts his First Amendment right was violated and cites Adler v. Pataki to argue that he has a clearly established cause of action for retaliation due to maintaining his relationship with his brother Alfred. In Adler, the Second Circuit recognized that*

*retaliation for action taken by a spouse is a violation of the First Amendment's right of intimate association. **ROA.26-60007.897.***

*Adler is a Second Circuit opinion which is not binding on this Court. Without any citation to an analogous Fifth Circuit or Supreme Court case on the matter, Mr. Bennard's First Amendment allegations fail to overcome the named Defendants' qualified immunity defense."* **ROA.26-60007.898.**

That framing set up the error that followed. By presenting *Adler* as though it were the doctrinal source of the claim, the court made it possible to dismiss the theory simply because *Adler* is a Second Circuit case. But Appellant's familial-association theory did not depend on Adler as its constitutional foundation. It depended on ***Roberts v. United States Jaycees, 468 U.S. 609 (1984)***, which recognized constitutional protection for intimate human relationships, with family relationships as the paradigm case.

Because Adler was at most a nonbinding application of *Roberts*, its nonbinding status could not by itself dispose of the claim unless the court first engaged *Roberts* and explained why it did not apply here. The opinion never did that. Instead, it reduced a *Roberts*-based claim to an *Adler* citation problem, applied an overly demanding clearly-established-law standard, and repeated the *Ex parte Young* error by using qualified-immunity reasoning against official-capacity claims already cleared for prospective relief.

The court compounded that error when it later wrote:

46

*"Assuming this Court would recognize a cause of action for retaliation for associating with a sibling, as Mr. Bennard argues by citing Adler v. Pataki, a second circuit opinion, Mr. Bennard has not adequately alleged that his downgrade in status was caused by his brother's complaints rather than his own failure to submit the Abilities Transcript. 185 F.3d 35 (2d. Cir. 1999); see Kelleher, 761 F.2d at 1083."* **ROA.26-60007.901.**

That sentence did two impermissible things at once. First, it treated a *Roberts*-based right as merely hypothetical. Second, it dismissed causation without performing the chronology analysis the opinion itself had identified as governing. The existence of Defendants' competing explanation did not by itself defeat Appellant's pleaded retaliatory inference at *Rule 12*.

So the familial-association theory was never properly adjudicated. It was recast as a citation problem and then dismissed by choosing Defendants' explanation over Appellant's pleaded chronology at the pleading stage.

## V. THE EQUAL PROTECTION CLAIMS WERE DISMISSED WITHOUT ENGAGING THE RELEVANT COMPARATOR THEORY

### 1. The Court Dismissed for Lack of Comparator Support Without Addressing Exhibit O

The district court framed the equal-protection issue as follows:

*"Mr. Bennard claims that the actions taken against him were due to discrimination based on his race as a Black man, and his national origin as an African in violation of his right to equal protection. The Defendants state that Mr. Bennard's equal protection claims must fail because while he claims to have been treated differently than similarly situated White*

*or U.S.-born students, he fails to point to any specific person or make any factual allegations about their circumstances. **ROA.26-60007.901.***

*His complaint alleges that other similarly situated students never faced changes to their mentoring agreements or reclassification as provisional students, but he points to no specific person in similar circumstances who is not within Mr. Bennard's protected class who was treated differently. **ROA.26-60007.902.***

*Mr. Bennard's equal protection claim fails because he did not sufficiently allege that he has been treated differently from others similarly situated. See Rountree v. Dyson, 892 F.3d 681, 685 (5th Cir. 2018)." **ROA.26-60007.902.***

That framing correctly identified the central issue: whether Appellant plausibly alleged differential treatment relative to similarly situated students outside his protected class. But having identified that issue, the court resolved it without addressing the record material Appellant says directly bore on it.

Appellant's pleaded comparator theory was that he alone, within the doctoral cohort, was subjected to the challenged co-mentorship structure involving the Department Chair. ***ROA.26-60007.887.*** After filing the complaint, he placed ***Exhibit O*** in the district-court record in support of preliminary relief and described it as the Department's Fall 2025 Graduate Student Developmental Mentor Assignment roster identifying the doctoral cohort and their mentoring assignments. ***ROA.26-60007.518.*** On Appellant's account, ***Exhibit O*** showed his distinct treatment within that cohort.

