U.S. COURT OF APPEALS
RECEIVED
*03/22/2026*
FIFTH CIRCUIT

**Case No. 26-60007**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

OMOKHODION ALFRED ERIAKHA,

PLAINTIFF - APPELLANT

V.

UNIVERSITY OF MISSISSIPPI; YI YANG, DOCTOR, CHAIR, DEPARTMENT OF PHARMACY ADMINISTRATION; MARIE BARNARD, DOCTOR, GRADUATE PROGRAM COORDINATOR, PHARMACY ADMINISTRATION; ANNETTE KLUCK, DOCTOR, DEAN OF THE GRADUATE SCHOOL,

DEFENDANTS - APPELLEES

---

EHIREMEN BENNARD ERIAKHA,

PLAINTIFF – APPELLANT, PRO SE

V.

UNIVERSITY OF MISSISSIPPI; YI YANG, DOCTOR, CHAIR, DEPARTMENT OF PHARMACY ADMINISTRATION; MARIE BARNARD, DOCTOR, GRADUATE PROGRAM COORDINATOR, PHARMACY ADMINISTRATION; ANNETTE KLUCK, DOCTOR, DEAN OF THE GRADUATE SCHOOL; YINAN HUANG, DOCTOR, FACULTY MEMBER,

DEFENDANTS - APPELLEES

1

ON APPEAL FROM THE

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF MISSISSIPPI, OXFORD DIVISION

CIVIL ACTION NO. 3:25-CV-00226-MPM-JMV (LEAD CASE)

(CONSOLIDATED WITH CIVIL ACTION NO. 3:25-CV-00250-DMB-RP)

**APPELLANT EHIREMEN BENNARD ERIAKHA'S RECORD EXCERPTS**

EHIREMEN BENNARD ERIAKHA

PLAINTIFF-APPELLANT, PRO SE

1802 JACKSON AVE. W., APT. 83

OXFORD, MS 38655

TEL: (662) 281-4676

EMAIL: ERIAKHABERNARD@GMAIL.COM

# Tab 1

# Docket Sheet

# ROA.26-60007.938.

APPEAL,JURY,ProSeOther,RP2,STAYED

# U.S. District Court
# Northern District of Mississippi (Oxford Division)
# CIVIL DOCKET FOR CASE #: 3:25-cv-00250-MPM-JMV
# Internal Use Only

| | |
|---|---|
| Eriakha v. University of Mississippi et al | Date Filed: 08/25/2025 |
| Assigned to: Senior Judge Michael P. Mills | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Jane M. Virden | Nature of Suit: 440 Civil Rights: Other |
| Lead case: 3:25-cv-00226-MPM-JMV | Jurisdiction: Federal Question |
| Member case: (View Member Case) | |
| Case in other court:  5th Circuit, 26-60007 | |
| Cause: 28:1331 Fed. Question: Other Civil Rights | |

**Plaintiff**

**Ehiremen Bennard Eriakha**                    represented by    **Ehiremen Bennard Eriakha**
1802 Jackson Avenue West
Apartment 83
Oxford, MS 38655
(662) 274-0258
PRO SE

V.

**Defendant**

**University of Mississippi**                    represented by    **Paul Bowie Watkins , Jr.**
Mayo Mallette PLLC
MS
5 University Office Park
2094 Old Taylor Road
Suite 200
Oxford, MS 38655
662-236-0055
Fax: 662-236-0035
Email: pwatkins@mayomallette.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Yi Yang**                    represented by    **Paul Bowie Watkins , Jr.**
*Chair, Department of Pharmacy*                    (See above for address)
*Administration*                    *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Marie Barnard**                    represented by    **Paul Bowie Watkins , Jr.**
*Graduate Program Coordinator, Pharmacy*                    (See above for address)
*Administration*                    *LEAD ATTORNEY*

26-60007.938

*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Annette Kluck**                              represented by **Paul Bowie Watkins , Jr.**
*Dean of the Graduate School*                              (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*


**Defendant**

**Dr. Yinan Huang**                               represented by **Paul Bowie Watkins , Jr.**
*Faculty Member*                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*


Email All Attorneys  Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 08/25/2025 | 1 (p.948) | COMPLAINT, Jury Demand,, filed by Ehiremen Bennard Eriakha. (Attachments: # 1 (p.948) Civil Cover Sheet) (jla) |
| 08/25/2025 | 2 (p.1811) | MOTION to Proceed in forma pauperis by Ehiremen Bennard Eriakha. (jla) |
| 08/25/2025 | 3 (p.982) | NOTICE of Related Case: 3:25-CV-226-MPM-JMV (jla) Modified on 8/26/2025 to update case number (jla). |
| 08/25/2025 | 4 (p.985) | NOTICE OF ASSIGNMENT. Case assigned to Judge Brown and Magistrate Judge Percy. (jla) |
| 08/25/2025 | | (Court only) ***Set Flag(s): ProSeOther (jla) |
| 08/25/2025 | | (Court only) Staff Note: Copy of Doc 4 (p.985) mailed to Plaintiff this date to address listed on docket. (jla) |
| 08/26/2025 | | (Court only) ***Set Flag(s): RP2 (bnd) |
| 08/27/2025 | 5 (p.987) | ORDER granting 2 (p.1811) Motion for Leave to Proceed in forma pauperis. Signed by Magistrate Judge Roy Percy on 8/27/25. (bnd) |
| 08/28/2025 | | (Court only) Staff Note: Copy of Doc 5 (p.987) with acknowledgement(s) and Consent Form to Receive Documents Electronically mailed to Plaintiff this date to address listed on docket. (jla) |
| 08/28/2025 | 6 (p.988) | Summons Issued as to Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. Forwarded to USM for service. (jla) |
| 09/08/2025 | 7 (p.993) | URGENT AND NECESSITOUS MOTION for Temporary Restraining Order by Ehiremen Bennard Eriakha. (Attachments: # 1 (p.948) Exhibit A - Signed Mentor/Mentee Agreement Form, # 2 (p.1811) Exhibit B - Email Thread on Abilities Transcript, # |

| | | |
|---|---|---|
| | | 3 (p.982) Exhibit C - Retaliation Threat Regarding Abilities Transcript, # 4 (p.985) Exhibit D - Formal Response to Abilities Transcript Threats, # 5 (p.987) Exhibit E - Email Thread on Abilities Transcript, # 6 (p.988) Exhibit F - Email Thread on Dr. Yinan Huang Attempting to Reframe Meeting, # 7 (p.993) Exhibit G - Email Thread Regarding Pretextual Teaching Assisstant Role, # 8 (p.1099) Exhibit H - Teaching Assisstant Coordinator Reach Out, # 9 (p.1102) Exhibit I - Teaching Assisstant Coordinator Reach Out (2), # 10 (p.1208) Exhibit J - Provisional Status Recommendation, # 11 (p.1211) Exhibit K - Provisional Status Recommendation, # 12 (p.1215) Exhibit L - Graduate Research Assisstantship Termination by Dr. Yi Yang (Department Chair), # 13 (p.1218) Exhibit M - Ratification of Provision Status by Dr. Annette Kluck (Dean of Graduate School), # 14 (p.1227) Exhibit N - Formal Complaint Submitted to Office of Civil Rights (Department of Education), # 15 (p.1298) Exhibit O - Differential Treatment in Mentor Assignment, # 16 (p.1306) Exhibit P - Abilities Transcript Form, # 17 (p.1314) Exhibit Q - Abilities Transcript Guide, # 18 (p.1433) Exhibit R - University of Mississippi M-Book (Governing Student Discipline Policies), # 19 (p.1438) Exhibit S - 2024/2025 Department Policies and Procedures Document, # 20 (p.1444) Exhibit T - Selective Retroactive Rewording of Procedural Safeguard (jla) |
| 09/08/2025 | 8 (p.1099) | Plaintiff's CERTIFICATION of Notice pursuant to FRCP 65(B)(1)(B) re 7 (p.993) MOTION for Temporary Restraining Order (jla) |
| 09/08/2025 | 9 (p.1102) | URGENT AND NECESSITOUS MOTION for Preliminary Injunction by Ehiremen Bennard Eriakha. (Attachments: # 1 (p.948) Exhibit A - Signed Mentor/Mentee Agreement Form, # 2 (p.1811) Exhibit B - Email Thread on Abilities Transcript, # 3 (p.982) Exhibit C - Retaliation Threat Regarding Abilities Transcript, # 4 (p.985) Exhibit D - Formal Response to Abilities Transcript Threats, # 5 (p.987) Exhibit E - Email Thread on Abilities Transcript, # 6 (p.988) Exhibit F - Email Thread on Dr. Yinan Huang Attempting to Reframe Meeting, # 7 (p.993) Exhibit G - Email Thread Regarding Pretextual Teaching Assisstant Role, # 8 (p.1099) Exhibit H - Teaching Assisstant Coordinator Reach Out, # 9 (p.1102) Exhibit I - Teaching Assisstant Coordinator Reach Out (2), # 10 (p.1208) Exhibit J - Provisional Status Recommendation, # 11 (p.1211) Exhibit K - Provisional Status Recommendation, # 12 (p.1215) Exhibit L - Graduate Research Assisstantship Termination by Dr. Yi Yang (Department Chair), # 13 (p.1218) Exhibit M - Ratification of Provision Status by Dr. Annette Kluck (Dean of Graduate School), # 14 (p.1227) Exhibit N - Formal Complaint Submitted to Office of Civil Rights (Department of Education), # 15 (p.1298) Exhibit o, # 16 (p.1306) Exhibit P - Abilities Transcript Form, # 17 (p.1314) Exhibit Q - Abilities Transcript Guide, # 18 (p.1433) Exhibit R - University of Mississippi M-Book (Governing Student Discipline Policies), # 19 (p.1438) Exhibit S |

| | | |
|---|---|---|
| | | - 2024/2025 Department Policies and Procedures Document, # 20 (p.1444) Exhibit T - Selective Retroactive Rewording of Procedural Safeguard (jla) |
| 09/08/2025 | 10 (p.1208) | MOTION for Leave to Exceed Page Limit re 9 (p.1102) MOTION for Preliminary Injunction by Ehiremen Bennard Eriakha. (jla) |
| 09/08/2025 | 11 (p.1211) | Declaration of Ehiremen Bennard Eriakha in Support re 9 (p.1102) MOTION for Preliminary Injunction, 7 (p.993) MOTION for Temporary Restraining Order. (jla) |
| 09/08/2025 | 12 (p.1215) | MOTION to Waive or Reduce Security Requirement under Rule 65(C) re 9 (p.1102) MOTION for Preliminary Injunction, 7 (p.993) MOTION for Temporary Restraining Order by Ehiremen Bennard Eriakha. (jla) (Entered: 09/10/2025) |
| 09/09/2025 | | (Court only) Motions No Longer Referred: 10 (p.1208) MOTION for Leave to Exceed Page Limit re 9 (p.1102) MOTION for Preliminary Injunction (bnd) |
| 09/10/2025 | | (Court only) Motions No Longer Referred: 12 (p.1215) MOTION to Waive or Reduce Security Requirement under Rule 65(C) re 9 (p.1102) MOTION for Preliminary Injunction, 7 (p.993) MOTION for Temporary Restraining Order (bnd) |
| 09/11/2025 | 13 (p.1218) | ORDER denying without prejudice 7 (p.993) URGENT AND NECESSITOUS Motion for Temporary Restraining Order; denying without prejudice 9 (p.1102) URGENT AND NECESSITOUS Motion for Preliminary Injunction; denying without prejudice 10 (p.1208) Motion for Leave to Exceed Page Limit; denying without prejudice 12 (p.1215) Motion to Waive or Reduce Security Requirement under Rule 65(C). Signed by District Judge Debra M. Brown on 9/11/2025. (lld) |
| 09/11/2025 | | (Court only) Staff Note: Copy of Doc 13 (p.1218) with acknowledgement mailed to Plaintiff this date to address listed on docket. (lld) |
| 09/15/2025 | | SUMMONS Returned Executed Marie Barnard served on 9/10/2025; Yinan Huang served on 9/10/2025; Annette Kluck served on 9/10/2025; University of Mississippi served on 9/10/2025; Yi Yang served on 9/10/2025. (jla) |
| 09/18/2025 | 14 (p.1227) | MOTION to Correct the Record by Ehiremen Bennard Eriakha. (Attachments: # 1 (p.948) Declaration of Ehiremen Bennard Eriakha) (jla) |
| 09/18/2025 | 15 (p.1298) | URGENT AND NECESSITIOUS RENEWED MOTION for Temporary Restraining Order by Ehiremen Bennard Eriakha. (jla) |
| 09/18/2025 | 16 (p.1306) | URGENT AND NECESSITIOUS RENEWED MOTION for Preliminary Injunction by Ehiremen Bennard Eriakha. (jla) |
| 09/18/2025 | 17 (p.1314) | DECLARATION of Ehiremen Bennard Eriakha in Support re 16 |

| | | |
|---|---|---|
| | | (p.1306) MOTION for Preliminary Injunction, 15 (p.1298) MOTION for Temporary Restraining Order. (jla) |
| 09/18/2025 | 18 (p.1433) | PLAINTIFF'S Verified Pleading Declaration re 1 (p.948) COMPLAINT (jla) |
| 09/18/2025 | 19 (p.1438) | MOTION for Leave to Exceed Page Limit re 16 (p.1306) MOTION for Preliminary Injunction by Ehiremen Bennard Eriakha. (jla) |
| 09/18/2025 | 20 (p.1444) | MOTION to Waive or Reduce Security Requirement under Rule 65(C) re 16 (p.1306) MOTION for Preliminary Injunction, 15 (p.1298) MOTION for Temporary Restraining Order by Ehiremen Bennard Eriakha. (jla) |
| 09/18/2025 | 21 (p.1450) | NOTICE OF SERVICE under Rule 5 and, in the alternative, Certification under Rule 65(b)(1)(B) to defendants. (jla) |
| 09/18/2025 | 22 (p.1457) | CERTIFICATE OF SERVICE (Under Penalty of Perjury, 28 USC § 1746) by Ehiremen Bennard Eriakha (jla) |
| 09/18/2025 | | (Court only) Motions No Longer Referred: 16 (p.1306) MOTION for Preliminary Injunction, 20 (p.1444) MOTION to Waive or Reduce Security Requirement under Rule 65(C) re 16 (p.1306) MOTION for Preliminary Injunction, 15 (p.1298) MOTION for Temporary Restraining Order, 19 (p.1438) MOTION for Leave to Exceed Page Limit re 16 (p.1306) MOTION for Preliminary Injunction, 15 (p.1298) MOTION for Temporary Restraining Order (jla) |
| 09/19/2025 | | (Court only) Motions No Longer Referred: 14 (p.1227) MOTION to Correct the Record (bnd) |
| 09/19/2025 | 23 (p.1463) | MEMORANDUM IN SUPPORT re 16 (p.1306) MOTION for Preliminary Injunction filed by Ehiremen Bennard Eriakha. (jla) |
| 09/25/2025 | 24 (p.1519) | NOTICE of Attorney Appearance by Paul Bowie Watkins, Jr on behalf of Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang (Watkins, Paul) |
| 09/25/2025 | 25 (p.1522) | NOTICE by plaintiff of Non-Consent to Consolidation and Statement of Prejudice (jla) |
| 09/25/2025 | 26 (p.1526) | MOTION to Preserve Jurisdiction and Adjudicate Pending Emergency Motion for Temporary Restraining Order and Preliminary Injunction by Ehiremen Bennard Eriakha. (jla) |
| 09/25/2025 | | (Court only) Motions No Longer Referred: 26 (p.1526) MOTION to Preserve Jurisdiction and Adjudicate Pending Emergency Motion for Temporary Restraining Order and Preliminary Injunction (jla) |
| 09/25/2025 | 27 (p.1531) | SUPPLEMENTAL NOTICE by plaintiff regarding Ripeness of Renewed Motion for Temporary Restraining Order and Preliminary Injunction (jla) |
| 10/01/2025 | 28 (p.1535) | |