48

If so, ***Exhibit O*** was directly relevant comparator evidence. It corroborated the cohort-based theory already described in the complaint by identifying the relevant group and allegedly showing Appellant's unique treatment within it. Yet the opinion dismissed for lack of comparator support without discussing that document at all.

That was error at the pleading stage. ***Rule 12*** did not require Appellant to provide discovery-level comparator detail. The question was whether the complaint plausibly supported an inference of intentional differential treatment. ***Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Iqbal, 556 U.S. at 678***. A plaintiff is not ordinarily required, before discovery, to identify a perfectly matched comparator with complete demographic and disciplinary detail, especially where the institution controls much of the underlying information. Here, Appellant alleges that he later obtained and placed in the district-court record the most probative comparator document available to him: the Department's own roster. The court nonetheless dismissed for lack of comparator specificity without acknowledging the document that, according to Appellant, confirmed the cohort-wide comparison his complaint had already described.

## 2. The Court Defined the Comparator Class Around Defendants' Disputed "Refusal" Premise

The district court dismissed the equal protection claim as follows:

*"Notably, he does not allege that any non-Black or non-African student who refused to complete the Abilities Transcript was treated differently than himself. Mr. Bennard's equal protection claims are 'merely legal conclusions that we are not required to credit.' For this reason, Mr. Bennard's equal protection claim shall be dismissed for failure to state a claim upon which relief could be granted."* **ROA.26-60007.902.**

That characterization does not fit the complaint Appellant filed. Rountree's "*merely legal conclusions*" language applies to pleadings that assert discrimination in conclusory terms without factual content making the inference of intentional differential treatment plausible. It does not fit a pleading that identifies specific actors, specific conduct, specific dates, and a concrete comparator theory grounded in differential treatment within an identified cohort.

Appellant alleged that he was a Black African international student, that specific officials took specific adverse actions against him, that those actions were preceded by a unique mentoring restructuring, and that no other student in the doctoral cohort was subjected to the same arrangement. **ROA.26-60007.1.; ROA.26-60007.584.** He also later placed **Exhibit O** in the district-court record and described it as showing the cohort and their mentoring assignments. **ROA.26-60007.887.** On Appellant's account, that document corroborated his unique treatment within the relevant group. Those allegations are not bare legal conclusions.

The comparator definition was also wrong. By requiring Appellant to identify a non-Black or non-African student who also "*refused to complete the Abilities*

*Transcript,*" the court defined the comparator class around Defendants' disputed characterization of Appellant's conduct. But Appellant's theory was not that he was one among several students who simply refused an ordinary requirement and was punished more harshly. His theory was that he was subjected to a unique antecedent condition: a forced co-mentorship structure involving the Department Chair, an assertedly unauthorized alteration of a signed mentoring arrangement, and a coercive Abilities Transcript process. ***ROA.26-60007.1.; ROA.26-60007.584.*** On his account, those conditions distinguished him from the rest of the cohort before the submission issue ever arose.

That meant the court looked for the wrong comparison. On Appellant's theory, the relevant question was not whether another student outside his protected class also failed to submit the Abilities Transcript and was treated differently. It was whether similarly situated doctoral students outside his protected class were subjected to the same antecedent conditions that Appellant says precipitated the non-submission and the adverse actions that followed. As Appellant described it, ***Exhibit O*** addressed that question by identifying the cohort and their mentoring assignments and by showing that Appellant alone was subjected to the challenged co-mentorship structure. ***ROA.26-60007.1.; ROA.26-60007.584.*** The court's comparator formulation made that evidence immaterial by definition.

So the equal-protection dismissal rested on two linked errors: the court ignored the record material Appellant says corroborated his pleaded comparator theory, and it defined the comparator class around Defendants' disputed "*refusal*" premise rather than the theory Appellant actually pleaded. On de novo review, the comparator inquiry should be framed around the theory Appellant actually pleaded, not around the label the court borrowed from Defendants.