| | | |
|---|---|---|
| | | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) Modified on 1/7/2026 (jla). |
| 10/01/2025 | 29 (p.1538) | MEMORANDUM IN SUPPORT re 28 (p.1535) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 10/02/2025 | 30 (p.1558) | ORDER STAYING CASE PENDING RULING ON IMMUNITY MOTION. Signed by Magistrate Judge Roy Percy on 10/2/25. (bnd) |
| 10/02/2025 | 31 (p.1559) | RESPONSE in Opposition re 15 (p.1298) MOTION for Temporary Restraining Order filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 10/02/2025 | 32 (p.1562) | MEMORANDUM IN SUPPORT re 31 (p.1559) Response in Opposition to Motion re 15 (p.1298) MOTION for Temporary Restraining Order filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) Modified on 10/8/2025 to link to original motion (lgm). Modified on 10/20/2025 (jla). |
| 10/02/2025 | 33 (p.1571) | RESPONSE in Opposition re 16 (p.1306) MOTION for Preliminary Injunction filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 10/02/2025 | 34 (p.1574) | MEMORANDUM IN SUPPORT re 33 (p.1571) Response in Opposition to Motion re 16 (p.1306) Motion for Preliminary Injunction filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) Modified on 10/8/2025 to link to original motion (lgm). Modified on 10/20/2025 (jla). |
| 10/02/2025 | 35 (p.1583) | RESPONSE in Opposition re 19 (p.1438) MOTION for Leave to Exceed Page Limit re 16 (p.1306) MOTION for Preliminary Injunction filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) Modified on 10/20/2025 to link to underlying motion (jla). |
| 10/09/2025 | 36 (p.1587) | RESPONSE in Opposition re 28 (p.1535) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Ehiremen Bennard Eriakha. (Attachments: # 1 (p.948) Exhibit Y: Developmental Mentor Alteration Correspondence) (jwr) |
| 10/09/2025 | 37 (p.1626) | REPLY in Support re 15 (p.1298) MOTION for Temporary Restraining Order, 16 (p.1306) MOTION for Preliminary Injunction filed by Ehiremen Bennard Eriakha. (rcm) |
| 10/09/2025 | 38 (p.1635) | |

| | | RESPONSE in Opposition re 19 (p.1438) MOTION for Leave to Exceed Page Limit filed by Ehiremen Bennard Eriakha. (rcm) |
|---|---|---|
| 10/09/2025 | 39 (p.1641) | NOTICE of Procedural Concern (Attachments: # 1 (p.948) Exhibit Consolidation Attempt, # 2 (p.1811) Exhibit Chamber Call Correspondence) (rcm) |
| 10/16/2025 | 40 (p.1653) | REPLY to Response to Motion re 28 (p.1535) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 10/17/2025 | 41 (p.1661) | SUPPLEMENTAL NOTICE of Continuing and Escalating Irreparable Harm by Ehiremen Bennard Eriakha (Attachments: # 1 (p.948) Exhibit 03 - Second Bursar Notice - Institutional Holds, # 2 (p.1811) Exhibit 04 - Civil Rent Complaint/Warrant for Removal at Plaintiff's Residence) (jla) |
| 10/22/2025 | 42 (p.1669) | MOTION to Consolidate Cases by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Attachments: # 1 (p.948) Exhibit 1 - Email from Alfred to Watkins, Oct. 15, 2025, # 2 (p.1811) Exhibit 2 - Email from Bennard to Watkins, Oct. 15, 2025, # 3 (p.982) Exhibit 3 - Email from Alfred to Watkins, Oct. 15, 2025) (Watkins, Paul) |
| 10/22/2025 | 43 (p.1678) | MEMORANDUM IN SUPPORT re 42 (p.1669) MOTION to Consolidate Cases filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 10/23/2025 | 44 (p.1688) | NOTICE OF SERVICE of Defendants' Motion to Consolidate and Brief in Support of Motion to Consolidate by Paul Bowie Watkins, Jr on behalf of Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang to Plaintiff. (Watkins, Paul) |
| 10/30/2025 | 45 (p.1690) | NOTICE of Prior Non-Consent and Procedural Clarification by plaintiff re 42 (p.1669) MOTION to Consolidate Cases (jla) |
| 11/03/2025 | 46 (p.1696) | MOTION to Expedite Ruling on Pending Urgent 15 (p.1298) MOTION for Temporary Restraining Order and 16 (p.1306) MOTION for Preliminary Injunction by Ehiremen Bennard Eriakha. (jla) |
| 11/03/2025 | | (Court only) Motions No Longer Referred: 46 (p.1696) MOTION to Expedite (jla) |
| 11/06/2025 | 47 (p.1703) | REPLY to Response to Motion re 42 (p.1669) MOTION to Consolidate Cases filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 11/17/2025 | 48 (p.1708) | RESPONSE in Opposition re 46 (p.1696) MOTION to Expedite filed by Marie Barnard, Yinan Huang, Annette Kluck, University of Mississippi, Yi Yang. (Watkins, Paul) |
| 11/17/2025 | 49 (p.1711) | ORDER granting (28) Motion to Consolidate Cases in case |

| | | |
|---|---|---|
| | | 3:25-cv-00226-MPM-JMV; granting (42) Motion to Consolidate Cases in case 3:25-cv-00250-DMB-RP. Signed by Magistrate Judge Jane M. Virden on 11/17/2025. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-DMB-RP (jla) |
| 11/17/2025 | | Case reassigned to Senior Judge Michael P. Mills and Magistrate Judge Jane M. Virden. District Judge Debra M. Brown, Magistrate Judge Roy Percy no longer assigned to the case. (jla) |
| 11/17/2025 | | (Court only) Staff Note: Copy of Doc [37 - 38] mailed to address listed on docket for Plaintiffs Omokhodion Alfred Eriakha, Ehiremen Bennard Eriakha (jla) |
| 11/19/2025 | 50 (p.1718) | REPLY to Response to Motion re (31 in 3:25-cv-00226-MPM-JMV, 31 in 3:25-cv-00226-MPM-JMV) MOTION to Dismiss for Lack of Jurisdiction *Amended Complaint* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Amended Complaint* filed by Marie Barnard, Erin Holmes, Annette Kluck, Meagen Rosenthal, Jennifer Simmons, University of Mississippi, Yi Yang. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (Watkins, Paul) |
| 12/12/2025 | 51 (p.1723) | NOTICE of Irreparable Harm by Ehiremen Bennard Eriakha (Attachments: # 1 (p.948) Exhibit)Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 12/12/2025 | 52 (p.1728) | NOTICE of Material Change in Circumstances and Record Preservation by Omokhodion Alfred Eriakha (Attachments: # 1 (p.948) Exhibit)Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 12/23/2025 | | Remark; Petition for Writ of Mandamus filed in USCA as 25-60700 Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) (Entered: 01/04/2026) |
| 12/24/2025 | 54 (p.1736) | USCA Order granting Motion for Expedited Consideration of Petition for Writ of Mandamus; granting Motion to Proceed IFP; denying Petition for Writ of Mandamus (Attachments: # 1 (p.948) USCA Cover Letter) Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) (Entered: 01/05/2026) |
| 12/29/2025 | 53 (p.1733) | NOTICE OF APPEAL as to 15 (p.1298) Motion for Temporary Restraining Order and 16 (p.1306) Motion for Preliminary Injunction (Order on Motion for TRO, and Order on Motion for Preliminary Injunction). (rcm) |
| 01/05/2026 | | (Court only) ***Staff notes; Appeal by JLAdams Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/05/2026 | 55 (p.1738) | Urgent and Necessitous MOTION for Immediate Adjudication of Pending Emergency Rule 65 Motions re (16 in 3:25-cv-00250-MPM-JMV) MOTION for Preliminary Injunction, (15 in 3:25-cv-00250-MPM-JMV) MOTION for |

| | | |
|---|---|---|
| | | Temporary Restraining Order by Ehiremen Bennard Eriakha. (Attachments: # 1 (p.948) Exhibit Collective Exhibits)Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/05/2026 | 56 (p.1758) | MOTION to Adopt and Join Pending Emergency Rule 65 Motions re (16 in 3:25-cv-00250-MPM-JMV) MOTION for Preliminary Injunction, (15 in 3:25-cv-00250-MPM-JMV) MOTION for Temporary Restraining Order by Omokhodion Alfred Eriakha. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/05/2026 | | (Court only) Motions No Longer Referred: (55 in 3:25-cv-00250-MPM-JMV, 44 in 3:25-cv-00226-MPM-JMV) MOTION for Immediate Adjudication of Pending Emergency Rule 65 Motions re (16 in 3:25-cv-00250-MPM-JMV) MOTION for Preliminary Injunction, (15 in 3:25-cv-00250-MPM-JMV) MOTION for Temporary Restraining Order, (56 in 3:25-cv-00250-MPM-JMV, 45 in 3:25-cv-00226-MPM-JMV) MOTION to Adopt and Join Pending Emergency Rule 65 Motions re (16 in 3:25-cv-00250-MPM-JMV) MOTION for Preliminary Injunction, (15 in 3:25-cv-00250-MPM-JMV) MOTION for Temporary Restraining Order Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/06/2026 | 57 (p.1762) | NOTICE OF APPEAL. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/07/2026 | 58 (p.1765) | MEMORANDUM OPINION denying as moot (44) Motion ; denying as moot (45) Motion in case 3:25-cv-00226-MPM-JMV; denying as moot (26) Motion ; denying as moot (46) Motion to Expedite; denying as moot (55) Motion ; denying as moot (56) Motion ; denying as moot (14) Motion ; denying as moot (15) Motion for TRO; denying as moot (16) Motion for Preliminary Injunction; denying as moot (19) Motion ; denying as moot (20) Motion in case 3:25-cv-00250-MPM-JMV; granting (28) Motion to Dismiss. Signed by Senior Judge Michael P. Mills on 1/6/2026. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/07/2026 | | (Court only) Staff Note: Copy of Doc (47) mailed to address listed on docket for Plaintiffs Omokhodion Alfred Eriakha, Ehiremen Bennard Eriakha Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/08/2026 | | USCA Case Number 26-60007 for (46 in 3:25-cv-00226-MPM-JMV, 57 in 3:25-cv-00250-MPM-JMV) Notice of Appeal filed by Ehiremen Bennard Eriakha, Omokhodion Alfred Eriakha. (jla) |
| 01/09/2026 | 59 (p.1784) | MOTION for Recusal/Disqualification of the Presiding Judge by Omokhodion Alfred Eriakha. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/09/2026 | 60 (p.1788) | |

| | | |
|---|---|---|
| | | MEMORANDUM IN SUPPORT re (59 in 3:25-cv-00250-MPM-JMV, 48 in 3:25-cv-00226-MPM-JMV) MOTION for Recusal filed by Omokhodion Alfred Eriakha. Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/09/2026 | 61 (p.1799) | NOTICE OF APPEAL as to (47 in 3:25-cv-00226-MPM-JMV, 58 in 3:25-cv-00250-MPM-JMV) MEMORANDUM OPINION Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/09/2026 | 62 (p.1802) | Rule 10(b) Statement Regarding Transcript filed by Ehiremen Bennard Eriakha Associated Cases: 3:25-cv-00226-MPM-JMV, 3:25-cv-00250-MPM-JMV (jla) |
| 01/21/2026 | 63 (p.1805) | USCA JUDGMENT as to (42 in 3:25-cv-00226-MPM-JMV, 53 in 3:25-cv-00250-MPM-JMV) Notice of Appeal filed by Ehiremen Bennard Eriakha; DISMISSING appeal for lack of jurisdiction. (Attachments: # 1 (p.948) USCA Opinion, # 2 (p.1811) USCA Cover Letter) (jla) (Entered: 01/22/2026) |

**Tab 2**

**Notice of Appeal**

**ROA.26-60007.921.**

# IN THE UNITED STATES DISTRICT COURT

RECEIVED

JAN 09 2026

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

### OXFORD DIVISION

OMOKHODION ALFRED ERIAKHA        PLAINTIFF

)

v.        )   CIVIL ACTION NO.: 3:25-cv-226-MPM-JMV

)

UNIVERSITY OF MISSISSIPPI, ET AL.        DEFENDANTS


*Consolidated With*


EHIREMEN BENNARD ERIAKHA        PLAINTIFF

)

v.        )   CIVIL ACTION NO.: 3:25-cv-250-DMB-RP

)

UNIVERSITY OF MISSISSIPPI, ET AL.        DEFENDANTS


## NOTICE OF APPEAL


### (Filed by Plaintiff Ehiremen Bennard Eriakha)


1

26-60007.1799

Notice is hereby given that Plaintiff Ehiremen Bennard Eriakha, proceeding pro se, appeals to the United States Court of Appeals for the Fifth Circuit from the Final Judgment entered on January 7, 2026, dismissing this action with prejudice, and from any accompanying Memorandum Opinion and Order and all rulings that merged into that final judgment.

This appeal is taken pursuant to *28 U.S.C. § 1291* and *Federal Rules of Appellate Procedure 3 and 4*.

Respectfully submitted this 9th day of January, 2026.

_____

Ehiremen Bennard Eriakha

Plaintiff, Pro Se

1802 Jackson Ave. W., Apt. 83

Oxford, MS 38655

Tel: (662) 281-4676

Email: eriakhabernard@gmail.com

2

26-60007.1800

**Tab 3**

**District Court Memorandum Opinion and Final Judgment**

**ROA.26-60007.887.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

OMOKHODION ALFRED ERIAKHA                                    PLAINTIFF

v.                                                    No. 3:25-cv-00226-MPM-JMV

UNIVERSITY OF MISSISSIPPI, *et al.*                          DEFENDANTS

*Consolidated With*

EHIREMEN BENNARD ERIAKHA                                      PLAINTIFF

v.                                                    No. 3:25-cv-00250-MPM-JMV

UNIVERSITY OF MISSISSIPPI, *et al.*                          DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on Defendants', The University of Mississippi, Dr. Yi Yang, Dr. Marie Barnard, Dr. Annette Kluck, and Dr. Yinan Huang (collectively, "Defendants"), Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction [28]. *Pro se* Plaintiff Ehiremen Bennard Eriakha ("Mr. Bennard") has responded in opposition. The Court has reviewed the record, along with relevant case law and evidence, and is now prepared to rule.

## RELEVANT BACKGROUND

Mr. Bennard is a Black African international graduate student pursuing his doctorate at the University of Mississippi. Who is currently in the United States on a F-1 visa. He claims that the following acts by the Defendants threaten his ability to stay within the country. On July 19, 2024, he executed a Mentor-Mentee Agreement to encourage his professional development and was assigned to Dr. Yinan Huang, a faculty member in the University's Department of Pharmacy Administration, which allowed a continuous one-on-one mentoring relationship.