## VI.    THE DUE PROCESS CLAIMS WERE DISMISSED UNDER THE WRONG FRAMEWORKS AND WITHOUT ANALYSIS OF SEPARATE INTERESTS

### 1. The Court Treated a Multi-Interest Due Process Claim as Though It Involved Only One "Affected Interest" and Simply Inherited the AT Characterization "From Above"

The district court framed the due process claim as follows:

> "*Mr. Bennard claims that his procedural and substantive due process rights were violated when the Defendants placed him on provisional status and did not renew his Graduate Research Assistantship position without adequate notice, hearing, or impartial review. The Defendants posit that Mr. Bennard's due process claim fails as his affected interest is not a protected property interest meriting due process.* **ROA.26-60007.903.**

> *The threshold issue in a due process claim is whether a protected property interest exists. Wigginton v. Jones, 964 F.3d 329, 335 (5th Cir. 2020). 'If there is no protected property interest, there is no process due.' Spuler v. Pickar, 958 F.2d 103, 106 (5th Cir. 1992).* **ROA.26-60007.903.**

52

*The United States Supreme Court 'has not held college academic decisions implicate property or liberty interests, entitling a student to constitutional due-process protections.' Smith v. Davis, 507 F. App'x 359, 362 (5th Cir. 2013).* **ROA.26-60007.903.**

*The Court determined above that the downgrade in status as a result of Mr. Bennard's refusal to submit his Abilities Transcript is an academic decision, so any associated interest is not protected so as to require due process."* **ROA.26-60007.903.**

That passage identifies more than one interest, but the analysis treated them as though they rose or fell together. Appellant pleaded at least two distinct interests: his status in the doctoral program and his paid Graduate Research Assistantship. The opinion itself acknowledged both. But instead of analyzing them separately, the court absorbed both into a single academic-decision framework and let the characterization of the provisional-status action control everything else.

That was error. The enrollment-status interest and the assistantship interest arise from different institutional relationships and require different analysis. The first concerns Appellant's standing in the doctoral program. The second concerns the loss of a paid position at a public institution. Even if the two events were temporally related, they were not constitutionally identical.

That distinction mattered here because, as pleaded, the assistantship loss was not merely descriptive fallout from the status decision. It was communicated separately, by a specific administrator, on a separate day, with immediate consequences for income and status. ***ROA.26-60007.1.*** Once the opinion recognized that the Graduate

Research Assistantship was a "*position*" that was "*not renewed,*" it had to confront whether that interest required its own due process analysis rather than being dismissed derivatively through the academic-status discussion.

The problem was compounded by the court's use of the phrase "*any associated interest*." Having "*determined above*" that the status downgrade was academic, the court treated every connected deprivation—academic status, assistantship loss, and downstream consequences—as automatically unprotected. That was not independent due process analysis. It was categorical spillover from the contested premise that the Abilities Transcript-based action was academic.

## 2. The Court Never Analyzed the Assistantship Loss Under the Governing Employment Due Process Framework

The word *Loudermill* does not appear in the district court's opinion. ***Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)***, is the governing Supreme Court authority on property interests in continued public employment and the process due before deprivation of such an interest. Yet the opinion never cited it, never discussed it, and never analyzed the Graduate Research Assistantship under its framework.

That omission matters because the authorities the opinion did rely on addressed a different kind of interest: academic status and the student–institution relationship.

But Appellant pleaded not only an academic-status deprivation; he also pleaded loss of a paid position at a public institution. Once the opinion itself acknowledged that the Graduate Research Assistantship was a "*position*" that was "*not renewed,*" the court had to determine whether that employment-related interest carried its own due process protection.

That is where *Loudermill* comes in. When state law, institutional rules, or established practices create a legitimate claim of entitlement to continued public employment, due process requires notice and an opportunity to respond before termination. ***470 U.S. at 538–46***. The relevant inquiry is therefore specific to the employment relationship: what rules governed the position, what expectations of continuation existed, what procedures applied to nonrenewal or termination, and what pre-deprivation process was required if a protected interest existed. The opinion never asked those questions.