On June 13, 2025, Dr. Yi Yang, the Department Chair, informed Mr. Bennard that she would serve as his co-mentor with Dr. Huang. Mr. Bennard claims that this unilateral change to his

1

26-60007.1765

mentorship agreement was retaliation for his familial association with his twin brother Omokhodion Alfred Eriakha. Dr. Yang informed Mr. Bennard that her involvement was to encourage Dr. Huang's professional development, and to ease Mr. Bennard's mentorship transition following Dr. Huang's upcoming departure from the University.

Mr. Bennard alleges that this interference was retaliation because, prior to Dr. Yang's interference, his brother, Mr. Alfred, raised complaints with the University and the Department of Pharmacy for failure to accommodate his disability. Mr. Alfred's complaints eventually culminated in disciplinary action, and a lawsuit that has been consolidated with this matter.

Dr. Yang scheduled an in-person meeting between herself, Mr. Bennard, and Dr. Huang for June 18 to discuss Mr. Bennard's Abilities Transcript, a non-coursework requirement to his graduate program, the deadline of which was set for June 19. Mr. Bennard refused to attend the meeting as he requested that it be held on Zoom with Dr. Huang only, and he complained that the mentor agreement was altered in violation of departmental policy. Dr. Yang confirmed that the mentorship change was approved by all tenured faculty. Mr. Bennard did not attend the meeting, nor did he submit his Abilities Transcript. Dr. Annette Kluck, Dean of the Graduate School, later confirmed with Mr. Bennard that the change in mentorship was appropriate.

On June 30, Dr. Marie Barnard, the Graduate Program Coordinator, sent a formal warning to Mr. Bennard, informing him that further failure to submit his Abilities Transcript would result in a recommendation that he be downgraded to provisional student status. Mr. Bennard's deadline was extended to August 15, 2025. Instead of completing the Abilities Transcript, Mr. Bennard continued to complain about his mentorship arrangement and the in-person meeting required to discuss the Abilities Transcript. Dr. Kluck informed Mr. Bennard that no policies prohibit faculty

2

26-60007.1766

from changing mentoring assignments, and that a student's concerns with aspects of their program does not excuse them from completing program requirements such as the Abilities Transcript.

On August 21, after Mr. Bennard again failed to submit his Abilities Transcript, he was informed by Dr. Barnard that the Department recommended that he be placed on provisional status. Mr. Bennard could regain full standing by Spring 2026 if he submitted his Abilities Transcript, met with his thesis advisor weekly, and completed his Fall 2025 classes successfully. Dr. Kluck accepted the recommendation and Dr. Yang informed Mr. Bennard that he was not eligible for a Graduate Research Assistantship, a paid position, during the Fall 2025 semester due to his provisional status.

On December 15, 2025, after failing to meet the requirements given by the University to regain full standing, Mr. Bennard and Mr. Alfred were further downgraded to the status of non-degree seeking students. This limited the number of credits they would be able to earn and classified them as no longer students in the Ph.D. program in the Department of Pharmacy Administration. They still may apply for another degree program in the University.

On December 29, Mr. Bennard filed a notice of appeal [42] on his pending motions for temporary restraining order [15] and preliminary injunction [16]. On December 31, the Fifth Circuit dismissed Mr. Bennard's appeal for lack of subject matter jurisdiction, and, to the extent subject-matter jurisdiction existed, for failure to show a likelihood of success on the merits. *Eriakha v. Univ. of Miss.*, No. 25-60708, 2025 WL 3772150 (5th Cir. Dec. 31, 2025). On January 5, 2026, Mr. Bennard filed a motion for immediate adjudication of the pending Rule 65 motions [44] and Mr. Alfred filed a motion to join the Rule 65 motions [45] because the University requires financial documentation by January 5, 2026, to meet the reporting requirements necessary to avoid termination of their F-1 visa status.

3

26-60007.1767

Mr. Bennard asserts that the downgrade in his status was wrongful. He claims that this downgrade is constructive expulsion because his F-1 visa requires him to maintain a source of income. As a result, his provisional, and now non-degree seeking status, endangers his ability to comply with his visa, stay in the country and to continue his education. He sued the Defendants for First Amendment retaliation, violations of his right to equal protection, violations of his procedural and substantive due process rights, and for breach of contract. He requests reinstatement of his full standing status and his Graduate Research Assistantship so that he may stay in the United States and continue his doctoral studies. Defendants filed this motion to dismiss for failure to state a claim.

## STANDARD OF REVIEW

### A. Rule 12(b)(1) Motion to Dismiss

The defendants raise Eleventh Amendment sovereign immunity as to some claims, thus questioning this Court's subject-matter jurisdiction under Rule 12(b)(1). The party seeking the forum bears the burden of proving that jurisdiction exists. *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012). In assessing whether there is jurisdiction, courts may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016). Therefore, "[i]n considering a challenge to subject matter jurisdiction, the district court is free to weigh the evidence and resolve factual disputes in order to satisfy that it has the power to hear the case." *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (citation omitted).

4

### B. Rule 12(b)(6) Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint and raises an issue of law. To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It is not necessary that a complaint contain detailed factual allegations, but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must liberally construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded facts as true. *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005).

It is the duty of the trial judge to hold pro se complaints to less stringent standards than proper pleadings drafted by lawyers. *Hepperle v. Johnston*, 544 F.2d 201, 202 (5th Cir. 1976). The Fifth Circuit has held that "[g]enerally a district court errs in dismissing a pro se complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend." *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998). However, "[t]he district court may dismiss an action on its own motion under Rule 12(b)(6) 'as long as the procedure employed is fair.'" *Id.* In *Bazrowx*, the Fifth Circuit found that "the district court erred in failing to give Appellant notice of the court's intention to dismiss his suit or an opportunity to amend his complaint[,]" but held that "[s]uch error may be ameliorated ... if the plaintiff has alleged his best case, or if the dismissal was without prejudice." *Id.* (footnote omitted). The Fifth Circuit has clarified that a court can

5

consider a plaintiff to have asserted his best case when the plaintiff has had a "fair opportunity to make out [his] case." *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986).

## ANALYSIS

### I.      Claims against the University

Defendants assert that Mr. Bennard's claims against the University of Mississippi and the named Defendants in their official capacity are barred by the Eleventh Amendment under sovereign immunity. "The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other States and by its own citizens." *Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002). Immunity also extends to state agencies that are considered "arms of the state." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989). Because an official capacity claim is "a suit against the official's office," it is "no different from a suit against the State itself." *Id.* at 71.

As a result of this immunity, federal courts lack jurisdiction over suits against a state, state agency, or state official in his or her official capacity "unless that state has waived sovereign immunity or Congress has clearly abrogated it." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 393-94 (5th Cir. 2015). Mr. Bennard does not dispute that the Eleventh Amendment bars his claims against the University of Mississippi, but he argues that *Ex parte Young* provides him an avenue for prospective relief.

A third exception under *Ex parte Young* allows suit against a state official acting in his official capacity "as long as the lawsuit seeks prospective relief to redress an ongoing violation of federal law." *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020). In determining whether the *Ex parte Young* exception applies, the district court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729,

6

26-60007.1770

736 (5th Cir. 2020). Furthermore, "a plaintiff must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

The *Ex parte Young* exception to sovereign immunity does not apply to state law claims in federal court against the State or state officials sued in their official capacities. *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 274-75 (5th Cir. 2020). Mr. Bennard's state law breach of contract claim against the University of Mississippi and the named Defendants in their official capacities is barred by sovereign immunity.

Under *Ex parte Young*, Mr. Bennard's § 1983 claims against the University of Mississippi are barred under sovereign immunity because the University is not a state official responsible for enforcing the alleged acts. *See K.P. v. LeBlanc*, 627 F.3d at 124. The claims against the University of Mississippi are barred. The Court will now turn to whether Mr. Bennard's § 1983 claims may be asserted against the individually named defendants in their official capacities.

42 U.S.C. § 1983 allows individuals to seek redress when someone acting under the authority of state law "subjects" them to a deprivation of rights or "causes" them "to be subjected" to a deprivation of rights. Generally, a plaintiff asserting a claim under 42 U.S.C. § 1983 must (1) allege the deprivation of a right secured by the Constitution or federal law and (2) demonstrate that the alleged violation was committed by a person acting under color of state law. *Cornish v. Correctional Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005). Mr. Bennard alleges that the named Defendants deprived him of his First Amendment rights, his right to equal protection, and both procedural and substantive due process. While Mr. Bennard raises these allegations against all four named defendants, Dr. Yinan Huang had no connection to the enforcement of the disputed acts. *See K.P. v. LeBlanc*, 627 F.3d at 124. She is a non-administrative faculty member, so she would

7

26-60007.1771

have no ability to grant Mr. Bennard his requested relief nor did she initiate, approve or ratify his provisional status. *Ex parte Young* does not allow claims against Dr. Huang in her official capacity.

He asserted that his downgrade in status and the non-renewal of his Graduate Research Assistantship was unlawful and he seeks injunctive relief from the same named officials. This meets the standard for alleging prospective relief for ongoing violations of federal law against the named Defendants. *See Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 324 (5th Cir.2008) (former state university employee's request for reinstatement of employment in his suit for FMLA and constitutional violations was "a claim for prospective relief designed to end a continuing violation of federal law" and thus within the *Ex parte Young* exception to Eleventh Amendment immunity). Mr. Bennard's § 1983 claims for prospective relief against Dr. Barnard, Dr. Yang, and Dr. Kluck in their official capacities is allowed under *Ex parte Young*.

## II.      Individual Capacity Claims

Mr. Bennard alleges that Defendants violated his First and Fourteenth Amendment rights. His 42 U.S.C. § 1983 claim is based upon alleged retaliation that he faced for his familial association with Mr. Alfred, who is suing the University for failure to accommodate his disability, which allegedly led to increased scrutiny of his Abilities Transcript submission and an alleged departure from academic norms in how he was treated, leading to his new state as a non-degree seeking student and non-renewal of his Graduate Research Assistantship position. Defendants Dr. Yi Yang, Dr. Marie Barnard, Dr. Annette Kluck, and Dr. Yinan Huang (collectively "The named Defendants") raised a qualified immunity defense in response to Mr. Bennard's claims against them in their individual capacities.

Qualified immunity is a judicially created legal doctrine which "shields federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v.*

8

*Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant "pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion," the burden shifts to the plaintiff to "rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997). "The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct." *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001)). The plaintiff, not the defendant, must do the majority of the work in the qualified immunity context.

In this case, Defendants Dr. Yang, Dr. Barnard, Dr. Kluck, and Dr. Huang are all officials working for the University of Mississippi, a state agency. All of the named defendants are government officials whose positions involve the exercise of discretion, so they are able to raise a good faith qualified immunity defense. *See e.g. Babinski v. Sosnowsky*, 79 F.4th 515 (5th Cir. 2023) (allowing a university professor to raise qualified immunity in a § 1983 action); *see also Dudley v. Angel*, 209 F.3d 460 (5th Cir. 2000) (holding that university officials were entitled to qualified immunity from § 1983 liability). The burden has shifted to the plaintiff, Mr. Bennard, who has responded to Defendants' qualified immunity motion.

To rebut a qualified immunity defense, the plaintiff must have "alleged a violation of a constitutional right and whether the right at issue was 'clearly established' at the time of the alleged violation." *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Supreme Court stated that "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft*, 563 U.S. at 735.

9

26-60007.1773

Mr. Bennard has alleged violations of his constitutional rights, which form the basis for his § 1983 claim against Defendants. At this motion to dismiss stage, the Court will accept the allegations that Defendants violated his rights as he claims in his complaint, so long as it does not contradict the record. *See id.* at 678. Even assuming the allegations in his complaint are sufficient to meet the first element, he has not cited sufficient case law to show that the rights violated were clearly established. *See Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (The burden of proof to show that an officer violated a clearly established law is "heavy.").

Regarding the clearly-established-right prong, "[a] right is 'clearly established' if it is 'one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Cope*, 3 F.4th at 204 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Unless existing precedent 'squarely governs' the conduct at issue, an official will be entitled to qualified immunity." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam)).

Mr. Bennard alleged that the named Defendants placed him on provisional status because he complained about the handling of his mentorship agreement and that he maintained his familial relationship with his brother Alfred. He also contends that he was treated harshly because he was a Black African student rather than because his actions merited such a sanction. The named Defendants assert that their actions did not violate Mr. Bennard's constitutional rights. They placed him on provisional status and did not renew his Graduate Research Assistantship because he failed to submit his Abilities Transcript and not due to his relation to his brother, his race, his national origin or his complaints about the department. They contend that a failure to complete the Abilities Transcript would result in any graduate student's classification as provisional and the non-renewal of their Assistantship position.

10

The named Defendants argue that Mr. Bennard has not cited a factually analogous case holding that the named Defendants' specific conduct was unconstitutional. The Court agrees with this assertion. Mr. Bennard cited some case law, but none of it "squarely governs" Defendants' conduct at issue. *See Cope*, 3 F.4th at 204. Mr. Bennard claims that his rights of "freedom from retaliation (**Pickering**), procedural due process in disciplinary actions (**Dixon; Goss**), and equal protection from arbitrary treatment (**Olech**) were long and clearly established." [36].[1] There is no clear indication on his part showing how the case law he cites classifies the named Defendants' particular actions as violations beyond debate. *See Morrow*, 917 F.3d at 874. Clearly established law must not be defined at a high level of generality. *See City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity is no immunity at all if clearly established law can simply be defined as the right to be free from unreasonable searches and seizures.").

The majority of Mr. Bennard's response to the Defendants' qualified immunity defense pertained to issues he had with how Defendants portrayed the record and facts he presented. The manner the facts are presented are not relevant to the Court's qualified immunity analysis. As a result, the Court will limit its analysis to Mr. Bennard's response to the case law he cited to indicate that his violated rights were clearly established.

Mr. Bennard asserts his First Amendment right was violated and cites *Adler v. Pataki* to argue that he has a clearly established cause of action for retaliation due to maintaining his relationship with his brother Alfred. 185 F.3d 35 (2d Cir. 1999). In *Adler*, the Second Circuit recognized that retaliation for action taken by a spouse is a violation of the First Amendment's

---

[1] Mr. Bennard is citing the following cases to show that his allegedly violated rights were clearly established, but he does so at a high level of generality: *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968); *Dixon v. Ala. State Bd. of Ed.*, 294 F.2d 150 (5th Cir. 1961); *Goss v. Lopez*, 419 U.S. 565 (1975); *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000).

11

right of intimate association. *Id.* at 44. *Adler* is a Second Circuit opinion which is not binding on this Court. Without any citation to an analogous Fifth Circuit or Supreme Court case on the matter, Mr. Bennard's First Amendment allegations fail to overcome the named Defendants' qualified immunity defense.

Mr. Bennard also claims his procedural and substantive due process rights were purposefully violated. He cites *Dixon v. Alabama State Board of Education* to argue that the named Defendants violated his due process rights because the University allegedly placed him in provisional status and altered his mentorship agreement in spite of the University's procedural safeguards. 294 F.2d 150 (5th Cir. 1961). The *Dixon* Court held that some form of notice and a hearing is required to expel or suspend a student from a state university when charged with misconduct. *Id.* at 158-59. Mr. Bennard's situation differs enough from the *Dixon* decision. Mr. Bennard was not expelled or suspended, he was merely placed into provisional status, still giving him access to the University and its courses.