This is not a case of citing the right authority and finding it inapplicable. It is a case of not engaging the governing authority at all. The opinion did not examine the assistantship's terms, did not analyze whether university policies or practices created a legitimate expectation of continued appointment, and did not ask what process was due before the assistantship ended. Instead, the assistantship loss was absorbed into the academic-status discussion and dismissed by inheritance from that analysis.

### 3.  The Court Used Educational-Status Cases to Resolve Program Removal, Assistantship Loss, and Visa-Linked Harm

The district court relied on *Nevares* and *Pickett* to conclude that no protected interest was implicated. ***ROA.26-60007.903.*** Those authorities do not resolve the interests Appellant actually pleaded.

First, ***Nevares v. San Marcos Consolidated Independent School District, 111 F.3d 25 (5th Cir. 1997)***, arose in a materially different constitutional setting: a K–12 disciplinary transfer within the compulsory public-school system. Its logic was tied to continued access to public education. That framework does not map neatly onto a doctoral student's claims involving loss of graduate-program standing, loss of a paid assistantship, and visa-linked consequences.

Second, even on its own terms, *Nevares* does not fit comfortably here. By the district court's own account, Appellant was ultimately "*classified as no longer a student in the Ph.D. program in the Department of Pharmacy Administration.*" ***ROA.26-60007.889.*** That is not analogous to an intra-system transfer that leaves the plaintiff in substantially the same educational framework.

Third, *Pickett* involved academic-performance deficiencies in a professional program. This case, as pleaded, involved non-submission of an Abilities Transcript that Appellant says the governing materials describe as "not a grading instrument,"

56

together with a disputed mentoring-process conflict and the status consequences that followed. Whether a case about academic-performance failure extends to a dispute over a developmental mentoring instrument depends on accepting the premise that the AT functioned as an academic evaluative requirement in the same sense. That premise is itself disputed here.

And fourth, neither *Nevares* nor *Pickett* resolved the assistantship issue. A rule about continued access to education does not answer whether a paid position at a public institution carried a protectable interest. Nor did those cases resolve the immigration-linked consequences the opinion's own Background acknowledged endangered Appellant's ability to comply with his visa, remain in the country, and continue his education.

4. **The Court Distinguished Dixon Only by Accepting Two Disputed Premises in Defendants' Favor**

The district court distinguished Dixon by reasoning that Appellant was not expelled or suspended, was "merely" placed on provisional status, and suffered adverse action because he failed to complete the Abilities Transcript, "rather than for any disciplinary reasons." ***ROA.26-60007.898.***

That analysis is defective because it depends on two disputed premises resolved against Appellant at ***Rule 12***.

57

The first premise is the AT characterization. The court treated the Abilities Transcript as an academic or scholastic requirement. But Appellant's position was that the governing materials described the AT as a developmental mentoring instrument and expressly as "not a grading instrument." ***ROA.26-60007.532.*** If that is correct, then the court could not simply classify the AT dispute as a scholastic-standards matter and invoke Dixon's academic/misconduct distinction as though the predicate were established.

The second premise is causation. The court said the adverse actions "were due to" failure to complete the AT "rather than for any disciplinary reasons." But Appellant's complaint alleged the opposite: that the AT rationale was pretextual and that the adverse actions were part of a punitive and retaliatory sequence triggered by the challenged mentoring intervention and Appellant's objections to it. ***ROA.26-60007.1.; ROA.26-60007.584.*** At ***Rule 12***, the court was not permitted to choose Defendants' explanation over Appellant's and then use that choice to defeat the due process theory.

Those two premises generated the court's core distinction from Dixon: this was an academic response to academic noncompliance, not a punitive deprivation requiring meaningful process. But that distinction exists only if both disputed premises are accepted in Defendants' favor. Once those predicates are recognized as contested, the effort to distinguish Dixon loses its foundation.