Additionally, Mr. Bennard's downgrade in status and nonrenewal of his Graduate Research Assistant position were due to his failure to complete his Abilities Transcript, a non-coursework requirement for his program, rather than for any disciplinary reasons. *Dixon* explicitly emphasizes the hearing requirement for expulsions based on misconduct rather than a failure to meet scholastic standards. Mr. Bennard's assertions that the Abilities Transcript is merely a tool for reflection does not negate that it is also a requirement for the completion of his program. The record also indicates that Mr. Bennard was given ample notice by the Defendants that his failure to complete his Abilities Transcript would have a negative effect on his Graduate Research Assistant position. His subsequent removal from the Ph.D. program was in response to his failure to meet scholastic standards and not for misconduct.

Mr. Bennard failed to meet his burden of showing that existing precedent squarely governs Defendants' conduct. Additionally, many of his arguments to support his claims, such as his equal protection claims, are not supported with any case law as required to rebut qualified immunity. The named Defendants are entitled to qualified immunity and all of Mr. Bennard's claims against them in their individual capacities are dismissed. See *Cope*, 3 F.4th at 204.

### III. Official Capacity Claims

Moving to the official capacity claims against the three non-barred Defendants, they argue that any remaining claims must be dismissed for failure to state a claim. The Court finds this argument well taken.

The Fifth Circuit has recognized that Section 1983 claims against public officials are subject to a heightened pleading requirement; a plaintiff "must do more than allege conclusions;" they must assert "claims of specific conduct and actions giving rise to a Constitutional violation." *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir.1996) (citing *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir.1995) (en banc). The Court will evaluate whether Mr. Bennard sufficiently stated a claim under this heightened standard.

### A. First Amendment Claims

Defendants argue that Mr. Bennard did not adequately raise a First Amendment retaliation claim because he did not plausibly allege that he was placed on provisional status due to activity protected by the First Amendment. "To prove a retaliation claim cognizable under the First Amendment, the plaintiff must show that her speech was constitutionally protected and that it was a 'substantial' or 'motivating' factor in the defendant's decision." *Kelleher v. Flawn*, 761 F.2d 1079, 1083 (5th Cir. 1985) (quoting *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). The plaintiff may meet this burden with direct evidence

13

or through "a chronology of events from which retaliation may be plausibly inferred." *Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997). If a plaintiff meets this burden, the burden shifts to the defendant to show "that it would have taken the same adverse employment action against" the plaintiff "even in the absence of the" plaintiff's "protected conduct" *Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 455 (5th Cir. 2013) (citing *Charles v. Grief*, 522 F.3d 508, 516 n. 28 (5th Cir. 2008)).

"Whether speech is entitled to First Amendment protection is a question of law." *Kelleher*, 761 F.2d at 1084. The Defendants argue that there is no case law establishing a student's refusal to accept department instructions related to his academic program, such as Mr. Bennard's refusal to submit the Abilities Transcript, as protected activity under the First Amendment. They even argue that, in the public employment context, the First Amendment does not shield speech and conduct amounting to insubordination directed at school officials. [29] (quoting *Kelleher*, 761 F.2d at 1084). Mr. Bennard argues that his downgrade in status occurred because he complained about the unilateral alteration of his mentorship agreement and that his complaints were merely legitimate requests to force the faculty to adhere to University policy, rather than acts of insubordination. [36].

Mr. Bennard did not cite to any law establishing this communication as protected, and how it differs from insubordination. He characterizes his communications as "professional" and 'evidence-based," but does not refute that he refused to submit his Abilities Transcript despite requests from faculty. Mr. Bennard's communications are not protected speech because he failed to cooperate with the Defendants' requirement to submit his Abilities Transcript. *See Kelleher*, 761 F.2d at 1084. The actions taken by Defendants in response to this unprotected speech are not actionable.

As to Mr. Bennard's claims that his familial association with Mr. Alfred formed the basis for retaliation against him, the Defendants argue that his downgrade in status was not caused by his familial association. Mr. Bennard asserts that he faced retaliation due to his association with his brother, who made complaints of his own to the department around the time that his mentorship agreement was changed.

Assuming this Court would recognize a cause of action for retaliation for associating with a sibling, as Mr. Bennard argues by citing *Adler v. Pataki*, a second circuit opinion, Mr. Bennard has not adequately alleged that his downgrade in status was caused by his brother's complaints rather than his own failure to submit the Abilities Transcript. 185 F.3d 35 (2d. Cir. 1999); *see Kelleher*, 761 F.2d at 1083. Mr. Bennard claims that his brother's complaints lead to him facing increased faculty scrutiny. Even if this is the case, the Defendants assert that Mr. Bennard would have faced the same downgrade in status for not completing the Abilities Transcript program requirement. The Court finds that Mr. Bennard's failure to submit the Abilities Transcript is the motivating factor for his provisional status, and the record supports the Defendants' contention that even if Mr. Alfred never made complaints about the graduate program, they still would have assigned Mr. Bennard provisional student status for failing to complete his Abilities Transcript. *See Mooney*, 538 F. App'x at 455. None of Mr. Bennard's protected speech and associations were the primary motivation for his downgrade in status, so Mr. Bennard's retaliation claims against Dr. Barnard, Dr. Yang, and Dr. Kluck in their official capacities fail.

B.  **Equal Protection Claims**

Mr. Bennard claims that the actions taken against him were due to discrimination based on his race as a Black man, and his national origin as an African in violation of his right to equal protection. The Defendants state that Mr. Bennard's equal protection claims must fail because

15

26-60007.1779

while he claims to have been treated differently than similarly situated White or U.S.-born students, he fails to point to any specific person or make any factual allegations about their circumstances. Notably, he does not allege that any non-Black or non-African student who refused to complete the Abilities Transcript was treated differently than himself.

Put simply, the equal protection clause directs states to treat all similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439 (1985). A state government can violate the Equal Protection Clause only by intentional discrimination. *Lavernia v. Lynaugh,* 845 F.2d 493, 496 (5th Cir. 1988). "Discriminatory purpose ... implies more than intent as violation or as awareness of consequences[.] ... It implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effect on an identifiable group[.]" *Id.* (internal quotations, citations, and footnote omitted) (emphasis in opinion). A violation of the equal protection clause can occur only when the governmental action in question classifies or distinguishes between two or more relevant persons or groups. *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir. 1988).

Mr. Bennard's equal protection claim fails because he did not sufficiently allege that he has been treated differently from others similarly situated. *See Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018). His complaint alleges that other similarly situated students never faced changes to their mentoring agreements or reclassification as provisional students, but he points to no specific person in similar circumstances who is not within Mr. Bennard's protected class who was treated differently. Mr. Bennard's equal protection claims are "merely legal conclusions that we are not required to credit." *Id.* For this reason, the Mr. Bennard's equal protection claim shall be dismissed for failure to state a claim upon which relief could be granted.

16

C. **Due Process Claims**

Mr. Bennard claims that his procedural and substantive due process rights were violated when the Defendants placed him on provisional status and did not renew his Graduate Research Assistantship position without adequate notice, hearing, or impartial review. The Defendants posit that Mr. Bennard's due process claim fails as his affected interest is not a protected property interest meriting due process.

The threshold issue in a due process claim is whether a protected property interest exists. *Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020). "If there is no protected property interest, there is no process due." *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992). The United States Supreme Court "has not held college academic decisions implicate property or liberty interests, entitling a student to constitutional due-process protections." *Smith v. Davis*, 507 F. App'x 359, 362 (5th Cir. 2013). The Fifth Circuit held that "a student who is not denied access to public education does not have a property or liberty interest implicated." *Id.* (citing *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997). The Court determined above that the downgrade in status as a result of Mr. Bennard's refusal to submit his Abilities Transcript is an academic decision, so any associated interest is not protected so as to require due process. *See Id.* This includes his subsequent removal from the Ph.D. program for failing to meet the requirements given to him by the University to regain full standing by the spring semester.

Mr. Bennard claims that because his provisional status prevented the renewal of his Graduate Research Assistantship, he lost his sole means of income and is unable to comply with his F-1 visa and to stay in the country. As a result, he claims his downgrade in status is constructive expulsion because he will lose access to the University and its courses if he is deported. Mr. Bennard cites no case law establishing this as a protected interest. Fifth Circuit precedent instead

17

establishes that continued enrollment in a post-graduate or professional program is not a protected interest. *Pickett v. Tex. Tech. Univ. Health Sci. Ctr.*, No. 24-10304, 2024 WL 4973300, at *2-3 (5th Cir. Dec. 4, 2024) (citing *Barnes v. Symeonides*, 44 F.3d 1005 (5th Cir. 1995)). Mr. Bennard's due process claims fail, and his claims against Dr. Barnard, Dr. Yang, and Dr. Kluck in their official capacities are dismissed.

## IV.     Breach of Contract Claims

Turning to Mr. Bennard's state breach of contract claim, in cases such as this one, where all federal claims are dismissed prior to trial, 28 U.S.C. § 1367(c)(3) grants this court discretion to decline to exercise supplemental jurisdiction over the remaining state law claims. In the Fifth Circuit, the "general rule" is that courts should "decline supplemental jurisdiction [over state law claims] when all federal claims are dismissed or otherwise eliminated from a case." *Certain Underwriters at Lloyd's v. Warrantech Corp.*, 461 F.3d 568, 578 (5th Cir. 2006). In concluding that it should follow the general rule in this case, this Court notes that § 1367(c) provides that:

> The district courts may decline to exercise supplemental jurisdiction [if] (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Importantly, the four § 1367(c) factors are listed in the disjunctive, which means that only one of them needs to be met to grant a district court discretion to decline to exercise supplemental jurisdiction. Since the underlying federal claims are being dismissed, the Court will decline to exercise supplemental jurisdiction over Mr. Bennard's breach of contract claim against any defendants in their individual capacities.

18

## V. Other Motions

Mr. Bennard has filed eight other pending motions before this Court. [14]; [15]; [16]; [19]; [20]; [26]; [46]; [44]. Mr. Alfred filed a motion to join his brother's Rule 65 motions. [45]. The dismissal of all of Mr. Bennard's underlying claims against every defendant has rendered all these other motions moot. As a result, all nine motions are denied.

## CONCLUSION

**ACCORDINGLY**, Defendants' Motion to Dismiss [28] is **GRANTED**. Mr. Bennard's eight pending motions [14], [15], [16], [19], [20], [26], [46], [44] and Mr. Alfred's pending motion to join [45] are **DENIED as moot**. Mr. Bennard's Federal Claims against Defendants are **DISMISSED WITH PREJUDICE** and Mr. Bennard's State Law Breach of Contract Claim is **DISMISSED WITH PREJUDICE** against the University of Mississippi and all other Defendants in their official capacities and is **DISMISSED WITHOUT PREJUDICE** against the named Defendants in their individual capacities.

**SO ORDERED** this 6th day of January, 2026.

/s/Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI

19

26-60007.1783

**Tab 4**

**Abilities Transcript Student Manual (Exhibit Q)**

**ROA.26-60007.532.**

Exhibit Q - 2024 ~ AT Guide Pg 6

## THE ABILITIES TRANSCRIPT

The "Abilities Transcript" is one of the chosen tools for assessment within the graduate programs of the Department of Pharmacy Administration. It is not a "grading" instrument, used as a "report card" for passing or failing grades. The graduate experience involves learning and growth in areas much broader than that represented by graded coursework. A tool was needed to aid in fostering that growth and development.

No ideal method of graduate assessment could be found among the models that were identified. Therefore, this instrument was developed by individuals within the Department of Pharmacy Administration, and is based in part on existing industry models designed to evaluate the professional development of employees.

The Abilities Transcript approach to assessment recognizes the uniqueness of each graduate student. How can a reliable and valid measure of development be standardized for graduate education within our department? Every student's experience is different, and those differences are encouraged and celebrated. Your own graduate experience should be tailored to you and your needs. You will find that the Department of Pharmacy Administration is willing extend itself wherever possible to make your graduate experience fit your expectations. Regular assessment through the use of the Abilities Transcript will enable the progressive realization of both your expectations and those of the department.

The Abilities Transcript is not a perfect tool. It has both advantages and disadvantages.

DISADVANTAGES:
- Time involved (both your time and that of the faculty members associated)

ADVANTAGES:
- Input to encourage improvement in departmental offerings (a formal voice)
- Timely feedback from faculty on your performance and their expectations
- Goal-directed guidance of your personal educational program
- Structured management of your graduate "career," enabling you to better get what you want out of your education
- Facilitation of well-rounded professional development
- Learning that occurs through the assessment process itself
- Preparation for curriculum vitae or teaching portfolio

## COMPLETING THE ABILITIES TRANSCRIPT

1. Preparing for the development consultation
   - Assemble (brief descriptions of) collected evidence supporting your development of the core abilities recognized by the department.
   - Obtain a copy of the Abilities Transcript forms, including the Transcript Worksheet, to help you gather information.
   - Review your year's experience, and make an effort to identify areas of professional growth over that time. (Allow yourself to think of areas of growth outside the core abilities. Your graduate experience is likely to include exposures

*Abilities Transcript: Student Manual – page 4*

26-60007.1411

Exhibit Q - 2024 ~ AT Guide Pg 8

3.  Consultation with Development Mentor (a faculty member of your choice)

    You and your Development Mentor will schedule a consultation meeting at least one week prior to its occurrence.

    In preparation for the consultation, your Development Mentor will complete a copy of an Abilities Transcript evaluation for you--independently of your input, but using input collected from other faculty with whom you have had contact during the year. (If you would like for your Mentor to have input from other sources, such as a summer internship mentor, provide your Mentor with that information.)

    Several steps will occur during the consultation:
    *   The two of you will, together, review the evidence (that which you have collected and that from external sources) regarding ability development during the current semester.
    *   Discussion will follow, during which levels indicating your current development status for each of the core abilities will be agreed upon. This is a joint decision, and equal contribution on the part of both the Student and the Mentor are expected. Understand that this assessment, which combines both objective and subjective elements, is not a "grade." The level assignments provide evidence of your developmental progress through the course of the graduate program.
    *   The level assignments also enable you and your Mentor to see where strengths lie and where improvements may be made — both in yourself, and in the department's delivery of course content.
    *   Based on your discussion, the Development Mentor will assist you in the formulation of realistic goals and objectives for the next semester, and develop a tentative plan (on paper) for accomplishing them.

4.  File completed Abilities Transcript
    *   Retain a copy of your completed Abilities Transcript and your goals statement for your records.
    *   Your Development Mentor will also keep a copy and will provide a copy to the department chair, for retention in the Departmental Assessment File that is kept in the Departmental Office.

## SUGGESTIONS FOR YOUR ABILITIES TRANSCRIPT

Don't wait until the last minute to consider your progress and to assemble your evidence. However, do not be intimidated if you do find yourself at the end of the semester without having given it a thought. Procrastinating may necessitate a more concerted effort at the end of the semester; but any time dedicated to your own development is time well-spent.

Keep a "personal" file folder in the front of one of your desk drawers. Throughout the semester, drop things into it that will help you assimilate supporting evidence of your development. Having these items centrally located will also help in the assembly of an updated CV.