58

The court's use of "merely provisional" further underscores the problem. Elsewhere, the opinion acknowledged assistantship loss, non-degree reclassification, and visa-related harm affecting Appellant's ability to remain in the country and continue his education. ***ROA.26-60007.903.*** A status action with those practical effects cannot be dismissed as "merely" because the institution avoided the formal label "expulsion."

5. **The Court Turned Dixon's Procedural-Adequacy Inquiry Into a Mere Notice Inquiry**

The district court concluded:

> *"The record also indicates that Mr. Bennard was given ample notice by the Defendants that his failure to complete his Abilities Transcript would have a negative effect on his Graduate Research Assistant position."* ***ROA.26-60007.898.***

That sentence reveals the central flaw in the procedural due process analysis. The court identified notice of possible consequences and then effectively treated the due process inquiry as complete. But notice that something adverse may happen is not the same thing as constitutionally adequate process before it happens.

*Dixon* requires more than warning. At minimum, it requires notice and some meaningful opportunity to be heard before a serious deprivation is imposed. The sentence quoted above addresses only the first half of that requirement. It says nothing about whether Appellant had a genuine chance to contest the grounds for the status action or the assistantship loss before those actions were taken.

That omission matters because Appellant's theory was not simply that he lacked warning in the abstract. It was that the University acted through a procedurally defective sequence: an allegedly unauthorized alteration of the mentoring arrangement, use of the Abilities Transcript process in a way inconsistent with the governing materials, status consequences imposed despite departures from published procedures, and downstream actions taken without meaningful review. ***ROA.26-60007.1.; ROA.26-60007.584.*** A sentence about "ample notice" does not answer that theory.

The opinion also never meaningfully addressed whether there was any real hearing component at all. As Appellant describes it, he submitted a formal and detailed rebuttal, but that rebuttal was not engaged before the adverse actions proceeded. ***ROA.26-60007.466.*** If so, then the issue is not merely whether he had the chance to write something down. It is whether the process afforded a genuine opportunity to affect the outcome before the deprivation occurred.

6. **The Court Rejected the F-1 Liberty Theory Because Appellant Cited No Case on Point, and It Never Addressed Substantive Due Process at All**

The district court stated:

> *"As a result, he claims his downgrade in status is constructive expulsion because he will lose access to the University and its courses if he is deported. Mr. Bennard cites no case law establishing this as a protected interest."* ***ROA.26-60007.903.***

That reasoning imposed the wrong requirement at the pleading stage. A complaint must plead facts that make a constitutional theory plausible; it need not identify a case already recognizing that exact theory. *Iqbal, 556 U.S. at 678*. Appellant alleged that the December 15 non-degree reclassification triggered same-day F-1 consequences communicated through ISSS, thereby threatening his ability to remain in the United States and continue his education. *ROA.26-60007.845.; ROA.26-60007.860.* The court did not reject those allegations as implausible. It rejected the theory because Appellant cited no case "establishing" the interest.

That is not enough. The absence of a case on all fours is not the same as authority foreclosing the claim. The relevant *Rule 12* question was whether the pleaded facts plausibly implicated a protected liberty interest, not whether Appellant had already identified a case expressly saying so. Instead of analyzing the liberty theory on its own terms, the court folded it into the same citation-deficit rationale used elsewhere.

The opinion then committed a more basic omission. It identified Appellant's "*procedural and substantive due process rights*" at the outset. *ROA.26-60007.903.* After that, the word "substantive" disappears. The court never identified the governing standard, never applied it to the pleaded facts, and never explained why the substantive due process claim failed. That is not insufficient analysis. It is no analysis.

Taken together, these defects show that the due process claims were not dismissed after full engagement with the theories Appellant actually pleaded. They were dismissed through omitted frameworks, inherited characterizations, and unaddressed theories. Remand is required so the district court can analyze the due process claims under the correct legal standards and with attention to each distinct interest and theory Appellant presented.