*Abilities Transcript: Student Manual – page 6*

26-60007.1413

# Tab 5

# PHAD Graduate Student Developmental Mentor Assignment Roster (Exhibit O)

# ROA.26-60007.518.

Exhibit O ~ 08_29_2025 ~ Differential treatment in mentor assignment

**PHAD Graduate Student Developmental Mentor Assignment – Fall 2025**

| Faculty Mentor | Student Mentee |
|---|---|
| Yang, Yi | Junnan Qi |
| | *Diamant Gashi* |
| | |
| | |
| Rosenthal, Meagen | Prachi Prajapati |
| | Arman Arabshomali Mohammad |
| | Shadi Bazzazzadehgan |
| | *James Hawkins* |
| | |
| Ramachandran, Sujith | *Natalie Minton* |
| | *Ziqi Guo* |
| | |
| | |
| Huang, Yinan (co-mentor, Yang, Yi) | Ehiremen (Bennard) Eriakha |
| | |
| | |
| | |
| Holmes, Erin | Joanne Canedo |
| | Nga Weng (Ivy) Leong |
| | *Keerthana Iyer* |
| Bentley, John | Alfred Omokhodion Eriakha |
| | Ann Kate Meagher |
| | |
| | |
| Barnard, Marie | Omkar Ghodke |
| | Liang-Yuan (Claire) Lin |
| | Sai Veeramachaneni |

26-60007.1397

# Tab 6

# Mentor-Mentee Agreement (Exhibit A)

# ROA.26-60007.450.

## Exhibit A ~ 07_19_2024 ~ UMSOP Mentor_Mentee Agreement Form Pg 7

- I will be knowledgeable of all institutional research policies. I will comply with all institutional safety practices and human-research policies. I will participate in my institution's Responsible Conduct of Research Training Program and practice the guidelines presented therein while conducting my research. I will also seek input on and comply with institutional policies regarding my research design and data analysis.

- I acknowledge that I have the primary responsibility for the development of my own career. I recognize that I need to explore career opportunities and paths that match and develop my individual skills, values, and interests to achieve my desired career goals. I understand that I should use the Abilities Transcript and the Individual Development Plan to help me define my career goals and develop my training plan. I will seek guidance throughout my graduate education from my developmental mentor, thesis/dissertation advisor, academic advisor, career counseling services, thesis/dissertation committee, other mentors, and any other resources that can offer advice on career planning and the wide range of career opportunities available.

Responsibilities & Expectations of Developmental Mentor

- I acknowledge that mentorship is a reciprocal relationship and that I must do my part to maintain it. Throughout the graduate student's time in our program, I will be supportive, equitable, accessible, encouraging, and respectful. I will foster the graduate student's professional confidence and encourage intellectual development, critical thinking, curiosity, and creativity. I will continue my interest and involvement as the student moves forward into a career.

- I will be committed to meeting one-on-one with the student on a regular basis. I will regularly review the student's progress and provide timely feedback and goal-setting advice.

- I will facilitate an environment that is intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment.

- I will demonstrate respect for all graduate students as individuals without regard to age, sex, gender, race, color, national origin, religion, disability or sexual orientation, and I will cultivate a culture of inclusivity among the entire department.

- I will not require the graduate student to perform tasks that are unrelated to the training program and professional development.

- I will expect the graduate student to share common graduate student responsibilities and use resources carefully and frugally.

- I will discuss with the student intellectual policy issues regarding disclosure, patent rights, and publishing research discoveries.

3

26-60007.1329

Exhibit A ~ 07_19_2024 ~ UMSOP Mentor_Mentee Agreement Form Pg 8

- I will expect the graduate student to abide by policies and requirements of the graduate program, graduate school, and institution. These policies include but are not limited to policies on work hours, medical leave, and vacation, policies on authorship, and policies on attendance at professional meetings. I will encourage the graduate student to discuss these policies with appropriate advisors

- I will encourage the graduate student to attend and present their research at a minimum of one scientific/professional meeting.

- I will promote the training of the graduate student in professional skills needed for a successful career. These skills include but are not limited to oral and written communication, grant writing, management and leadership collaborative research, responsible conduct of research, teaching, and mentoring. I will encourage the student to seek opportunities to develop skills in other areas, even if not specifically required by the student's program. I will also encourage the graduate student to seek input from multiple mentors such as their thesis/dissertation advisor and teaching/research assistantship advisor

- I will facilitate an environment in which the student can discuss and explore career opportunities and paths that match their skills, values, and interests and be supportive of their career path choices. I will be accessible to give advice and feedback on career goals

- I will work with the student on their Abilities Transcript and Individual Development Plans to help define career goals and identify training milestones.

By signing this document, the developmental mentor and the graduate student agree to each other's responsibilities and expectations

_____ 7/19/2024

Graduate Student (Mentee) Signature & Date

_____ Tiran Huang 7/19

Developmental Mentor (Mentor) Signature & Date

26-60007.1330

**Tab 7**

**Plaintiff's Opposition to Motion to Dismiss**

**ROA.26-60007.710.**

## I.   INTRODUCTION

Defendants' Motion to Dismiss (doc. 28-29) rests not on law but on distortion—anchored in overbroad claims of immunity and selective mischaracterizations of the record. Plaintiff does not challenge academic discretion, contest grades, or pursue monetary damages from the State of Mississippi. His claims seek prospective, equitable relief to remedy ongoing constitutional violations: retaliation for protected advocacy, unequal treatment based on race and national origin, and deprivation of protected liberty and property interests without due process. Each violation was carried out under color of state law by identifiable University officials acting beyond the bounds of lawful authority.

At this stage, the Court's role is limited and precise: *to assess whether the pleadings, taken as true, plausibly state a claim for relief*—not to weigh evidence or adjudicate factual disputes. ***Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)***; ***Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)***. Under this standard, every well-pleaded fact must be accepted as true and all reasonable inferences drawn in Plaintiff's favor. Viewed through that lens, the Complaint not only meets but exceeds the ***Rule 12(b)(6)*** threshold.

## II.   MISCHARACTERIZATION OF PLAINTIFF AND THE RECORD

Defendants' briefing relies on a pattern of rhetorical inversion—using words such as *"refused,"* *"on his own terms,"* *"obstinate,"* *"insubordinate,"* and *"mentor of his choice"* to invert the truth of Plaintiff's conduct. These are not factual descriptions at all, but unfounded characterizations designed to recast Plaintiff's policy-based advocacy as misconduct. The purpose is transparent: to divert attention from Defendants' own procedural violations.

26-60007.1588

Plaintiff's communications, contemporaneous emails, and attached exhibits reflect a consistent pattern of professionalism and good faith. He sought only what University policies require: transparency, fairness, and mutual respect. His actions were anchored in respect for institutional norms, not defiance of them. He advocated for a mentoring environment that was collegial, equitable, and psychologically safe—principles the University itself publicly espouses.

Mischaracterizations of the record burden not only the Plaintiff but also the Court. **Rule 11** requires parties to present factual and legal contentions that are grounded in evidence and to refrain from knowingly misrepresenting the record. When advocacy crosses into distortion, it threatens the integrity of judicial proceedings. Plaintiff raises this concern not as a matter of personal indignation, but as one of institutional importance: the justice system can only function when the facts before the Court reflect reality, not a strategic fiction.

The Court should accordingly view Defendants' characterizations for what they are—efforts to obscure the constitutional substance of this case beneath a veneer of caricature. Plaintiff's conduct was never "*insubordinate*"; it was principled. It was not "*on his own terms*," but within the terms the University itself prescribed. His record is one of compliance, consultation, and courage in the face of pressure.

Accordingly, the following section sets forth, with precision and documentation, the principal factual and legal misstatements contained in Defendants' memorandum, alongside the contemporaneous evidence that corrects them. These corrections are necessary not only to protect the integrity of this proceeding but to ensure that this Court's review proceeds on a foundation of accuracy and truth.

## III.   FACTUAL AND LEGAL CORRECTIONS

3

26-60007.1589

## 1. The Record Contradicts Defendants' Claim That Plaintiff Refused to Complete the Abilities Transcript

Defendants' memorandum (doc. 29) opens with the unfounded assertion:

> *"Plaintiff Ehiremen Bennard Eriakha, a doctoral student in the University of Mississippi's Department of Pharmacy Administration refused to complete a required self-assessment unless the Department provided him with a mentor of his choice and excused him from an in-person meeting with the mentor".*

The contemporaneous record clearly shows that Plaintiff never "*refused*" to complete the Abilities Transcript ("AT"); he sought only to ensure that its completion occurred within lawful, policy-compliant mentoring conditions. As documented in *Exhibit D (July 9, 2025 – Response to Abilities Transcript Threats)*, Plaintiff repeatedly affirmed his willingness to complete the AT in accordance with the procedures established in the *July 19, 2024 Mentor–Mentee Agreement (Exhibit A)* and the *Department's own Abilities Transcript policy and guide (Exhibits P and Q)*. Those documents expressly required that the AT process occur within a mentoring environment that is supportive, psychologically safe, and professionally respectful—conditions the Department itself pledged to uphold.

The record contains no evidence that Plaintiff ever sought "*a mentor of his choice*." His position was not one of preference, but of policy continuity—to preserve the mentoring relationship that had already been formalized, documented, and approved by the Department. He sought adherence to the existing structure, not alteration of it.

Likewise, Defendants' claim that Plaintiff sought to be "*excused*" from an in-person meeting is a gross distortion. The record shows that Plaintiff objected only to being compelled into a closed-door, in-person meeting with two faculty members in violation of the signed Mentor–Mentee

4

26-60007.1590

Agreement, principles of mentoring ethics, and the University's own Title IX–aligned standards of professional conduct.

Plaintiff sought only that the Department honor the express terms of the formally signed Mentor-Mentee Agreement that explicitly guaranteed: *"one-on-one mentorship"*; *"a mentoring environment that is intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment"*; and *"respect for students as individuals regardless of age, sex, gender, race, color, national origin, religion, disability or sexual orientation."* Those expectations were not inventions of convenience; they are explicitly embedded in the *Mentor–Mentee Agreement (Exhibit A)* and in the Department's own policies.

## 2. Procedural Violations, Not Academic Judgment, Led to the Provisional Status and Assistantship Termination

Defendants attempt to portray procedural violations as a routine "academic measure", with the statement:

> *"After several warnings, Plaintiff was placed on 'provisional status' but 'was not removed' from his program of study. Because he was on provisional status, Plaintiff was not eligible to serve as a graduate assistant during the Fall 2025 semester."*

collapses under the weight of evidence to the contrary. Plaintiff was downgraded to "provisional status" on **August 21, 2025**—after the start of the academic semester—in direct violation of the University's mandatory procedural safeguards. Under the University's M Book, such a downgrade may occur only **(1)** between semesters or enrollment periods, **(2)** following a documented academic performance deficiency, and **(3)** after formal review by an appropriate faculty committee. None of these conditions was met.

5

The following day, **August 22, 2025**, the status downgrade was ratified by the Dean of the Graduate School, and that same day, Plaintiff's Graduate Research Assistantship was terminated by the Department Chair, expressly invoking the newly imposed provisional status as the sole justification. The timing speaks for itself—an academic downgrade in the morning followed by termination that same evening. These events, thoroughly documented in Plaintiff's Memorandum of Law (***Docket. 23, pp. 19–22; Exhibits. L & M***), reveal a pattern of premeditated planning and calculated coordination.

Defendants' assertion that Plaintiff "*was not removed*" from the program is form over substance. It is as inaccurate as it is dismissive. It ignores the constitutional and practical reality that the combined effect of their actions—an unauthorized status downgrade immediately followed by the termination of all financial support—operated as a constructive expulsion. The Graduate Research Assistantship was not a peripheral privilege; it formed the foundation of Plaintiff's academic continuity, providing his sole income and enabling his enrollment, housing, and F-1 visa compliance. Out of necessity, Plaintiff and his twin brother have established a verified GoFundMe campaign to secure minimal support for food, rent, and other basic living expenses during this period of deprivation (available at *https://shorturl.at/Qzkr0*).

To claim that Plaintiff "*remained in the program*" while deliberately stripping away the means necessary to remain enrolled reflects not academic oversight, but administrative indifference of a constitutional magnitude. The knowing deprivation of livelihood, standing, and legal status under the pretense of discretion is not an exercise of professional judgment—it is conscience-shocking conduct.

### 3. The Mentor–Mentee Agreement Was Binding and Could Not Be Unilaterally Altered

6

Defendants attempt to undermine their own department-approved, signed formal Mentor-Mentee Agreement with the statement:

> *"This document discussed the parameters of the mentoring relationship between Plaintiff and Dr. Huang, but it did not prohibit the Department from assigning Plaintiff a different mentor for 'any reason'."*

provides further evidence of the unethical practices and procedural irregularities that Plaintiff advocates against. Contrary to Defendants' assertion, the Department had no authority to unilaterally restructure Plaintiff's signed mentoring agreement without his consent or policy authorization. The assertion misconstrues both the language and the legal character of the ***July 19, 2024 Graduate Mentor–Mentee Agreement (Exhibit A)***. The Mentor-Mentee Agreement is not a casual administrative form; it is a bilateral commitment designed to safeguard the quality, stability, and integrity of graduate mentorship. It expressly guarantees regular *one-on-one* meetings and obligates the mentor to provide an environment that is *"intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."* These are enforceable institutional promises rooted in professional ethics and the University's own published policy.

## 4. The Abilities Transcript is a Reflective Tool, not a Graded Assignment or Disciplinary Tool

The evidence shows that the Abilities Transcript ("AT") was designed for developmental self-assessment—not as an evaluative instrument to justify termination of Graduate Research Assistantship or downgrade to "provisional status."

> *"Plaintiff and Dr. Huang corresponded between June 11 and 13, 2025, to discuss a time to meet to discuss and complete his Abilities Transcript, a project he acknowledged was 'required' to be completed by June 15."*

7

The AT is not an academic *"project"* or graded deliverable—it is a formative mentoring tool, expressly designed to promote self-reflection and constructive dialogue between a graduate student and their assigned mentor. Its stated purpose is developmental, not evaluative. The University's own AT Student Manual makes this clear, describing the AT as *"not a grading instrument, but a tool to aid in fostering growth and development"*. (**Exhibit Q – 2024 AT Guide**).

Similarly, the Department's Policies and Procedures (**Exhibit S**) define the AT as an element of the annual mentoring process—specifically, an "Abilities Consensus Meeting" intended to promote reflection, identify developmental goals, and strengthen the trust and psychological safety essential to effective mentorship. Nowhere do these policies describe the AT as evaluative, coercive, or disciplinary in nature. Repurposing such a document into a mechanism for sanction fundamentally distorts both its design and the spirit of the policies that govern it.

## 5. The June 13 "Co-Mentorship" Decision Was Unsupported by Policy and Lacked Mutual Consent

Defendants' description of the **June 13** restructuring:

> *"On June 13, 2025, Defendant Yi Yang, the Department Chair, informed Plaintiff that she would 'serve as Plaintiff's co-developmental mentor with Dr. Huang.'"*

omits that the Department Chair's self-appointment as "co-mentor" occurred without mutual consent and outside any established procedural framework. Dr. Yang's unilateral decision to insert herself as "co-developmental mentor" was an unauthorized restructuring of a mentoring relationship that had been formally established, approved, and documented under a signed Mentor–Mentee Agreement (**Exhibit A – July 19, 2024**).