## VII.   THE BREACH OF CONTRACT DISMISSAL IS DERIVATIVE AND FALLS IF ANY FEDERAL CLAIM IS REINSTATED

The district court's contract ruling does not require extended merits analysis because it is derivative of the federal dismissals. The court correctly identified the *§ 1367(c)(3)* framework: a district court may decline supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." The problem is not the rule. It is the predicate. *Section 1367(c)(3)* applies only if all claims over which the district court had original jurisdiction were properly dismissed. Here, that predicate exists only because the district court dismissed every federal claim. If any of those dismissals is reversed, the premise for the supplemental-jurisdiction declination disappears.

The court also correctly noted the general Fifth Circuit practice of declining supplemental jurisdiction after elimination of all federal claims. But that principle

likewise depends on the same premise: that all federal claims were properly dismissed. If that premise fails on appeal, the general rule never comes into play. And even if the premise had been valid, the rule is only a default. *Section 1367(c)* confers discretion, not a mandate. This Court need not reach that further point, however, because the simpler one is enough: if any federal claim is reinstated, *§ 1367(c)(3)* no longer applies.

The district court quoted the four *§ 1367(c)* factors and noted that they are disjunctive. *ROA.26-60007.904.* But it relied only on factor (3): dismissal of all claims over which it had original jurisdiction. It did not rest its ruling on novelty or complexity of state law under factor (1), and it did not invoke exceptional circumstances under factor (4). *ROA.26-60007.904.* That matters because the supplemental-jurisdiction ruling has only one stated foundation. If factor (3) falls because one or more federal claims is reinstated, there is no alternative *§ 1367(c)* basis identified in the opinion to support dismissal of the individual-capacity contract claim.

The disposition must therefore be separated into its components. The sovereign-immunity dismissal of the contract claim against the University and the official-capacity defendants is correct and is not challenged. *Ex parte Young* does not permit state-law claims against the State or state officials in their official capacities. That part of the ruling should stand. The only derivative component is the without-

prejudice dismissal of the individual-capacity contract claim under *§ 1367(c)(3)*. That ruling rises or falls with the federal dismissals. If this Court reinstates any federal claim, the basis for declining supplemental jurisdiction disappears, and the individual-capacity breach-of-contract claim must be reinstated as well.

No separate merits argument on breach of contract is necessary here. Reversal of any federal dismissal removes the only ground the district court gave for declining jurisdiction over the individual-capacity contract claim.

## VIII.    THE MOOTNESS RULING WAS PROCEDURALLY IMPROPER, AND THE JANUARY 7 SEQUENCING WARRANTS THIS COURT'S ATTENTION

### 1. The Court Used the Final Merits Ruling to Avoid Deciding the Preliminary-Relief Motions

The district court denied nine separate motions in three sentences, including fully briefed *Rule 65* motions that had been pending for months, a motion to expedite, and a January 5 motion specifically requesting immediate adjudication because visa-related consequences were alleged to be imminent. The court did not analyze the motions individually, did not distinguish among them, and did not explain why motions that had been ripe for weeks or months could properly be denied without ever reaching their substance.

That disposition was circular. The *Rule 65* motions were filed before the motion to dismiss was decided, were fully briefed before final judgment, and sought emergency relief while the merits remained unresolved. Instead of deciding those motions first, or at least alongside the motion to dismiss, the court decided the later-filed merits motion and then used that ruling to declare the earlier emergency motions moot. That sequencing guaranteed that the preliminary-relief motions would never be adjudicated on their own terms.

The delay underscores the problem. As Appellant points out, Defendants themselves represented by November 17 that the *Rule 65* motions were ripe for decision on the papers. *ROA.26-60007.830.* Yet the court did not rule on them then. It waited, ruled on the merits later, and only then denied the emergency motions as moot. That sequence allowed the court to avoid deciding whether interim relief was warranted before the alleged irreparable harms occurred.

The January 5 motion makes the problem especially clear. *ROA.26-60007.860.* specifically requested immediate adjudication because Appellant alleged that visa-related consequences would follow that very day if relief were not granted. A motion seeking relief by a date certain because irreparable harm is alleged to be imminent on that date cannot be meaningfully denied as "moot" two days later without any discussion of whether the threatened harm occurred, whether it could still be remedied, or whether the court's own delay contributed to the claimed irreversibility.