8

26-60007.1594

That Agreement expressly adopted a *one-on-one* mentoring model between Plaintiff and Dr. Yinan Huang. It emphasized the creation of an environment that was *"intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."* The Agreement was not a mere formality; it was a bilateral commitment that bound both parties—and, by extension, the Department itself—to a relationship founded on trust, transparency, mutual respect, and psychological safety.

Neither the Department's Policies and Procedures (***Exhibit S***) nor the executed Mentor–Mentee Agreement authorizes the unilateral restructuring of a mentoring relationship into a *two-on-one* arrangement without prior consultation, documentation, or mutual consent. Dr. Yang's self-appointment as co-mentor was therefore an extraordinary procedural deviation.

## 6. The June 18 Meeting Was Imposed, Not Mutually Scheduled

While defendants selectively frame the **June 18** meeting by stating:

> *"Dr. Yang scheduled an in-person meeting for herself, Plaintiff, and Dr. Huang on June 18, and she confirmed that the deadline for Plaintiff to submit his Abilities Transcript would be extended through June 19."*

the record clearly shows that the **June 18** meeting was not arranged through mutual agreement or collaboration—it was a meeting imposed over Plaintiff's documented objections, and while his procedural concerns remained unresolved. As shown in ***Exhibit B (June 24, 2025 Email Thread)***, Plaintiff consistently affirmed his willingness to complete the Abilities Transcript ("AT") but requested two simple clarifications before proceeding: **(1)** the policy basis for the sudden and unilateral "co-mentorship" restructuring that violated the signed Mentor–Mentee Agreement (***Exhibit A***), and **(2)** the rationale for attempting to compel a closed-door, in-person meeting

9

26-60007.1595

between plaintiff and two faculty members when a virtual format had already been approved by his assigned mentor.

Despite Plaintiff's measured and policy-grounded requests for clarification, the Department Chair unilaterally insisted on an in-person meeting—disregarding both the good-faith nature of Plaintiff's procedural inquiries and the University's own mentoring safeguards.

## 7. Plaintiff's June 13 Email Reflected Policy Inquiry

Defendants attempt to misstate the '*tone and substance*' of Plaintiff's **June 13** correspondence, which raised legitimate policy questions about mentoring structure—questions that were neither answered nor acknowledged by departmental leadership by selectively stating:

> *"Plaintiff responded the same day and told Dr. Yang he had 'reviewed the departmental policies and did not see any provision stating that developmental mentors can be reassigned or restructured without mutual agreement between the mentor and mentee.' Plaintiff also expressed a preference for a virtual meeting rather than the in-person meeting Dr. Yang had proposed."*

This selective framing again collapses under the weight of evidence and factual record. The record shows that at the time of this correspondence, the only operative document—the duly executed ***UMSOP Mentor–Mentee Agreement*** (attached as ***Exhibit A***)—formally established a *one-on-one* mentoring relationship between Plaintiff and Dr. Yinan Huang.

On **June 13, 2025,** Dr. Yi Yang unilaterally announced her self-appointment as "co-developmental mentor" absent Plaintiff's consent or mutual agreement. Recognizing that this sudden change violated the terms of his existing Mentor–Mentee Agreement with Dr. Yinan Huang and appeared to contravene department policy, Plaintiff sought clarification rather than blindly acquiescing.

Plaintiff's **June 13** email sought to clarify whether any departmental or university policy authorized such a unilateral restructuring of the established mentoring agreement. In the same

10

26-60007.1596

correspondence, he reaffirmed his preference for a virtual meeting—a format already accepted by his assigned mentor, Dr. Yinan Huang, and fully consistent with the University's own principles of mutual consent, collaboration, and psychological safety in mentoring (***Exhibit B, June 11–13 emails***).

## 8. Defendants' Evolving Justifications Reveal the Lack of Policy Basis for the Restructuring

The Department's justification for unilaterally altering Plaintiff's mentoring structure has shifted repeatedly—each iteration further undermining its credibility. The initial claim:

> *"Dr. Yang responded that the change in Plaintiff's developmental mentor structure was approved by all tenured faculty recently in the department to support Dr. Huang's professional development as a faculty member."*

was later reframed as an act of "*faculty protection*," and eventually rebranded as one of "*mentoring continuity*." None of these explanations is supported by contemporaneous documentation or any policy authorizing such a structural alteration. The evolution of these rationales reveals not a legitimate academic purpose but a post hoc rationalization of an act that was procedurally and ethically defective from its inception.

The *UMSOP Mentor–Mentee Agreement* (***Exhibit A***) was not merely an administrative form—it was a mutual commitment establishing a *one-on-one* mentoring relationship defined by transparency, respect, and consent. By unilaterally inserting herself as co-mentor, Dr. Yi Yang breached both the letter and the spirit of the agreement, thereby compromising the trust and confidentiality essential to mentorship. A mentoring process that excludes the student from decisions about his own professional development is not supportive—it is coercive.

## 9. The Record Refutes Defendants' Account of the Meeting Format and Intent

11

26-60007.1597

What Defendants portray as routine "confirmation":

> *"She also stated that she had confirmed Dr. Huang had intended for the developmental meeting to be in person. Dr. Huang confirmed that the developmental meeting would be in person."*

was, in truth, an administrative override of a prior agreement—an act inconsistent with policy, unsupported by authority, and emblematic of the procedural irregularities at the heart of this case. As reflected in *Exhibit B* (*June 2025 Email Thread*), Dr. Yinan Huang initially expressed complete flexibility regarding the meeting format and explicitly agreed to conduct the mentoring meeting virtually. That agreement was consistent with both the letter and spirit of the Mentor–Mentee Agreement (*Exhibit A*) and established practice.

The record clearly shows that the shift and imposition of an in-person requirement did not originate from Dr. Yinan Huang but from Department Chair Dr. Yi Yang, who entered Dr. Huang's office during a virtual (Zoom) research meeting between Plaintiff and Dr. Huang, unilaterally declaring that the meeting "must be held in person." Discovery will provide further details regarding this event. No departmental policy, Graduate School rule, or University regulation authorized that a developmental mentoring meeting must be held in person, nor was any written rationale ever provided. This abrupt reversal, imposed by administrative fiat rather than mutual consent, disregarded both the governing mentorship agreement and the student's right to a mentoring environment grounded in respect, transparency, psychological safety, and free of harassment and intimidation.

**10. Plaintiff's June 14 Email Was a Policy-Grounded Clarification**

Defendants attempt, yet again, to misstate the '*tone and substance*' of Plaintiff's **June 14** correspondence, which raised legitimate ethical and policy questions about mentoring structure

12

and practices—questions that were neither answered nor acknowledged by departmental leadership, by selectively stating:

> *"Plaintiff responded with an email the next day 'challenging' Dr. Yang's participation in his mentoring process, asserting without explaining that her involvement would 'override [his] right to a safe, supportive, and non-coercive mentoring environment' and 'bypass [his] agency or compromise the autonomy that is fundamental to effective mentorship.'"*

This selective framing of '*tone and substance*' collapses yet again under the weight of the evidence and factual record. Plaintiff did not "*challenge*" authority or "*refuse*" to engage in the mentoring process. Rather, upon learning that his signed *one-on-one* Mentor–Mentee Agreement (***Exhibit A***) had been unilaterally altered—without consultation, documentation, or any citation to policy— Plaintiff exercised his right and duty to seek clarification.

The **June 14, 2025** correspondence (***Exhibit B***) demonstrates a tone of professionalism and respect throughout. Plaintiff expressed gratitude for the faculty's time, reiterated his willingness to complete the Abilities Transcript, and calmly requested clarification regarding the administrative authority and procedural basis for the sudden restructuring of his mentoring arrangement. His concurrent request to continue with a virtual meeting format—already accepted by Dr. Huang— was a principled, policy-based request that aligned with both the letter and spirit of the Mentor– Mentee Agreement and established practice. Defendants' decision to mischaracterize this correspondence as a "*challenge*", despite the record's clear tone of professionalism, underscores the heart of this dispute.

## 11. The Request for a Virtual Meeting Reflected Ethical Prudence

13

Defendants' attempt to mischaracterize Plaintiff's effort to preserve transparency, balance, and psychological safety within the mentoring environment as "objection" further strikes at the heart of this dispute:

> *"Plaintiff also 'objected' to meeting in person, claiming that imposing an in-person format without clear justification or mutual agreement risks compromising psychological safety and may diminish the openness and quality of the mentoring exchange."*

Plaintiff's assigned mentor, Dr. Yinan Huang, had already expressed full flexibility regarding a virtual format under the signed Mentor–Mentee Agreement (***Exhibit A***)—an agreement explicitly designed to ensure mentoring interactions occur within a *"safe, equitable, and supportive environment."* It was Dr. Yi Yang—who is not Plaintiff's mentor and who held administrative authority over both parties—that unilaterally imposed an in-person format, without reference to any University policy or procedural authority authorizing such action.

Even assuming, arguendo, that Plaintiff's assigned mentor had not previously agreed to a virtual meeting, given the unexplained departure from normal protocol and the power imbalance inherent in such a meeting, Plaintiff's preference for a transparent, open format was ethically justified, professionally sound, and fully consistent with University policy and mentoring best practices. The record reflects that two faculty members sought to compel Plaintiff into a closed, in-person meeting involving only the three of them—despite Plaintiff's documented and reasonable concerns regarding psychological safety and the need for transparency. The insistence and imposition of an in-person format disregarded well-established principles of mentoring ethics, power-balance awareness, and Title IX-aligned standards of professional conduct, all of which emphasize the student's right to a psychologically safe and non-coercive environment.

14

As Plaintiff rightly noted at the time: "*No student should be coerced into a private meeting that compromises comfort, transparency, or perceived safety, particularly where a reasonable alternative exists.*"

## 12. Plaintiff's Policy Clarification Was Fully Supported by Departmental Rules

Defendants' reliance on a single sentence from the Department Chair's email:

> "*Dr. Yang told Plaintiff that '[t]he developmental mentor for PHAD graduate students is assigned by the department chair.'*"

misrepresents both the scope and the substance of the governing policies. The *2024–2025 Department of Pharmacy Administration Policies and Procedures Manual* provides that the Chair assigns each student's initial developmental mentor, not that the Chair may unilaterally restructure an existing mentoring relationship or override a signed Mentor-Mentee agreement.

Plaintiff's assigned mentor is Dr. Yinan Huang. On **July 19, 2024,** at the outset of his doctoral studies, Plaintiff and his assigned mentor, Dr. Yinan Huang, signed a formal **Mentor–Mentee Agreement** (*Exhibit A*). That agreement established a *one-on-one* relationship built on mutual trust, respect, and confidentiality, explicitly guaranteeing a mentoring environment that was "intellectually stimulating, emotionally supportive, safe, equitable, and free of harassment."

Plaintiff's **June 14, 2025** correspondence (***Exhibit B***) properly invoked this agreement, requesting clarification of the policy basis for its sudden alteration. Rather than provide a substantive response or cite any applicable rule, the Department later inserted new language into its recent *2025-2026 Policies and Procedures Guide*—retroactively authorizing the very discretion Plaintiff had questioned. In an **August 29, 2025** email, the department's chair, Dr. Yi Yang, wrote:

15

26-60007.1601

*"You will have the same developmental mentor throughout your time in our program unless the department chair or faculty determine that a change in mentorship is necessary due to special circumstances." (Exhibit Y)*

This post hoc revision confirms what Plaintiff's inquiry had already revealed: at the time of the June restructuring, no policy authorized the Department Chair to unilaterally impose or alter a signed *one-on-one* mentorship agreement.

## 13. Requests for Clarification Were Grounded in Documented Policy, Not Personal Preference

Defendants' characterization of Plaintiff's communications as mere "concerns" or "preferences" misrepresents their substance and purpose:

*"Plaintiff responded that his concerns about the mentoring process and preference for a virtual meeting were 'neither acknowledged nor addressed.'"*

In reality, Plaintiff's correspondence identified clear and verifiable violations of the Department's own Policies and Procedures and of the executed *2024–2025 Mentor–Mentee Agreement* (**Exhibit A**). His **June 14** and **June 24, 2025** emails (**Exhibit B**) did not express personal dissatisfaction—they raised concrete procedural issues, including the Department's unilateral alteration of his mentoring structure and the imposition of an in-person meeting without policy authority, documentation, or mutual consent. Rather than address these legitimate inquiries, the Department ignored its own procedural safeguards and escalated directives. The question was never one of Plaintiff's compliance, but of the Department's adherence to its own rules.

## 14. The June 18 Exchange Must Be Understood Within Its Full Procedural Context

Defendants' reliance on the isolated statement:

16

26-60007.1602

> *"On the date and time of the scheduled June 18 meeting, Dr. Huang emailed to ask whether Plaintiff intended to attend."*

misrepresents both the sequence and the substance of events. The **June 18** exchange cannot be divorced from the procedural context that defined it.

Plaintiff did not "fail to attend" a validly convened meeting. Rather, he paused participation pending clarification of a newly imposed and procedurally irregular structure—an in-person "co-mentorship" meeting mandated without policy authority, without mutual consent, and in direct conflict with the signed *2024–2025 Mentor–Mentee Agreement* (***Exhibit A***).

As reflected in his **June 14** and **June 17, 2025,** correspondences (***Exhibit B***), Plaintiff explicitly confirmed his willingness to engage in the mentoring process once the Department clarified the administrative authority and procedural basis for the restructuring. The **June 18** exchange, viewed in its proper context, evidences Plaintiff's respect for institutional policy and adherence to due process.

## 15. The Record Demonstrates Plaintiff's Willingness to Complete the Abilities Transcript in Accordance with Policy

Defendants' assertion:

> *"He again acknowledged the importance of completing the Abilities Transcript and noted that Dr. Marie Barnard, the Graduate Program Coordinator, had 'recently followed up' to remind him about that requirement."*

mischaracterizes both the substance and spirit of Plaintiff's position. Plaintiff never opposed the Abilities Transcript ("AT") or questioned its value. His communications consistently affirmed the AT's intended purpose as a formative, self-reflective instrument to promote open dialogue between mentor and mentee—not as a tool of coercion or discipline. From the outset, Plaintiff demonstrated

17

26-60007.1603

readiness to complete the AT within the procedural and ethical boundaries set forth by the University's own mentoring policies, emphasizing mutual consent, professional respect, and transparency.

## 16. Protected Advocacy Cannot Be Miscast as Defiance

Defendants' attempt to portray Plaintiff's principled insistence on procedural fairness as "defiance"—using phrases like "*on his own terms*"—collapses under the weight of the record itself:

> "*Plaintiff told Dr. Yang he was 'eager' to complete the task, but only 'in a mentoring environment that is respectful, student-centered, and aligned with institutional expectations.' In other words, he would only agree to complete the assignment on his own terms.*"

The **June 24, 2025** correspondence (***Exhibit B***) reveals a student eager to complete the Abilities Transcript ("AT") in full compliance with the University's own mentoring framework, ethical standards, and signed agreements.

He asked for nothing more than adherence to the very principles the University itself proclaims: respect, transparency, mutual consent, and psychological safety. These were not *"Plaintiff's own terms—They are the University's"*.