Treating that motion the same way as months-old motions in a single omnibus mootness denial was procedurally inadequate.

### 2. The January 7 Timing Warrants This Court's Attention

The January 7 sequence is also notable. Appellant filed an emergency motion in this Court that morning. The district court entered final judgment that afternoon. *Exhibits 01-02*.

That sequence does not by itself establish bad faith. But it is relevant context. A district court that had not ruled on ripe emergency motions for weeks or months entered a full dismissal order within hours of an emergency filing in the court of appeals. At minimum, that timing underscores that the emergency motions did not receive the urgent treatment their subject matter required.

### 3. If the Federal Dismissals Are Reversed, the Mootness Ruling Falls With Them

The mootness ruling is derivative of the merits dismissals. The court denied the pending motions as moot only because it dismissed all underlying federal claims. If this Court reverses any of the federal dismissals, the predicate for the mootness ruling falls away.

In that event, the ***Rule 65*** motions should be reinstated on remand and addressed on their own terms, in the proper procedural sequence, with the irreparable-harm arguments adjudicated rather than bypassed.

## IX. THE CONSOLIDATION ORDER PREJUDICED APPELLANT'S PENDING EMERGENCY-MOTION POSTURE

### 1. Appellant Objected, Identified Concrete Prejudice, and the Objection Was Not Meaningfully Addressed

Consolidation was not a neutral administrative step in the procedural posture of this case. Appellant objected on the record, identified specific prejudice that consolidation would create, and that prejudice later materialized.

At the time consolidation was pursued, Appellant had fully briefed ***Rule 65*** motions pending in his case. He expressly objected that consolidating the actions before those motions were resolved would prejudice him by subsuming the emergency posture of his case into a broader combined proceeding and diminishing the urgency and independence of the relief he had sought. ***ROA.26-60007.643.; ROA.26-60007.647.; ROA.26-60007.652.; ROA.26-60007.763.; ROA.26-60007.812.; ROA.26-60007.818.*** That objection went directly to sequencing and the preservation of emergency relief.

Appellant also placed on the record his concerns regarding irregular communications and delay requests during the consolidation period, including communications he understood as seeking delay in adjudication of his pending emergency motions. ***ROA.26-60007.763.*** Whether or not those communications independently warrant relief, they form part of the procedural context in which consolidation occurred and in which the emergency motions remained unresolved.

The relevant point for this appeal is concrete prejudice. Appellant warned that consolidation before resolution of the ***Rule 65*** motions would impair the emergency posture of his case. That is what happened. The motions were never adjudicated on their merits. They remained pending through the consolidated proceedings and were later denied as moot when the merits dismissal was entered. The prejudice Appellant identified in advance was therefore not speculative. It was realized.

2. **The Consolidation Issue Matters as Procedural Context Even If It Is Not the Primary Ground for Reversal**

Consolidation is not the principal basis on which reversal is sought. The independently reversible errors set out elsewhere in this brief are sufficient without it.

But the consolidation decision remains relevant because it helps explain how a case with fully briefed emergency motions proceeded to final dismissal without any

merits ruling on those motions. It forms part of the sequence that produced the mootness problem addressed above: pending emergency motions, identified urgency, objection to procedural handling, no ruling, then merits dismissal and omnibus mootness denial.

If this Court reverses and remands, the district court should reconsider case management with full attention to the prejudice Appellant identified, the emergency posture that existed before consolidation, and whether separate treatment is necessary to ensure that emergency motions are addressed in the proper procedural sequence rather than absorbed into broader merits proceedings.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Appellant Ehiremen Bennard Eriakha respectfully requests that this Court:

1. Reverse the dismissal of the official-capacity claims against Defendants Drs. Yang, Barnard, and Kluck, which the district court dismissed under qualified-immunity standards after ruling that those claims were cognizable under *Ex parte Young*;

2. Vacate the dismissal of Appellant's federal claims and remand for further proceedings under the correct **Rule 12(b)(6)**, *Ex parte Young*, qualified-

immunity, and due-process frameworks, including proper consideration of the governing Abilities Transcript documents and *Exhibit O*;