## 17. The Dean's Endorsement Provided No Policy or Evidentiary Support

Defendants cite the Dean's email response:

> "*The Dean of the Graduate School, whom Plaintiff had added to this email exchange several days earlier, responded the same day and confirmed that '[t]he change in mentor structure is appropriate as outlined in the information provided by Dr. Yang.'*"

But this statement carries no independent weight. The Dean's message merely echoed departmental assertions, offering neither citation to governing policy nor reference to any

18

26-60007.1604

evidentiary record supporting the unilateral restructuring. It identified no provision of the *2024-2025 Department's Policies and Procedures Manual*, no clause of the *signed Mentor–Mentee Agreement* (***Exhibit A***), and no record of faculty deliberation authorizing such a unilateral change. The email provides no indication of what *"information provided by Dr. Yang"* was reviewed, what standard guided the Dean's assessment, or whether Plaintiff's documented procedural and ethical objections were considered in good faith.

**18. The Record Exposes Retaliatory Pretext Disguised as Mentoring Oversight**

Defendants' narrative that:

> *"Dr. Barnard also responded to Plaintiff's June 24 email to inform him that the faculty needed his Abilities Transcript to discuss his performance and progress and that his reappointment for a graduate assistantship 'hung in the balance'."*

collapses under the weight of its own contradictions. The record shows that rather than address Plaintiff's valid procedural questions, Defendants escalated the situation almost immediately after **June 18**. On **June 24, 2025**, Dr. Marie Barnard warned Plaintiff that his graduate assistantship *"hung in the balance"* unless the Abilities Transcript ("AT") was submitted within twenty-four hours. Yet less than a week later, on **June 30, 2025**, the same administrator abruptly abandoned that *"employment-related consequence"* and invoked an entirely new justification: *"academic discipline"*—threatening to recommend a downgrade to "provisional status" if the AT remained incomplete. These rapid, unexplained shifts—from employment-based coercion to academic sanction reveal the retaliatory intent.

Such oscillating justifications are the unmistakable hallmark of pretext. When a university repeatedly shifts its rationale after the fact to defend punitive action, especially in the wake of a student's protected advocacy for procedural fairness, its motives lose any pretense of educational

19

26-60007.1605

legitimacy and reveal themselves as retaliatory. No University policy authorizes the termination of employment or the downgrading of academic status based on a reflective, non-evaluative self-assessment form. The absence of any governing authority, combined with these contradictory explanations, exposes the actions for what they were: administrative reprisals carried out without due process, devoid of legitimate academic purpose, and in violation of the very institutional integrity the University claims to uphold.

**19. The June 30 Memorandum Functioned as a Coercive Threat, Not an Academic Warning**

The **June 30, 2025** memorandum (*Exhibit C*) was not a legitimate "formal warning," as Defendants claim:

> *"When Plaintiff still did not submit his Abilities Transcript, Dr. Barnard sent him a 'formal warning' on June 30 informing him that his failure to do so by August 15 would 'result in a recommendation to the Graduate Dean that you have a change of status to provisional status.'"*

rather, it was a coercive threat—an instrument of retaliation aimed at punishing protected advocacy and compelling compliance with a procedurally irregular directive.

By the University's own policies (*Exhibits P and Q*), the Abilities Transcript ("AT") is a developmental self-assessment tool intended to promote reflection and mentoring dialogue, not a disciplinary or evaluative device. Repurposing that form as a condition for continued enrollment or employment represented a fundamental departure from established policy, a violation of procedural fairness, and a misuse of administrative power.

The memorandum's timing and tone reveal its retaliatory purpose. Issued just days after Plaintiff's written requests for clarification of procedural irregularities, it transformed a non-evaluative mentoring exercise into a disciplinary weapon. The threat to alter Plaintiff's academic standing for opposing the irregular, unconstitutional, and procedurally defective manner in which Defendants

20

attempted to enforce completion of a non-evaluative tool (AT) was arbitrary, capricious, and retaliatory on its face. It functioned not as an academic notice but as a coercive lever to silence lawful advocacy and coerce submission to an unlawful process.

**20. The July 9 Letter Was an Evidence-Based Rebuttal, Not "Relitigation"**

Defendants' attempt to recast Plaintiff's **July 9, 2025,** letter as mere "relitigation" misrepresents both its purpose and its substance:

> *"Plaintiff responded to Dr. Barnard with an eleven-page memorandum that relitigated his complaints about the mentorship process and the in-person meeting requirement but did not dispute the fact that he had not completed the Abilities Transcript."*

Plaintiff's **July 9, 2025,** letter (***Exhibit D***) was a detailed, evidence-based rebuttal that addressed the procedural violations and administrative irregularities contained in the University's **June 30** memorandum. It identified, with precision, three central breaches of institutional policy: **(1)** the unilateral alteration of a duly executed and signed Mentor–Mentee Agreement, absent mutual consent, and academic justification; **(2)** the coercive directive to attend an in-person meeting with two faculty members despite an established virtual arrangement consistent with University policy and the principles of psychological safety and mutual respect; and **(3)** the repurposing of a non-evaluative, developmental tool—the Abilities Transcript ("AT")—into a coercive instrument for sanction, contrary to University and Graduate School policy.

**21. The July 17 "Co-Mentorship" Explanation Was Pretextual and Retaliatory**

By **July 17**, the Department had abandoned its original rationale for the unilaterally imposed "co-mentorship" arrangement and substituted a new, contradictory one:

21

26-60007.1607

*"On July 17, Dr. Huang informed Plaintiff that Dr. Yang was serving as his co-mentor because Dr. Huang would be leaving the University within the next year and asked him to meet with Drs. Yang and Huang to complete the Abilities Transcript by the August 15 deadline."*

This newly asserted rationale stands in direct conflict with prior explanations. Dr. Yang first claimed the restructuring was implemented *"to support Dr. Huang's professional development."* The Graduate Dean later echoed that justification, deeming the change *"appropriate"* based solely on undisclosed *"information provided by Dr. Yang"*—information never cited, identified, or preserved in any contemporaneous record. Yet Dr. Huang herself later contradicted both accounts, admitting that the change was made *"to protect me,"* acknowledging her planned departure from the University and describing the decision as one intended *"to keep the faculty happy."* These shifting explanations cannot all be true—and their inconsistency is telling.

If, as Dr. Huang admitted, the restructuring was undertaken *"to protect"* faculty members rather than to advance the student's educational development, it constitutes an abuse of administrative authority fundamentally at odds with both constitutional principles and the University's own policies. At a minimum, these contradictions raise material factual disputes regarding motive, fairness, and compliance with the ***First Amendment***, the ***Due Process Clause***, and the ***Equal Protection Clause***—disputes that cannot be resolved on a motion to dismiss.

## 22. The July 18–21 Correspondence Demonstrates Policy-Based Advocacy

Defendants' account of the **July 18–21** correspondence:

*"On July 18, Dr. Yang emailed Plaintiff and again reminded him that the Abilities Transcript was a mandatory requirement for all students, that he must complete it by August 15, and that failure to do so would result in a recommendation to the Graduate Dean to change his enrollment status to provisional. After Plaintiff again complained about the change to his mentorship arrangement and the in-person meeting requirement, the Graduate Dean responded to the email thread."*

22

26-60007.1608

omits the very context that gives it meaning. Dr. Yi Yang's email acknowledged that "*you may have concerns regarding the AT process*," yet when Plaintiff responded, measuredly and respectfully, by asking why those legitimate concerns had been met with escalating sanctions rather than constructive dialogue, Dr. Yang did not reply. That silence speaks volumes: it underscores the central issue in this case—the Department's unwillingness to engage in the very accountability its own policies require.

At no point did any University official—Dr. Yang, Dr. Barnard, or Dean Kluck—acknowledge or address the detailed procedural violations and due process deficiencies documented in Plaintiff's **July 9** submission. Instead, they escalated punitive pressure, compounding threats of disciplinary action while ignoring the substantive policy concerns Plaintiff raised in good faith. This pattern raises clear factual issues of motive, fairness, and constitutional compliance—matters that cannot be resolved on the pleadings and that warrant full discovery and judicial scrutiny.

### 23. The August 21–22 Actions Were Procedurally Defective and Retaliatory

Defendants' account of the **August 21–22, 2025** events:

> "*Plaintiff did not complete the Abilities Transcript. On August 21, Dr. Barnard sent Plaintiff a memorandum informing him the Department was recommending to the Graduate Dean that Plaintiff be placed on provisional status. [Doc. 9-10]. The memo also informed Plaintiff he could return to full standing for the Spring 2026 semester if he met with his mentor and completed the Abilities Transcript, met weekly with his thesis advisor to make progress on his thesis, and successfully completed his Fall 2025 classes. Id. The Graduate Dean accepted this recommendation. [Doc. 9-13]. Dr. Yang, the Department Chair, confirmed to Plaintiff by email that he was not eligible for a graduate assistantship during the Fall 2025 semester because of his provisional status.*"

conceals more than it reveals. In both timing and substance, the **August 21–22** actions constituted administrative reprisals, motivated by retaliation, flawed in process, and wholly unsupported by

23

law or policy. The stated justification for sanctioning Plaintiff, his alleged "failure" to complete the Abilities Transcript ("AT"), collapses under scrutiny.

The Abilities Transcript ("AT") is a developmental, non-evaluative self-assessment tool designed to encourage reflection and mentorship—not a mechanism for grading, discipline, or employment action. According to the department's own description (***Exhibits P & Q, Department guidance on the Abilities Transcript***), the AT is intended to be a *formative* tool to facilitate honest self-reflection and open dialogue between the student and mentor, helping to identify areas for professional development. In keeping with that purpose, the AT process is supposed to occur in a supportive, non-punitive environment. Plaintiff understood this and, at all times, communicated that he valued the AT exercise, was eager and fully committed to completing the AT *"in a mentoring environment that is respectful, student-centered, and aligned with policy expectations."* In other words, he sought only the adherence to the University's own professed standards of mentorship: respect, transparency, and freedom from coercion.

While wholly disregarding Plaintiff's detailed **July 9** rebuttal letter and depriving him of a meaningful opportunity to be heard, Defendants' decided to weaponize the Abilities Transcript ("AT") as a pretext for punitive measures. This marked a profound departure from established academic norms, procedural due process, and institutional integrity.

On **August 21, 2025**, Dr. Marie Barnard issued a memorandum recommending that Plaintiff be placed on provisional status. The very next day, Dean Annette Kluck ratified that recommendation (***Exhibit M***), issuing a letter that conspicuously omitted every procedural safeguard required under University policy. Within hours, Department Chair Dr. Yi Yang invoked the newly imposed provisional status to terminate Plaintiff's Graduate Research Assistantship (***Exhibit L***)—his sole source of income and the financial condition necessary for continued enrollment. The rapid

24

temporal sequence of these actions—recommendation, ratification, and termination within twenty-four hours—underscores not academic deliberation but retaliatory coordination.

Each action, procedurally defective, substantively baseless, and temporally aligned with Plaintiff's protected advocacy, underscores precisely why this case must proceed beyond the pleadings.

## IV. DEFENDANTS' ARGUMENTS FAIL

### 24. Defendants' Rule 12(b)(6) Argument Misstates Both Law and Pleading Standard

Plaintiff incorporates by reference the factual chronology and legal arguments in his Memorandum of Law in Opposition to the Motion to Dismiss and attached exhibits, to the fullest extent permitted. See *Fed. R. Civ. P. 10(c)*. A motion to dismiss under *Rule 12(b)(6)* tests the sufficiency of the complaint, not the merits of the case. To survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to *"state a claim to relief that is plausible on its face."* This "plausibility" standard is not a probability requirement; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence to support the claim. Plaintiff's complaint exceeds that threshold with detailed factual allegations of constitutional violations. The Court must accept all well-pleaded facts as true and draw every reasonable inference in Plaintiff's favor. *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*. Accepting the facts as pleaded, Plaintiff's claims are more than plausible—they reveal a coherent pattern of retaliatory, arbitrary, and conscience-shocking conduct—each tied to named defendants and supported by contemporaneous documents. The motion to dismiss should therefore be denied in its entirety.

### 25. Sovereign Immunity Does Not Bar Prospective Relief Against Ongoing Constitutional Violations

25

26-60007.1611

Defendants' reliance on sovereign immunity collapses under long-settled constitutional doctrine. Under *Ex parte Young, 209 U.S. 123 (1908)*, state officials may be sued in their official capacities for prospective equitable relief to halt ongoing violations of federal law. Plaintiff seeks exactly that—reinstatement of his graduate assistantship and academic standing, expungement of retaliatory sanctions, and declaratory relief ensuring compliance with constitutional safeguards. These forward-looking remedies fall squarely within the *Ex parte Young* exception. See *Edelman v. Jordan, 415 U.S. 651, 664 (1974)*. While the University of Mississippi, as an arm of the State, may enjoy immunity from damages, that protection does not extend to officials who act outside the bounds of lawful authority. *Hafer v. Melo, 502 U.S. 21, 31 (1991)*. Plaintiff alleges exactly that—deliberate constitutional violations by Drs. Yi Yang, Marie Barnard, Annette Kluck, and Yinan Huang, each acting under color of state law to fabricate a non-existent deficiency, bypass due process, and terminate Plaintiff's employment and standing without cause. As the Supreme Court made clear, officials who act unconstitutionally "are stripped of their representative character." *Scheuer v. Rhodes, 416 U.S. 232, 237–38 (1974)*.

Each named Defendant maintains an active and continuing enforcement connection to the challenged deprivations: Dr. Marie Barnard initiated the downgrade to "provisional" status with deliberate indifference to procedural safeguards; Dr. Yi Yang approved and implemented the downgrade and termination despite full knowledge of their illegality; Dr. Annette Kluck, as Dean, ratified both actions, conferring institutional legitimacy on conduct she had the authority—and duty—to prevent; Dr. Yinan Huang, Plaintiff's assigned mentor, acquiesced in and enforced the coercive "co-mentorship" structure that served as the retaliatory pretext. Each defendant therefore satisfies *Ex parte Young's* "connection with enforcement" requirement. Because the resulting

26

deprivations of academic standing, livelihood, and reputation are ongoing, dismissal of the official-capacity claims would be premature.

**26. Qualified Immunity Cannot Shield Knowing Retaliation or Procedural Abuse**

**a. Defendants argue:**

*"The individual defendants are entitled to qualified immunity."*

**Plaintiff Responds:**

Qualified immunity shields only reasonable mistakes made in good faith—not deliberate retaliation, coercion, or procedural manipulation. *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)*. Plaintiff's allegations, accepted as true, describe intentional misconduct far outside lawful discretion: transforming a self-reflective mentoring tool into a disciplinary weapon, downgrading academic status in disregard of due process, and terminating employment within twenty-four hours. No reasonable official could believe such conduct lawful. *Hope v. Pelzer, 536 U.S. 730, 739–41 (2002)*. The rights at stake—freedom from retaliation (*Pickering*), procedural due process in disciplinary actions (*Dixon; Goss*), and equal protection from arbitrary treatment (*Olech*)—were long and clearly established.