3. Vacate the district court's denial of the pending *Rule 65* motions as moot and remand with instructions that those motions be addressed on their merits in the proper procedural sequence;

4. Reinstate the individual-capacity breach-of-contract claim if any federal claim is reinstated, because the district court's *§ 1367(c)(3)* ruling was purely derivative of its dismissal of all federal claims;

5. In the alternative, vacate the dismissal with prejudice and remand with instructions to permit Appellant to file a curative amended complaint; and

6. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Ehiremen Bennard Eriakha
Ehiremen Bennard Eriakha
Plaintiff-Appellant, pro se
1802 Jackson Ave. W., Apt. 83
Oxford, MS 38655
Tel: (662) 281-4676
Email: eriakhabernard@gmail.com
Dated: March 16, 2026

## CERTIFICATE OF SERVICE

Pursuant to *Fed. R. App. P. 25(d)* and *Fifth Circuit Rule 25.2*, I certify that on March 16, 2026, I served a true and correct copy of the foregoing Appellant's Opening Brief as follows:

Via electronic filing / email (Fifth Circuit Pro Se Filings):
Clerk's Office
United States Court of Appeals for the Fifth Circuit
Email: pro_se@ca5.uscourts.gov


Via email (Counsel for Appellees):
Paul B. Watkins, Esq.
Mayo Mallette PLLC
Email: pwatkins@mayomallette.com

Brooke Jackson, Esq.
Mayo Mallette PLLC
Email: bjackson@mayomallette.com


Executed this 16th day of March, 2026.

Respectfully submitted,

/s/ Ehiremen Bennard Eriakha
Ehiremen Bennard Eriakha
Plaintiff-Appellant, pro se
1802 Jackson Ave. W., Apt. 83
Oxford, MS 38655
Tel: (662) 281-4676
Email: eriakhabernard@gmail.com

71

# CERTIFICATE OF COMPLIANCE

Pursuant to *Fed. R. App. P. 32(a)(7)* and *Fifth Circuit Rule 32.1*, I certify as follows:

1.  **Type-Volume Limitation (Fed. R. App. P. 32(a)(7))**

This brief complies with the type-volume limitation of *Fed. R. App. P. 32(a)(7)(B)*. Excluding the parts of the brief exempted by *Fed. R. App. P. 32(f)*, the word count is 12,664 words, which does not exceed the 13,000-word limit for a principal brief.

2.  **Typeface and Type Style (Fed. R. App. P. 32(a)(5)–(6); 5th Cir. R. 32.1)**

This brief complies with the typeface and type-style requirements of *Fed. R. App. P. 32(a)(5)–(6)* and *Fifth Circuit Rule 32.1*. It was prepared in a proportionally spaced typeface using 14-point Times New Roman. Any footnotes appear in at least 12-point font.

3.  **Privacy Redactions (Fed. R. App. P. 25(a)(5); 5th Cir. R. 25.2)**

All required privacy redactions have been made in compliance with *Fed. R. App. P. 25(a)(5)* and *Fifth Circuit Rule 25.2*.

Executed on March 16, 2026.

Respectfully submitted,

/s/ Ehiremen Bennard Eriakha
Ehiremen Bennard Eriakha
Plaintiff-Appellant, pro se
1802 Jackson Ave. W., Apt. 83

Oxford, MS 38655
Tel: (662) 281-4676
Email: eriakhabernard@gmail.com

3/16/26, 4:09 AM

Case: 26-60007    Document: 41-1    Page: 74    Date Filed: 03/16/2026

Emergency Motion for Administrative Stay / Injunction Pending Appeal - Appeal No. TBD - Eriakha 1 - eriakhabernard@gmail.com - Gmail



EXHIBIT 01

3/16/26, 4:11 AM

Rule 27.3 Conference & Service – Emergency Motion for Administrative Stay / Injunction Pending Appeal (Eriakha) - zediakhabernard@gmail.com - Gmail

# EXHIBIT 02