**b. Defendants contend:**

*"Plaintiff has not alleged that any defendant violated his clearly established first amendment rights."*

**Plaintiff responds:**

The record establishes precisely the opposite. Between **June 14** and **August 22, 2025**, Plaintiff engaged in protected advocacy—raising documented, policy-based concerns about procedural violations and due process—only to face escalating retaliation, including threats, disciplinary

27

26-60007.1613

memoranda, a downgrade to provisional status, and termination of his assistantship. This sequence forms a clear and compelling causal chain: protected activity followed by adverse action.

c. **Defendants argue:**

> *"The University has found no clearly established law holding that a student's refusal to accept department instructions related to his academic program constitutes protected activity. In fact, at least in the public employment context, "it is firmly established that the first amendment's shield does not extend to speech and conduct amounting to insubordination directed at school officials. The speech for which plaintiff seeks protection was his repeated refusal to attend a developmental meeting and complete his abilities transcript unless the department met his demands. Even if plaintiff plausibly alleged that his series of obstinate emails was a motivating factor in the decision to move him to provisional status, he cannot establish that those emails were protected speech."*

**Plaintiff responds:**

Raising documented concerns about due process and policy violations is not *"refusal"* to accept departmental instructions—it is the exercise of a constitutional right. Defendants' characterization of Plaintiff's advocacy as *"insubordination"* collapses under scrutiny. The record shows that Plaintiff's communications were professional, evidence-based, and rooted in legitimate requests for adherence to University policy and procedural fairness. Rather than engaging those substantive concerns, Defendants rely on conclusory labels like *"obstinate"* and *"insubordination,"* devoid of factual support.

d. **Defendants argue:**

> *"Plaintiff has also failed to plausibly allege that any of the defendants took steps to place him on provisional status because he sent a series of emails refusing to comply with their instructions. He does not allege there is any direct evidence of such a motive, and the chronology of events formed by documents referenced in the pleadings makes clear that he was placed on provisional status because he failed to complete the abilities transcript, even after his deadline to do so had been extended three times."*

28

26-60007.1614

**Plaintiff responds**

Defendants' contention that Plaintiff "*has failed to plausibly allege*" retaliatory motive ignores both the chronology and the context of the record. Plaintiff has, in fact, established a clear prima facie case of retaliation supported by well-pleaded factual allegations. The issue is not what the Department's post hoc documents claim—but what discovery will reveal about the underlying motive, timing, and irregularity of those actions. The chronology tells a consistent story. The **June 24** threat, the **June 30** disciplinary memorandum, the **August 21–22** downgrade, and the **August 22** termination each followed Plaintiff's protected advocacy for procedural fairness and adherence to policy. Discovery will reveal the answers Defendants now evade: Why did scrutiny of Plaintiff suddenly intensify as his twin brother engaged in protected advocacy?; Why was he coerced into a co-mentorship arrangement contrary to a signed agreement?; Why did the University offer shifting, contradictory explanations for its actions?; Why was he pressured into a closed-door meeting with two faculty members despite prior approval for a virtual meeting?; Why were threats of academic and employment sanctions issued days apart by the same administrator?; Why was a non-evaluative, self-assessment tool repurposed as a punitive mechanism—contrary to written policy?; and Why were disciplinary rationales fabricated after the fact to justify a downgrade imposed days into the semester without evidence of academic deficiency or committee review?

Each question underscores the retaliatory pattern that Defendants now seek to obscure behind conclusory denials. At this stage, Plaintiff is not required to prove motive—only to allege facts that plausibly suggest it. He has done so with precision and corroborating documentation. Whether retaliation motivated these actions is a factual question reserved for discovery, not dismissal.

**e. Defendants argue:**

29

26-60007.1615

*"The record is also clear that defendants would have taken the same action if plaintiff had failed to complete the abilities transcript but had not complained about it. Dr. Yang's July 18 email specifically addressed this...Dr. Kluck echoed this...In other words, Plaintiff was specifically warned that he would face consequences for refusing to complete the abilities transcript regardless of whether he shared concerns about the process. Plaintiff cannot use the First Amendment to forestall these consequences by simply complaining about the mentoring process."*

**Plaintiff responds**

That argument collapses under both logic and chronology. How could a **July 18 email** retroactively justify threats and sanctions that began weeks earlier on **June 24**? Defendants' own timeline betrays their position: the **June 24** threat, the **June 30** disciplinary memorandum, the **August 21-22** downgrade, and the **August 22** termination all followed Plaintiff's protected advocacy—each escalation occurring after he raised documented concerns about procedural irregularities, coercive mentorship restructuring, and policy violations. As the **July 18** correspondence shows, Dr. Yang explicitly acknowledged that Plaintiff *"may have concerns regarding the AT process."* Plaintiff replied respectfully, asking why those concerns were met with punitive measures instead of constructive dialogue. Dr. Yang never responded.

### f. Defendants argue:

*"Plaintiff also alleges he exercised first amendment rights by maintaining familial association with his twin brother, Omokhodion Alfred Eriakha...the contours of a first amendment retaliation claim for a family member's speech are not at all clear. Plaintiff's complaint cites Adler v. Pataki, in which the second circuit...However, there is no clearly established law in the fifth circuit giving rise to such a cause of action, much less extending it to a relationship between siblings...the individual defendants are entitled to qualified immunity."*

**Plaintiff responds**

That contention fails both logically and constitutionally. The absence of a Fifth Circuit case addressing identical facts does not obscure the clearly established principle that government actors

30

26-60007.1616

may not punish one individual for another's protected speech. *Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)*. The Supreme Court has repeatedly held that officials are not entitled to immunity when their conduct "transgresses bright lines of constitutional protection." *Hope v. Pelzer, 536 U.S. 730, 739–41 (2002)*. Every circuit to consider this principle has condemned such conduct, and its logic is self-evident: the Constitution forbids punishing an individual for the protected advocacy of someone with whom they share a close familial bond.

g. **Defendants argue further**:

> "*Even if plaintiff's relationship with his brother could give rise to a potential associational claim, plaintiff has failed to plausibly allege that his brother's complaints were the cause of plaintiff's change to provisional status…plaintiff has failed to state a viable first amendment claim, and the individual defendants are entitled to qualified immunity.*"

The record demonstrates the opposite. Plaintiff has plausibly alleged, and documented in his memorandum of law (*Docket. 23, p. 15*), a clear causal sequence linking his brother's protected advocacy to the retaliatory actions taken against him. The events unfolded in a predictable progression: following Alfred's protected complaints, faculty scrutiny of Plaintiff intensified, culminating in his downgrade to provisional status and the termination of his assistantship.

h. **Defendants claim**:

> "*Plaintiff alleges defendants discriminated against him because of his race (Black) and national origin (Africa) in violation of the Equal Protection Clause. To state a claim of sex discrimination…that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent…Only when a complaint pleads and proves that each defendant individually engaged in actions that caused the unconstitutional harm…For instance, a general statement that other similarly situated individuals were treated differently without pointing to a specific person or providing specifics as to their violations, is not sufficient to state an equal protection claim…None of these statements, even if true, are evidence of discriminatory intent.*"

31

26-60007.1617

**Plaintiff responds**

Defendants' argument both misstates the law and misrepresents the record. Plaintiff does not allege sex discrimination; his claim rests on race- and national-origin–based unequal treatment, supported by specific comparators, factual evidence, and documented statements demonstrating discriminatory and retaliatory motive. As detailed in *Exhibit O*, Plaintiff was the only student in the department assigned a forced co-mentorship—while every similarly situated peer retained a single mentor. Plaintiff and his twin brother were the only students subjected to disciplinary threats over a non-evaluative self-assessment form. These are not generalized allegations; they are specific, documented disparities grounded in institutional records. Claims alleging unequal treatment based on race and national origin trigger strict scrutiny, and Plaintiff's allegations comfortably meet the *Rule 12(b)(6)* plausibility threshold. The record—specific, individualized, and corroborated by contemporaneous evidence—supports far more than a speculative inference of discrimination; it establishes a prima facie case warranting discovery into Defendants' motives and decision-making processes, where the full scope of discriminatory intent can be examined under the constitutional lens it deserves.

**i.  Defendants maintain:**

> *"Moreover, only one of these statements, Dr. Yang's purported statement that Plaintiff and his brother dominate conversations was both about plaintiff and made by a defendant with supervisory authority within the department."*

**Plaintiff responds**

That contention misses the point. Discriminatory animus is not absolved by job title or confined to a single speaker. The fact that one remark was made by a supervisor does not render other racially charged comments by faculty members, including Plaintiff's assigned mentor, benign or

32

26-60007.1618

irrelevant. Nor does it erase the cumulative impact of those remarks within a close-knit academic department. Discrimination rarely manifests as a single statement; it emerges through patterns of tone, repetition, and coordinated behavior that reinforce bias and unequal treatment. Here, the comments attributed to multiple faculty members share the same racialized and retaliatory undertones, revealing a consistent pattern of differential treatment. The Equal Protection Clause guards against the collective operation of bias, not merely its most overt expression. To isolate one remark and disregard the rest is to ignore how discrimination functions in real institutional environments—through subtle reinforcement and cumulative harm.

### j. Defendants argue:

> *"Plaintiff also alleges that upon information and belief, he was treated differently than similarly situated white or U.S. born student, but he points to no specific person and makes no factual allegation about their circumstances. He notably does not allege that any non-Black student who refused to complete an abilities transcript was treated differently than himself...Plaintiff has failed to state an equal protection claim."*

**Plaintiff responds**

Defendants' argument collapses under its own premise. Plaintiff did not "refuse" to complete the Abilities Transcript; he raised good-faith procedural and policy concerns—concerns expressly protected under both University policy and constitutional law. Even setting aside that mischaracterization, the issue extends far beyond the Transcript itself. Before any question of completion arose, Plaintiff was subjected to conditions no other student faced: the forced imposition of a co-mentor and the requirement of a closed-door, in-person meeting with two faculty members—actions taken in direct violation of his signed mentoring agreement and contrary to university practice. As documented in *Exhibit O*, no similarly situated student—white or U.S.-born—was subjected to such coercive measures or threatened with academic and employment

33

26-60007.1619

sanctions tied to a developmental, non-evaluative form. These disparities are not conjecture; they are substantiated by the department's own records.

**k. Defendants argue:**

*"Plaintiff alleges defendants violated his procedural and substantive due process rights...Here, the individual defendants are entitled to qualified immunity because there is no clearly established law creating a property interest in good standing or non-provisional status...Plaintiff has not alleged he was removed – even temporarily – from his graduate program, and his status change was not disciplinary in nature. Nor does the mentor-mentee document create a cognizable property interest, as it does not limit the university's ability to change the mentorship program. Plaintiff does not, as he suggests, have a property interest in the renewal of his graduate assistantship because he has not alleged a legitimate claim of entitlement to it."*

**Plaintiff responds**

Defendants' argument fails both factually and legally. Repurposing a developmental mentoring document into a disciplinary weapon is not an *"academic act"*; it is administrative coercion disguised as scholarship. Likewise, downgrading a student's standing in direct violation of university policy is not academic judgment—it is procedural misconduct with constitutional consequences. Plaintiff maintained a 4.0 GPA and a spotless record. To characterize his downgrade as *"non-disciplinary"* strains credulity.

Clearly established law requires universities to adhere to their own procedural safeguards and to afford students fair process before depriving them of any recognized interest. ***Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961)***. The signed Mentor–Mentee Agreement created a legitimate expectation of stability within the mentoring relationship—an expectation Defendants could not unilaterally discard without justification. Altering that agreement in violation of governing policies constituted a deprivation of a protected interest without due process. Plaintiff also held a protected property interest in his Graduate Research Assistantship, renewed for two

34

26-60007.1620

consecutive years and serving as his sole source of income. Defendants were fully aware that this assistantship was integral to his continued enrollment, housing, and F-1 visa compliance. Its sudden termination—without cause, notice, or hearing—just days into a new semester was not merely arbitrary; it was conscience-shocking. Defendants' assertion that Plaintiff *"was not removed"* from the program is misleading. The combined impact of the unlawful downgrade and immediate termination of financial support amounted to a constructive expulsion, executed with deliberate indifference to its predictable harm. Plaintiff and his twin brother have established a verified GoFundMe campaign to obtain minimal support for food, rent, and other basic living expenses during this period of this deprivation (available at *https://shorturl.at/Qzkr0*).

**1. Defendants contend:**

> *"A public university is not required to afford significant process before dismissing a student on academic grounds…Plaintiff cannot state a procedural due process claim. Nor could plaintiff state a substantive due process claim if he had alleged the existence of a property interest. Public officials violate substantive due process rights if they act arbitrarily or capriciously…Plaintiff must show that the challenged decision so lacked a basis in fact that it could be said to have been made without professional judgement…Defendants conduct cannot be said to have been arbitrary and capricious and plaintiff cannot state a substantive due process claim."*

**Plaintiff responds**

Defendants' argument collapses under its own weight. The sanctions imposed were not academic in nature—they were administrative reprisals masquerading as academic judgment. Repurposing a developmental self-assessment form into a disciplinary weapon, fabricating deficiencies in an exemplary record, ratifying a status downgrade in direct violation of university policy, and terminating employment within hours of that downgrade are not exercises of professional judgment. They are acts of arbitrariness and retaliation, plain and simple.

35

26-60007.1621

The Constitution does not shield misconduct merely because it occurs in an academic setting. Plaintiff's record, 4.0 GPA, timely progress, and full compliance with all programmatic requirements, contradicts any suggestion of academic deficiency. *Bd. of Curators v. Horowitz, 435 U.S. 78 (1978)*, and *Regents of the Univ. of Michigan v. Ewing, 474 U.S. 214 (1985)*, protect genuine academic decisions—not bad-faith administrative coercion disguised as pedagogy. Furthermore, *Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir. 1961)*, clearly established more than sixty years ago that public universities must follow their own policies and afford due process before imposing adverse actions. Here, Defendants disregarded their established procedure and policy in executing a downgrade and termination that effectively expelled Plaintiff from the program. Such omissions are not discretionary; they are constitutional violations and meets every standard of arbitrary and capricious behavior under the Due Process Clause.

## I.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

a.  Deny Defendants' Motion to Dismiss in its entirety;

b.  Permit this action to proceed to discovery; and

c.  Grant such further equitable relief as justice requires, including declaratory and injunctive relief restoring Plaintiff's Graduate Research Assistantship, academic standing, and full constitutional protections.

Respectfully submitted this 9th day of October, 2025.

Ehiremen Bennard Eriakha, Plaintiff, Pro Se

36

**CERTIFICATE OF SERVICE**

Pursuant to *Fed. R. App. P. 25(d)* and *Fifth Circuit Rule 25.2*, I certify that on March 23, 2026, I served a true and correct copy of the foregoing Record Excerpts as follows:

Via electronic filing / email (Fifth Circuit Pro Se Filings):
Clerk's Office
United States Court of Appeals for the Fifth Circuit
Email: pro_se@ca5.uscourts.gov


Via email (Counsel for Appellees):
Paul B. Watkins, Esq.
Mayo Mallette PLLC
Email: pwatkins@mayomallette.com

Brooke Jackson, Esq.
Mayo Mallette PLLC
Email: bjackson@mayomallette.com


Executed this 23rd day of March, 2026.

Respectfully submitted,

/s/ Ehiremen Bennard Eriakha
Ehiremen Bennard Eriakha
Plaintiff-Appellant, pro se
1802 Jackson Ave. W., Apt. 83
Oxford, MS 38655
Tel: (662) 281-4676
Email: eriakhabernard@gmail.com

3