**NO. 26-60007**

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

_____

EHIREMEN BENNARD ERIAKHA

*Plaintiff – Appellant*

v.

UNIVERSITY OF MISSISSIPPI; YI YANG, DOCTOR, CHAIR, DEPARTMENT OF PHARMACY ADMINISTRATION; MARIE BARNARD, DOCTOR, GRADUATE PROGRAM COORDINATOR, PHARMACY ADMINISTRATION; ANNETTE KLUCK, DOCTOR, DEAN OF THE GRADUATE SCHOOL; YINAN HUANG, DOCTOR, FACULTY MEMBER

*Defendants – Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION
CIVIL ACTION NO. 3:25-CV-226-MPM-JMV
*CONSOLIDATED WITH*
CIVIL ACTION NO. 3:25-CV-250-DMB-RP

_____

**BRIEF OF APPELLEES**

_____

Paul B. Watkins, Jr. (MB No. 102348)
Mayo Mallette pllc
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Telephone: (662) 236-0055
Facsimile: (662) 236-0035
pwatkins@mayomallette.com

## NO. 26-60007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

OMOKHODION ALFRED ERIAKHA                          Plaintiff – Appellant

v.

UNIVERSITY OF MISSISSIPPI;
DR. YI YANG; DR. MARIE BARNARD;
AND DR. ANNETTE KLUCK                              Defendants – Appellees

*Consolidated with*

EHIREMEN BENNARD ERIAKHA                           Plaintiff – Appellant

v.

UNIVERSITY OF MISSISSIPPI;
DR. YI YANG; DR. MARIE BARNARD;
DR. ANNETTE KLUCK; AND
DR. YINAN HUANG                                    Defendants - Appellees

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

University of Mississippi              Defendant – Appellee

Dr. Yi Yang                           Defendant – Appellee

Dr. Marie Barnard                     Defendant – Appellee

i

| | |
|---|---|
| Dr. Annette Kluck | Defendant – Appellee |
| Dr. Yinan Huang | Defendant – Appellee |
| Mayo Mallette PLLC | Attorney for Defendant – Appellee |
| Paul B. Watkins, Jr. | |
| Omokhodion Alfred Eriakha<br>*Pro se* | Plaintiff – Appellant |
| Ehiremen Bennard Eriakha<br>*Pro se* | Plaintiff – Appellant |
| Judge Michael P. Mills | U.S. District Judge for the Northern District of Mississippi |

SO CERTIFIED, this the 26th day of May 2026.

*/s/ Paul B. Watkins, Jr.*
Paul B. Watkins, Jr.
Attorney for Appellees

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This case presents straightforward issues that can be decided on the briefs.

Oral argument is not necessary in this case.

## **TABLE OF CONTENTS**

Certificate of Interested Persons ................................................................i

Statement Regarding Oral Argument ....................................................... iii

Table of Contents ..............................................................................iv

Table of Authorities ..........................................................................vi

Statement of the Issues............................................................................1

Statement of the Case............................................................................2

Summary of the Argument......................................................................10

Argument.............................................................................................12

    1.  Standard of review ..................................................................12

    2.  The District Court did not abuse its discretion in dismissing Bennard's federal claims with prejudice ........................................................15

    3.  The Eleventh Amendment bars Plaintiff's claims against the University ....................................................................................................16

    4.  Bennard failed to state a First Amendment Claim....................................17

        a. Bennard did not allege constitutionally protected speech ......................18

        b. Bennard did not plausibly allege his status change was motivated by protected speech..................................................................................19

        c. Bennard did not plausibly allege a familial association claim ..............21

    5.  Bennard failed to state a due process claim ..............................................23

    6.  Bennard failed to state an equal protection claim......................................26

7.   Bennard failed to overcome the Individual Appellees' qualified immunity defenses ....................................................................................................30

8.   The breach of contract claim is not saved by supplemental jurisdiction...33

9.   The District Court correctly denied Bennard's motions for mootness ......34

10.   The District Court did not err in consolidating the brothers' cases.........35

Conclusion .........................................................................................................36

Certificate of Compliance ..................................................................................38

# TABLE OF AUTHORITIES

**Cases:**

*Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999) ......................................................22, 32

*Air Prods. & Chems., Inc. v. GSA*, 700 F. Supp. 3d 487 (N.D. Tex. 2023) ............34

*Atkinson v. Pustilnik*, No. 4:22-cv-04315, 2024 U.S. Dist. LEXIS 80141 (S.D. Tex. May 2, 2024) ............................................................................................................33

*Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419 (5th Cir. 1997) .................20, 21

*Brewster v. Dretke*, 587 F.3d 764 (5th Cir. 2009) ....................................................16

*Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (citing *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)) ........................................................................................32

*Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986) ..........................................12

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)..............................24, 25

*Club Retro LLC v. Hilton*, 568 F.3d 181 (5th Cir. 2009) .........................................15

*Corkern v. Hammond City*, No. 11-1828, 2013 U.S. Dist. LEXIS 114848 (E.D. La. Aug. 14, 2013) ..........................................................................................................33

*DePree v. Saunders*, 588 F.3d 282 (5th Cir. 2009) ..................................................30

*Doe v. Harrell*, 841 F. App'x 663 (5th Cir. 2021)..............................................18, 25

*Doe v. Jewell*, 151 F.4th 236 (5th Cir. 2025)...........................................................30

*Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597 (S.D. Miss. 2019) ...............................17

*Elder v. Holloway*, 510 U.S. 510 (1994) .................................................................31

In re *FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 646 F.3d 185 (5th Cir. 2011) ............................................................................................................................12

*Frazier v. Garrison I.S.D.*, 980 F.2d 1514 (5th Cir. 1993)......................................35

*Gibson v. Kilpatrick*, 838 F.3d 476 (5th Cir. 2016)................................................19

*Goodrich v. United States*, 3 F.4th 776 (5th Cir. 2021)..........................................34

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011) ..........................................................15

*Jacquez v. Procunier*, 801 F.2d 789 (5th Cir. 1986) ..............................................16

*Jones v. Bd. of Supervisors*, 809 F.3d 231 (5th Cir. 2015).....................................26

*Jones v. Hosemann*, 812 F. App'x 235 (5th Cir. 2020)............................................27

In re *Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007)........................13

*Kelleher v. Flawn*, 761 F.2d 1079 (5th Cir. 1985)..............................................18, 19

*Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) ...........................................16, 17, 33

*Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010).....
.........................................................................................................................13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................12

*Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................................30

*McKay v. LaCroix*, 117 F.4th 741 (5th Cir. 2024) ..................................................12

*Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447 (5th Cir. 2013) .................21

*Murphy v. Kellar*, 950 F.2d 290 (5th Cir. 1992)......................................................31

*Perdomo v. City of League City*, 163 F.4th 921 (5th Cir. 2026) ...............................
.........................................................................................................................14

*Pickett v. Tex. Tech. Univ. Health Sci. Ctr.*, No. 24-10304, 2024 U.S. App. LEXIS
30592 (5th Cir. Dec. 4, 2024) ................................................................................24

*Priester v. Lowndes Cnty.*, 354 F.3d 414 (5th Cir. 2004)............................................26

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ...........................................22

*Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633 (5th Cir. 2021) ..29

*Rountree v. Dyson*, 892 F.3d 681 (5th Cir. 2018)....................................................28

*Sligh v. City of Conroe*, 87 F.4th 290 (5th Cir. 2023) ..............................................14

*Smith v. Davis*, 507 F. App'x 359 (5th Cir. 2013)....................................................23

*Smith v. Hood*, 900 F.3d 180 (5th Cir. 2018)..........................................................12

*Spuler v. Pickar*, 958 F.2d 103 (5th Cir. 1992) ......................................................23

*Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010)............................................29

*Vann v. City of Southaven*, 884 F.3d 307 (5th Cir. 2018)........................................32

*Wallace v. Tex. Tech Univ.*, 80 F.3d 1042 (5th Cir. 1996).......................................22

*Whiting v. Univ. of So. Miss.*, 451 F.3d 339 (5th Cir. 2006) ...................................24

*Wigginton v. Jones*, 964 F.3d 329 (5th Cir. 2020)...............................................23, 31

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ..........................................17

*Yul Chu v. Mississippi State Univ.*, 592 F. App'x 260 (5th Cir. 2014) ...................27

**Statutes and Rules:**

28 U.S.C. § 1367 .......................................................................................................33

42 U.S.C. § 1983 ..................................................................................................10, 17

FED. R. CIV. P. 12(b)(1)...........................................................................................12

FED. R. CIV. P. 12(b)(6)..............................................................................12, 13, 14, 31

## STATEMENT OF THE ISSUES

1. Whether the District Court lacked jurisdiction over certain of Appellant's constitutional and breach of contract claims against the University of Mississippi.

2. Whether the District Court abused its discretion in dismissing certain of Appellant's claims with prejudice.

3. Whether Appellant failed to state a First Amendment claim.

4. Whether Appellant failed to state a race discrimination claim.

5. Whether Appellant failed to state a due process claim.

6. Whether the Individual Appellees were otherwise entitled to qualified immunity.

7. Whether the District Court can exercise supplemental jurisdiction over Appellant's breach of contract claim against the University of Mississippi.

8. Whether the District Court erred in considering the Motion to Dismiss before Appellant's motions for injunctive relief.

9. Whether the District Court erred in consolidating Appellant's case with his twin brother's case.

**STATEMENT OF THE CASE**

1.      **Relevant Facts**

Appellant Ehiremen Bennard Eriakha ("Bennard") and his twin brother, Omokhodion Alfred Eriakha ("Alfred"), were graduate students in the University of Mississippi's Department of Pharmacy Administration in 2025. The Department assigned Bennard a faculty mentor, Dr. Yinan Huang, in 2024. ROA.953-54. In July 2024, Bennard and Dr. Huang signed a document titled "Agreement Between University of Mississippi School of Pharmacy (UMSOP), Pharmacy Administration Graduate Students, and Their Developmental Mentors." ROA.1106-1109. This document discussed the parameters of the mentoring relationship between Bennard and Dr. Huang, but it did not prohibit the Department from assigning Bennard a different mentor for any reason.

Bennard and Dr. Huang corresponded between June 11 and 13, 2025, to discuss a time to meet to discuss and complete his Abilities Transcript, a project he acknowledged was "required" to be completed by June 15. ROA.1115. On June 13, 2025, Dr. Yi Yang, the Department Chair, informed Bennard that she would "serve as [Plaintiff's] co-developmental mentor with Dr. Huang." ROA.1116-1118. Dr. Yang scheduled an in-person meeting for herself, Bennard, and Dr. Huang on June 18, and she confirmed that the deadline for Bennard to submit his Abilities Transcript would be extended through June 19. *Id*.

Bennard objected to the Department Chair's proposed meeting in an email

2

on June 13, both because she planned to participate in addition to Dr. Huang and because the meeting scheduled as an in-person event:

> Hi Dr. Yang,
>
> Thank you very much for your email. I appreciate your support and your interest in contributing to my professional development.
>
> Dr. Huang had previously informed me of her intention to meet either yesterday or today and expressed flexibility in meeting virtually. Given this, I am surprised by the sudden change in the developmental mentoring arrangement particularly since I've already established a positive and constructive rapport with Dr. Huang and have found her guidance both helpful and encouraging.
>
> I reviewed the departmental policies and did not see any provision stating that developmental mentors can be reassigned or restructured without mutual agreement between the mentor and mentee. I would appreciate any clarification you could provide regarding this sudden change.
>
> Lastly, I had already communicated my preferred meeting modality with Dr. Huang, and she had kindly expressed flexibility in accommodating that preference.
>
> Thank you again for your time and guidance.
>
> Best regards,
>
> Bennard

ROA.1117.

Dr. Yang responded that "[t]he change in [Plaintiff's] developmental mentor structure was approved by all tenured faculty recently in the department to support Dr. Huang's professional development as a faculty member." ROA.1118. She also confirmed Dr. Huang had intended for the developmental meeting to be in person.

3

*Id*. Dr. Huang confirmed that the developmental meeting would be in person. ROA.1116.

Bennard responded with an email the next day challenging the Department Chair's participation in his mentoring process and asserting without explaining that her involvement would "override [his] right to a safe, supportive, and non-coercive mentoring environment" and "bypass[] [his] agency or compromis[e] the autonomy that is fundamental to effective mentorship." ROA.1120-21. Bennard also objected to meeting in person, claiming that "[i]mposing an in-person format without clear justification or mutual agreement risks compromising psychological safety and may diminish the openness and quality of the mentoring exchange." ROA.1121.

Dr. Yang told Bennard that "[t]he developmental mentor for PHAD graduate students is assigned by the department chair." *Id*. Bennard responded that his concerns about the mentoring process and preference for a virtual meeting "were neither acknowledged nor addressed." ROA.1122. On the date and time of the scheduled June 18 meeting, Dr. Huang emailed to ask whether Bennard intended to attend. *Id*. He did not attend the meeting.

Bennard emailed Dr. Yang again on June 24 to repeat his complaints about her participation in the mentoring process and the in-person meeting requirement. ROA.1124. He again acknowledged the importance of completing the Abilities

4

Transcript and noted that Dr. Marie Barnard, the Graduate Program Coordinator, had "recently followed up" to remind him about that requirement. *Id*. Bennard told Dr. Yang he was "eager" to complete the task, but that he would only do so if he believed the University had provided "a mentoring environment that is respectful, student-centered, and aligned with institutional expectations." *Id*.

Dr. Annette Kluck, the Dean of the University's Graduate School, responded the same day and confirmed that "[t]he change in mentor structure is appropriate as outlined in the information provided by Dr. Yang." *Id*.

Dr. Barnard also responded to Bennard's June 24 email to inform him that the faculty needed his Abilities Transcript to discuss his performance and progress and that his reappointment for a graduate assistantship hung in the balance:

> Hi Bennard,
>
> I appreciate being copied on this email. Please see the email I sent you yesterday. As I noted in that email, we need your Abilities Transcript for the discussion at the faculty retreat that begins Thursday morning. ***Submission of the Abilities Transcript is a program requirement. As is indicated in our Department Policies and Procedures Guide, reappointment for assistantship is contingent on several factors including a student's performance and progress.*** If you do not submit this by end of business tomorrow, June 25, 2025, the faculty will not have this to guide their discussion of your performance and progress. I encourage you to please submit your Abilities Transcript.

ROA.1125 (emphasis added).

When Bennard still did not submit his Abilities Transcript, Dr. Barnard sent him a "formal warning" on June 30 informing him that his failure to do so by

August 15 would "result in a recommendation to the Graduate Dean that you have a change of status to provisional status." ROA.1127. Bennard responded to Dr. Barnard with an eleven-page memorandum that relitigated his complaints about the mentorship process and the in-person meeting requirement but did not dispute the fact that he had not completed the Abilities Transcript. ROA.1128-38.

On July 17, Dr. Huang informed Bennard that Dr. Yang was serving as his co-mentor because Dr. Huang would be leaving the University within the next year and emphasized the importance of completing his assignment: "**Of note, as I discussed with you during our meeting, please schedule a meeting with Dr. Yang and me in-person before August 15 to complete and submit your signed Abilities Transcript, which is required by the department for all students.**" ROA.1146-48 (emphasis in original).

On July 18, Dr. Yang emailed Bennard and again reminded him that the Abilities Transcript was a mandatory requirement for all students:

> I am writing to follow up regarding the submission of your Abilities Transcript (AT). As of today, we have not yet received your AT.
>
> We understand that you may have concerns regarding the AT process. However, please be advised that annual submission of the AT is a mandatory requirement for all students in our program. To ensure compliance with program requirements, please contact your Development Mentors, Dr. Yinan Huang (copied on this email) and myself, to schedule a meeting, complete, and submit your AT by August 15, 2025. Please be aware that failure to do so will result in a formal recommendation to the Graduate Dean for a change of your status to provisional status.

ROA.1139-40.

> Bennard responded with three "concerns":
>
> 1. Documented objections to the **unilateral restructuring** of my **signed** developmental mentoring agreement,
>
> 2. The **imposition** of an in-person meeting format, and
>
> 3. The **ethical implications** of completing the AT under conditions that compromise **trust**, **psychological safety**, **transparency**, **student agency**, and **ethical mentoring**.

ROA.1140 (emphasis in original).

The Graduate Dean responded on July 22, giving him yet another

opportunity to complete the assignment:

> I am writing to provide clarification regarding questions you raised in the email below.
>
> First, there are no policies that prohibit program faculty from making changes to mentoring assignments when the faculty deem such changes to be appropriate. In addition, programs can set reasonable expectations about the format of meetings. When a program is a face-to-face full-time program, it is not unreasonable for a program to require students to attend meetings in person, on campus, during regular university business hours.
>
> I also want to be sure that you understand that even when a student has concerns about some aspect(s) of their program, they still need to complete program requirements. As such, I encourage you to complete the Abilities Transcript by the deadline set by the program.

ROA.1144-45.

Plaintiff did not complete the Abilities Transcript. On August 21, Dr.

Barnard sent Plaintiff a memorandum informing him the Department was

7

recommending to the Graduate Dean that Plaintiff be placed on provisional status. ROA.1157. The memo also informed Plaintiff he could return to full standing for the Spring 2026 semester if he met with his mentor and completed the Abilities Transcript, met weekly with his thesis advisor to make progress on his thesis, and successfully completed his Fall 2025 classes. *Id*. Dr. Kluck accepted this recommendation on August 22, 2025. ROA.1161. Dr. Yang confirmed to Plaintiff by email that he was not eligible for a graduate assistantship during the Fall 2025 semester because of his provisional status. ROA.1159.

**2.     Procedural History**

Bennard sued the University, Dr. Yang, Dr. Barnard, Dr. Kluck, and Dr. Huang on August 25, 2025, alleging unlawful race discrimination in violation of the Equal Protection Clause and Title VI, violation of his substantive and procedural due process rights, violation of his First Amendment rights, and breach of contract. ROA.948. Appellees moved the District Court to dismiss Bennard's suit for lack of jurisdiction and failure to state a claim. ROA.1535. Because that motion raised immunity and jurisdictional defenses, the District Court stayed discovery pursuant to its Local Rules. ROA.1558.

Bennard also filed motions for a temporary restraining order, ROA.993, and a preliminary injunction, ROA.1102., seeking an order directing the University to remove him from "provisional" enrollment status and to instate him as a graduate

assistant. The District Court denied those motions because Bennard had not notified the Appellees of those motions or provided justification for his failure to do so. ROA.1218. Bennard re-filed both motions.

Bennard's twin brother Alfred, who was also a graduate student in the same program, filed his own lawsuit in the same District Court, which made similar allegations against the University, Dr. Yang, Dr. Barnard, Dr. Kluck, and three more University faculty members. ROA.9. The Defendants in both actions filed a motion to consolidate the two cases, which the District Court granted. ROA.1711-1717.

Bennard twice sought relief from this Court related to his motions for injunctive relief, first in the form of an "emergency" writ of mandamus seeking a ruling on those motions, No. 25-60700, and then as appeal of the District Court's interlocutory "failure to rule" on those motions, No. 25-60708. This Court denied the mandamus petition and dismissed the interlocutory appeal.

The District Court granted the Motion to Dismiss Bennard's claims on January 7, 2026. ROA.1765-83. Bennard appealed.

## SUMMARY OF THE ARGUMENT

The District Court did not err in dismissing Bennard's constitutional claims with prejudice because he had ample opportunity to plead his best case.

Bennard's claims against the University are barred by the Eleventh Amendment, and his constitutional claims are further precluded by the fact that the University is not a "person" within the meaning of 42 U.S.C. § 1983.

Bennard has cited no authority to support his theory that he engaged in speech protected by the First Amendment when he objected to Dr. Yang's participation in his mentoring process and the requirement of an in-person developmental meeting. Likewise, there is no Fifth Circuit authority recognizing a claim for First Amendment retaliation based on Bennard's brother's alleged speech. Even if Bennard's brother's alleged speech was protected, Bennard has failed to plausibly allege that the University's alleged actions with respect to Bennard were motivated by that speech.

Bennard also failed to state an equal protection claim because he did not plausibly allege that he was treated differently than similarly-situated students, much less that such treatment stemmed from discriminatory intent on the part of the University's employees.

Bennard's Complaint did not state a due process claim because he did not have a protected property interest in remaining a student in "good standing,"

10

because the University was not required to afford significant process before changing his academic standing, and because he did not plausibly allege that the challenged decision was arbitrary and capricious.

The Individual Appellees were entitled to qualified immunity because Bennard did not meet his burden to show that they violated his clearly established constitutional rights.

The District Court did not have supplemental jurisdiction over Bennard's breach of contract claim against the University.

The District Court did not err in deciding Appellees' Motion to Dismiss before deciding Bennard's motions for injunctive relief, and it did not abuse its discretion in consolidating Bennard's case with his twin brother's case.

**ARGUMENT**

1.    <u>**Standard of review.**</u>

The University sought dismissal of Bennard's Section 1983 and breach of contract claims against it under FED. R. CIV. P. 12(b)(1) because it is immune from those claims under the Eleventh Amendment. The claims against the University's employees were dismissed under Rule 12(b)(6) for failure to state a claim and because Bennard failed to overcome their qualified immunity defenses.

This Court reviews a Rule 12(b)(1) dismissal *de novo*, applying the same standards as the District Court. *Smith v. Hood*, 900 F.3d 180, 184 (5th Cir. 2018). When a party challenges subject matter jurisdiction, the party asserting jurisdiction bears the burden of establishing jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 646 F.3d 185, 189 (5th Cir. 2011). When considering a motion to dismiss for lack of subject matter jurisdiction, a court may consider (ii) the complaint alone, (ii) the complaint supplemented by undisputed facts in the record, or (iii) the complaint supplemented by undisputed fact plus the court's resolution of disputed facts. *See Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986).

The Court reviews orders on 12(b)(6) motions to dismiss under a *de novo* standard. *McKay v. LaCroix*, 117 F.4th 741, 746 (5th Cir. 2024) (citing *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 253 (5th Cir. 2021)). "To

survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[1]

However, the Court's review may also include "documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). This caveat is important to this case, as Bennard's Complaint is replete with references that underpin his allegations but are not specifically attached to the pleadings. Bennard did not argue that any of the documents referenced in the Appellees' Motion to Dismiss were not properly before the District Court.

Bennard now argues that the District Court applied the wrong standard of review because it considered the documents but did not accept his *characterization* of the documents. Br., at 20-24 [46]. For example:

> The court inferred "*failure to cooperate*" from conduct Appellant pleaded as documented objection; ***ROA.26-60007.900.***; "*academic decision*" from action Appellant pleaded as retaliatory and procedurally defective; ***ROA.26-60007.903.***; and "*scholastic*

---

[1] Bennard is correct that his § 1983 claims against the Individual Appellees in their official capacities are not subject to a heightened pleading standard. However, as discussed below, those claims were properly dismissed because they failed to meet the *Twombly* plausibility standard.

13

*standards*" from the use of a developmental instrument Appellant pleaded had been repurposed into a punitive compliance mechanism. ***ROA.26-60007.898.*** In each instance, the defendant-favorable inference prevailed over the plaintiff-favorable one.

Br., at 23 [46].; *see also id*. at 26 ("At the pleading stage, factual characterization is central, not irrelevant."); 42 (arguing that District Court "did not meaningfully engage Appellant's factual characterization of his communications").

Even at the 12(b)(6) stage, though, "[a] reviewing court need not accept 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Perdomo v. City of League City*, 163 F.4th 921, 923 (5th Cir. 2026) (quoting *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020)). Thus, "[i]f an allegation is qualified by the contents of an exhibit attached to the pleadings, but the exhibit instead contradicts the allegation, 'the exhibit and not the allegation controls.'" *Sligh v. City of Conroe*, 87 F.4th 290, 298 (5th Cir. 2023) (quoting *U.S.* ex rel. *Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004)).

Nearly every substantive allegation in Bennard's Complaint is based on communications reflected in the documents referenced in his Complaint. In other words, the entirety of Bennard's dispute with the University and its employees is reflected in contemporaneous writings. The District Court correctly considered those documents, and it was not required to accept Bennard's preferred gloss on those documents in ruling on the Motion to Dismiss.

14

Finally, to the extent Bennard challenges the District Court's decision to dismiss his federal claims with prejudice rather than give him an opportunity to amend his pleadings, that decision is reviewed for abuse of discretion. *See Club Retro LLC v. Hilton*, 568 F.3d 181, 215 n.34 (5th Cir. 2009) ("Because the district court is best situated to determine when plaintiffs have had sufficient opportunity to state their best case, we review the district court's decision to grant a motion to dismiss with or without prejudice only for abuse of discretion.").

**2.** **The District Court did not abuse its discretion in dismissing Bennard's federal claims with prejudice.**

Bennard argues the District Court did not make "the required findings" before dismissing his federal claims with prejudice. Br., at 25-26 [46]. The District Court did not abuse its discretion in dismissing Bennard's federal claims with prejudice because he gave no indication he had not pleaded his best case.

This Court has held that dismissal of a *pro se* complaint with prejudice is disfavored except where it is "obvious from the record that the plaintiff has pled his best case." *Hale v. King*, 642 F.3d 492, 503 (5th Cir. 2011). In *Hale*, the district court allowed the *pro se* plaintiff to amend his pleadings to state a Title II ADA claim, but it then dismissed that claim *sua sponte*. This Court remanded with instructions for the district court to allow another amendment because the plaintiff had not "had an opportunity to amend his Title II claim *after being alerted to its deficiencies*." *Hale*, 641 F.3d at 503 (emphasis added).

15

The Court has also indicated that a district court does not abuse its discretion in dismissing a *pro se* complaint without leave to amend where the plaintiff "gives no indication that he did not plead his best case" in his original complaint and "does not state any material facts he would have included in an amended complaint." *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009); *see also Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986) (holding that plaintiff had pleaded his best case when he declared the adequacy of his pleadings in response to defendants' motion to dismiss).

Bennard was well aware of the deficiency of his pleadings. Appellees filed their Motion to Dismiss on October 1, 2025. ROA.1535. Bennard's October 9 response did not seek leave to amend or state any material facts that he would include in an amended pleading. ROA.1587. He never sought the District Court's leave to amend before this matter was dismissed on January 1, 2026. His Brief to this Court continues to defend the adequacy of his pleadings. The District Court did not abuse its discretion in dismissing his federal claims with prejudice.

3.      **The Eleventh Amendment bars Plaintiff's claims against the University.**

Bennard did not dispute before the District Court that his claims against the University were barred by the Eleventh Amendment, including his state law breach of contract claim, and he does not appear to do so here. Br., at 27-30 [46]. The District Court's dismissal of those claims was correct. *See Lapides v. Bd. of*

16

*Regents*, 535 U.S. 613, 616 (2002) (recognizing that Eleventh Amendment "grants a State immunity from suit in federal court by citizens of other States, and by its own citizens as well"); *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 604-06 (S.D. Miss. 2019) (dismissing Section 1983 and breach of contract claims against University of Mississippi due to Eleventh Amendment).[2]

The District Court also correctly dismissed the official-capacity claims against Dr. Huang because she was a "non-administrative faculty member" with no ability to grant the relief Bennard seeks. ROA.898.

## 4.     **Bennard failed to state a First Amendment Claim.**

Bennard alleges his First Amendment rights were violated when he was placed on provisional status after he objected to Dr. Yang's participation in his mentoring process and the requirement of an in-person developmental meeting. He also alleges he was punished for the speech of his twin brother Alfred. ROA.953-54. Bennard appears to argue the District Court incorrectly dismissed his First Amendment claims because it (1) improperly found that he had "refused" to submit his Abilities Transcript, (2) incorrectly found that his failure to submit an Abilities Transcript was the cause of his change in status, and (3) did not consider the correct legal authorities in support of Bennard's familial association claim. Br.,

---

[2] The University is also not a "person" within the meaning of 42 U.S.C. §1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989).

at 40-47 [46]. These arguments lack merit. The District Court correctly dismissed the First Amendment claims.

### a. **Bennard did not allege constitutionally protected speech.**

The District Court correctly held that Bennard's communications with University officials did not amount to constitutionally protected speech. A university student alleging First Amendment retaliation by school staff must plausibly allege that he engaged in constitutionally protected speech and that his speech was a substantial or motivating factor in decision to subject him to an adverse action. *See Doe v. Harrell*, 841 F. App'x 663, 669 (5th Cir. 2021) (citing *Kelleher v. Flawn*, 761 F.2d 1079, 1083 (5th Cir. 1985)). The question of whether speech is entitled to First Amendment protection is a question of law. *Kelleher*, 761 F.2d at 1084.[3]

Bennard has offered no authority – much less clearly established law – suggesting that a graduate student's refusal to accept department instructions related to his academic program constitutes protected activity. In fact, at least in the public employment context, "[i]t is firmly established that the First Amendment's shield does not extend to speech and conduct amounting to insubordination

---

[3] Bennard argues the District Court did not properly "analyze" whether *Kelleher* was a "doctrinal fit" for this case. Br., at 44 [46]. However, he does not explain why the test articulated in that case for a First Amendment retaliation claim (constitutionally protected speech plus causation) would not apply to his claim.

directed at school officials." *Kelleher*, 761 F.2d at 1084.

Instead, Bennard argues that the District Court improperly characterized his behavior as "insubordination" or "refusal" when it should have instead accepted his characterization of those communications as "professional" or "evidence-based." Br., at 42-43 [46]. As discussed above, all these communications are part of the record, and the District Court correctly found that Bennard failed to "refute that he refused to submit his Abilities Transcript despite requests from faculty." ROA.904. It is undisputed that Bennard was aware that the Abilities Transcript was required, that the faculty repeatedly instructed him to complete the Abilities Transcript and extended his deadline to do so, and that he knowingly failed to complete the assignment. The speech for which Bennard claims constitutional protection consists of his communications telling the faculty that he would not complete the assignment unless certain conditions were met. The District Court correctly found this was not protected speech.[4]

### b. **Bennard did not plausibly allege his status change was motivated by protected speech.**

Even if his speech was protected, Bennard could not plausibly plead that it

---

[4] Plaintiff's Brief does not address the claim he purported to state under the First Amendment's Petition Clause. ROA.953. However, this claim would fail for the same reasons his Speech Clause retaliation claim fails. *Gibson v. Kilpatrick*, 838 F.3d 476, 481 (5th Cir. 2016) (holding that First Amendment retaliation claims under the Speech Clause and the Petition Clause "are analyzed in the same way").

19

motivated Appellees' action because that claim is flatly contradicted by the record. Bennard argues that the District Court should have accepted the "chronology" in his Complaint as an adequate allegation of causation. Br., at 44 [46]. Bennard is correct that a plaintiff may meet his burden to prove causation with "a chronology of events from which retaliation may plausibly be inferred." *See Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997) (*citing Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995)). However, the chronology of communications referenced in Bennard's complaint does not show that Appellees were motivated by Bennard's complaints, and the District Court correctly found that his change in status was motivated by his failure to complete a required assignment. ROA.905.

In fact, the record shows that Appellees went out of their way *not* to change Bennard's status after receiving his complaints. ROA.1121-27, 1139-48. Bennard first raised his complaints about the mentorship process and the in-person meeting requirement in a series of emails on June 13 and 14, 2025. ROA.1117-20. After receiving those emails, Dr. Barnard extended the deadline for his Abilities Transcript, first through June 25, then through August 15. ROA.1125-27. Dr. Yang reached out to Bennard on July 19, expressly acknowledged his concerns, and asked him to complete the assignment by August 15. ROA.1139-40. After Bennard roped Dr. Kluck into the same email exchange, she too encouraged him to complete the Abilities Transcript by the Department's deadline. ROA.1144-45.

20

Bennard's status did not change in response to any of his complaints – it only changed *after* he missed the twice-extended August 15 deadline. In the interim, the faculty members encouraged and accommodated him. This timeline does not state a plausible claim for retaliation. *See Brady*, 113 F.3d at 1424 (holding that supervisor's positive evaluations of plaintiffs after alleged speech were "utterly inconsistent" with inference of retaliation).

The District Court also correctly found that Appellees would have taken the same action if Plaintiff had failed to complete the Abilities Transcript but had not complained about it. *See Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 455 (5th Cir. 2013) (holding that, even if First Amendment plaintiff shows causation, defendant can still prove it would have taken same action even without protected speech). Dr. Yang's July 18 email specifically warned Bennard that he would face consequences for refusing to complete the Abilities Transcript *regardless of whether he shared concerns about the process*. ROA.1140. His assertion that the change in status was motivated by his complaints is conclusory and unsupported by the record.

### c.    <u>Bennard did not plausibly allege a familial association claim.</u>

The District Court also correctly dismissed Bennard's First Amendment "familial association" based on alleged statements made by his twin brother Alfred. The association clause of the First Amendment protects "the choice to enter into

and maintain certain intimate human relationships is protected as an element of personal liberty." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1051 (5th Cir. 1996) (citing *City of Dallas v. Stanglin*, 490 U.S. 19 (1989)). However, Bennard has identified no authority extending that protection to these facts.

Plaintiff's Complaint cited *Adler v. Pataki*, in which the Second Circuit allowed a First Amendment retaliatory discharge claim based solely on litigation by the plaintiff's spouse. 185 F.3d 35, 45 (2d Cir. 1999). This Court has not recognized such a claim, much less extended it to a relationship between siblings. Bennard now argues the District Court focused too much on *Adler* and did not adequately consider *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), as the source of his familial association claim. However, he provides no discussion or analysis of that case except to say it "recognized constitutional protection for intimate human relationships, with family relationships as the paradigm case." Br., at 46 [46].

*Roberts* involved an effort by a private organization (the Jaycees) to prevent the State of Minnesota from requiring it to admit women as full voting members. 468 U.S. at 612-17. While *Roberts* briefly mentions family relationships in a broad overview of constitutionally protected associational rights, *Id*. at 619-20, it does not address the type of claim Bennard sought to bring.

The District Court correctly held that Bennard failed to plausibly allege that

Alfred's complaints motivated Appellees to change Bennard's provisional status. ROA.905. Bennard alleged that Alfred engaged in protected activity during "Spring 2025" through June 3, 2025. ROA.954. Again, Bennard's timeline does not support a claim of First Amendment retaliation. Bennard was told repeatedly after June 3 that he would not be placed on provisional status if he completed his Abilities Transcript by the deadline, and he was not placed on provisional status until after that deadline had passed.

**5.      Bennard failed to state a due process claim.**

The threshold question in reviewing a due process claim is whether a protected property interest exists. *Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020); *see also Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992) ("If there is no protected property interest, there is no process due."). The District Court correctly dismissed Bennard's due process claims because he did not identify a protected property interest.

This Court has noted that the Supreme Court "has not held college academic decisions implicate property or liberty interests, entitling a student to constitutional due-process protections." *Smith v. Davis*, 507 F. App'x 359, 362 (5th Cir. 2013). Moreover, this Court has recognized that "a student who is not denied access to public education does not have a property or liberty interest implicated." *Smith*, 507 F. App'x at 362 (citing *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111

F.3d 25, 26 (5th Cir. 1997)); *see also Pickett v. Tex. Tech. Univ. Health Sci. Ctr.*, No. 24-10304, 2024 U.S. App. LEXIS 30592, at *3 (5th Cir. Dec. 4, 2024) (rejecting dismissed graduate student's due process claim cased on an academic dismissal because "continued enrollment in that program is not a protected interest"). Bennard asserts that the authorities cited by the District Court did not "map neatly" or "fit comfortably" in this case, Br., at 56 [46], but he does not identify any authority recognizing a property interest in "good standing" in a graduate program.

Bennard argues the District Court failed to adequately consider the allegation that he lost his graduate assistantship, for which he was given a stipend, after he refused to complete the Abilities Transcript. *Id*. at 53-55. Even if the Court was to consider Bennard's graduate assistantship as a separate employment relationship with the University, "Mississippi law is clear that neither state legislation nor state regulations create a legitimate expectation of continued employment for a non-tenured faculty member." *Whiting v. Univ. of So. Miss.*, 451 F.3d 339, 344 (5th Cir. 2006).

*Cleveland Bd. of Educ. v. Loudermill* does not identify any property interest relevant to this case. In *Loudermill*, the Supreme Court found that some public employees in Ohio had a property interest related to continued employment because a state statute classified them as "classified civil service employees" and

24

limited the circumstances under which they could be terminated. 470 U.S. 532, 538-39 (1985). No such statute applies here.

Bennard also suggests that he had a protected interest in his immigration status. Br., at 61 [46]. This argument appears to be based in part on events that occurred after he filed his Complaint, which are not properly before the Court. *Id*. In any event, as the District Court correctly held, Bennard did not cite any authority recognizing such a property interest exists, particularly in a claim against an institution that does not determine immigration status.

Even Bennard had identified a cognizable property interest, "[a] public university is not required to afford significant process before dismissing a student on academic grounds; the university need only provide notice explaining the reasons for the 'faculty's dissatisfaction'" and the danger it posed to the student's continued enrollment. *Doe v. Harrell*, 841 F. App'x 663, 670 (5th Cir. 2021) (citing *Bd. of Curators v. Horowitz*, 435 U.S. 78, 85 (1978)). Bennard was repeatedly informed that the Abilities Transcript was a requirement for his program of study and specifically warned that his failure to complete the assignment could result in placement on provisional status. What's more, he had numerous opportunities to respond to this notice, and several Appellees specifically acknowledged those responses. Bennard did not plausibly allege a procedural due process violation.

Nor could Bennard state a substantive due process claim if he had alleged the existence of a property interest. "Public officials violate substantive due process rights if they act arbitrarily or capriciously." *Jones v. Bd. of Supervisors*, 809 F.3d 231, 240 (5th Cir. 2015). Plaintiff must show that the challenged decision "'so lacked a basis in fact' that it could be said to have been made 'without professional judgment.'" *Id*. (citing *Texas v. Walker*, 142 F.3d 813, 819 (5th Cir. 1998)). Here, Bennard himself acknowledged that completion of the Abilities Transcript was an important part of his graduate studies. ROA.1115. Appellees' conduct cannot be said to have been arbitrary and capricious, and Bennard cannot state a substantive due process claim.

**6.　Bennard failed to state an equal protection claim.**

An equal protection plaintiff must plausibly allege that he "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004) (citing *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)). "A discriminatory purpose 'implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group.'" *Id*. (citing *Taylor*, 257 F.3d at 473).

Bennard must further plead "that each Government-official defendant, through *the official's own individual actions*, has violated the Constitution." *Jones v. Hosemann*, 812 F. App'x 235, 238 (5th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (emphasis added). Only when a complaint pleads and proves "that each defendant individually engaged in actions that caused the unconstitutional harm" can that plaintiff seek relief under Section 1983. *Id*. at 239; *see, e.g., Yul Chu v. Mississippi State Univ.*, 592 F. App'x 260, 267 (5th Cir. 2014) (professor's bare allegation that university discriminated against him by denying him tenure differently from white faculty failed to state equal protection claim).

Here, the District Court correctly found that Bennard had failed to identify similarly situated persons outside his protected class who were treated differently. ROA.906. In fact, Bennard concedes that he cannot identify a non-Black student who also failed to submit the Abilities Transcript and was treated differently. Br., at 51 [46]. This should end the inquiry. However, Bennard argues his equal protection theory is "that he was subjected to a unique antecedent condition: a forced co-mentorship structure involving the Department Chair, an assertedly unauthorized alteration of a signed mentoring agreement, and a coercive Abilities Transcript process." *Id*. Even if this "antecedent condition" was the injury for which he sought relief, and it is not, Bennard has not identified similarly situated comparators outside of his protected class who were treated differently.

27

Bennard's Complaint alleges only that, "[u]pon information and belief, discovery will confirm the stark absence of comparable treatment among similarly situated peers, establishing that Defendants' actions were not the product of neutral academic judgment." ROA.964. This allegation is not sufficient to state an equal protection claim. *See Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018) (affirming 12(b)(6) dismissal of equal protection claims where plaintiff's "complaint generally alleges that other similarly situated individuals were treated differently, but he points to no specific person or persons and provides no specifics as to their violations").

Bennard argues the District Court failed to consider a document he refers to as Exhibit "O," which he claims "show[s] the cohort and their mentoring assignments" and "that no other student in the doctoral cohort was subjected to the same arrangement." Br., at 47-50 [46]. However, this document was neither attached to nor referenced in the Complaint. Rather, it was an exhibit to his Motion for a Temporary Restraining Order, which was filed two weeks after the Complaint. ROA.1071. It is not even clear whether the document existed at the time Plaintiff filed his lawsuit.

Even if it the Court considers this document as part of the record and assumes its accuracy, it would not support a claim of race discrimination. First, the document does not list the race of any of the graduate students. Thus, there are

28

only two graduate students in the cohort whose race is known – Bennard and his twin brother Alfred. According to Bennard's theory of the case, any different treatment he received than Alfred was necessarily for some reason other than Bennard's race.

Also, the document reflects that Bennard was the only graduate student assigned to Dr. Huang as a mentee. Because there is no allegation that any of the other faculty members on Bennard's list were leaving the University or that their assigned students would need new mentors, none of the other graduate students could be similarly situated to Bennard.

Nor has Bennard alleged any facts to support a finding of discriminatory intent. Again, Dr. Yang told Bennard she was stepping in as a co-mentor because Dr. Huang was leaving the University and would no longer be able to advise him. ROA.1146. Bennard does not allege that this statement was untrue, so he has not plausibly alleged that she acted with a discriminatory purpose.[5] Bennard has failed to state an equal protection claim for race discrimination.[6]

---

[5] Bennard's Complaint also purported to allege that some faculty members told Bennard that he and Alfred "dominated conversations" or acted "disruptively." ROA.963-64. Bennard did not raise that argument in his opening brief and therefore waived it. *See Valle v. City of Houston*, 613 F.3d 536, 544 n.5 (5th Cir. 2010). Without more, though, these statements do not constitute proof of race discrimination.

[6] Plaintiff's Complaint also purported to state a claim for race discrimination under Title VI, but that claim fails for the same reasons because the statute only prohibits "racial discrimination of the same character as that forbidden by the Equal Protection Clause." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 639 (5th Cir. 2021).

**7.** **Bennard failed to overcome the Individual Appellees' qualified immunity defenses.**

For the reasons above, Bennard failed to state a constitutional claim against any of the Appellees. However, even if any of his claims had arguable merit, the Individual Appellees are entitled to qualified immunity from the claims against them because Bennard did not identify clearly established law to support any of those claims.

Designed to protect "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), the qualified immunity defense "protects public officials from suit unless their conduct violates a clearly established constitutional right." *DePree v. Saunders*, 588 F.3d 282, 287 (5th Cir. 2009) (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)). The qualified immunity standard "gives ample room for mistaken judgments." *DePree*, 588 F.3d 282 at 287 (citing *Malley*, 475 U.S. at 343). This Court asks a "standard two-part qualified immunity question: whether the conduct was unconstitutional and whether the unconstitutionality was 'clearly established' at the time the challenged conduct occurred." *Doe v. Jewell*, 151 F.4th 236, 244 (5th Cir. 2025). Courts are given "flexibility and discretion" in resolving qualified immunity issues, and "the court can decline entirely to address the first part of the question and skip straight to the second." *Id*. at 245 (internal citation

30

omitted). "Plaintiffs carry the burden of demonstrating that qualified immunity is inappropriate." *Id*.

The question of qualified immunity is to be determined as a matter of law and requires a conduct-based inquiry, not an abstract legal or factual inquiry. *E.g., Elder v. Holloway*, 510 U.S. 510, 515-16 (1994). A Section 1983 plaintiff "must specify the personal involvement of each defendant." *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992). The plaintiff must point to controlling authority or a robust consensus of persuasive authority that placed his rights beyond debate. *See Wigginton v. Jones*, 964 F.3d 329, 337 (5th Cir. 2020) (citing *Morgan v. Swanson*, 659 F.3d 359, 371-72, 382 (5th Cir. 2011)).

Bennard criticizes the District Court's qualified immunity analysis, but he makes no attempt to explain how any of the authorities in his response to Appellees' Motion to Dismiss amount to controlling authority or a robust consensus of persuasive authority that placed his rights beyond debate. He complains variously that the District Court applied the wrong standard of review, [7] did not adequately address the first prong of the qualified immunity test, did not

---

[7] Bennard asserts that the District Court used the wrong standard of review, but he does not explain how the purported error changed the outcome. Br., at 32-33 [46]. While the District Court's Memorandum Opinion contained an errant quote referencing "genuine issues of material fact," ROA.899, it clearly applied the proper 12(b)(6) standard. *See* ROA.895 (describing *Twombly* plausibility standard); ROA.900 ("At this motion to dismiss stage, the Court will accept the allegations that Defendants violated his rights as he claims in his complaint, so long as it does not contradict the record."). The District Court did not conduct a summary judgment analysis.

adequately discuss the different claims against the individuals, did not

"meaningfully engage the Supreme Court's fair-warning principle," did not explain

why the authorities he cited were too general to defeat the defense, and improperly

characterized his failure to complete the Abilities Transcript. Br., at 32-40 [46].

These arguments are facile – they do not identify any legal error in the District

Court's analysis.

Plaintiff's qualified immunity burden was to cite specific Fifth Circuit or

Supreme Court cases on point that did not define the law at a "high level of

generality." *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (citing

*Cass v. City of Abilene*, 814 F.3d 721, 732-33 (5th Cir. 2016)). He did not do that –

his briefing in the District Court invoked constitutional rights only at the most

general level: "[t]he rights at stake – freedom from retaliation (*Pickering*),

procedural due process in disciplinary actions (*Dixon*; *Goss*), and equal protection

from arbitrary treatment (*Olech*) were long and clearly established." ROA.901;

ROA.1613. These broad statements did not show that the Individual Appellees had

"fair warning" that their specific alleged conduct was unconstitutional. *Cass v. City

of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (citing *Tolan v. Cotton*, 572 U.S. 650,

656 (2014)).

In fact, the only case Bennard cited to the District Court for a specific point

of law was *Adler v. Pataki*, the Second Circuit case discussing a First Amendment

claim based on the speech of a spouse. 185 F.3d 35 (2d Cir. 1999). The District Court was correct that *Adler* did not suffice to overcome qualified immunity in this Circuit, a conclusion that two other district courts had already reached. *See Atkinson v. Pustilnik*, No. 4:22-cv-04315, 2024 U.S. Dist. LEXIS 80141, at *17 (S.D. Tex. May 2, 2024) (holding defendant entitled to qualified immunity where plaintiff had not "pointed to any authority showing that a sister's right to be free from retaliation for her brother's speech is clearly established in this circuit"); *Corkern v. Hammond City*, No. 11-1828, 2013 U.S. Dist. LEXIS 114848 at *9 (E.D. La. Aug. 14, 2013) (granting qualified immunity from First Amendment claim in absence of "binding or persuasive authority that recognizes the right to be free from retaliation based on the conduct of one's spouse"). The District Court correctly held that Bennard failed to overcome the Individual Appellees' qualified immunity defenses.

**8.      The breach of contract claim is not saved by supplemental jurisdiction.**

Bennard argues that his breach of contract claim against the University should be reinstated under 28 U.S.C. § 1367 if the Court reverses the District Court with respect to any of his federal claims. Br., at 62-64 [46]. As Bennard notes, though, the Eleventh Amendment bars that claim in federal court. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002). Instead, Bennard asserts that the Court should reinstate "the individual-capacity breach-of-contract claim." Br., at 64 [46].

33

Bennard's Complaint purported only to state a breach of contract claim against the University. ROA.971. He did not allege he had a contract with any of the Individual Appellees. *Id*.

**9.      The District Court correctly denied Bennard's motions for mootness.**

Bennard argues that the District Court improperly considered the Motion to Dismiss before ruling on his Motion for Temporary Restraining Order and Motion for Preliminary Injunction and that those motions should have been "adjudicated on their own terms" because those they alleged he would suffer irreparable harm without an injunction. Br., at 64-66 [46]. He cites no authority to support his argument, which overlooks the fact that an award of injunctive relief based on meritless claims would be inappropriate.

Also, the Motion to Dismiss challenged the District Court's jurisdiction to hear certain claims. *See Goodrich v. United States*, 3 F.4th 776, 778-79 (5th Cir. 2021) ("Jurisdiction cannot be waived, and it is the duty of a federal court first to decide, *sua sponte* if necessary, whether it has jurisdiction before the merits of the case can be addressed.") (quoting *Filer v. Donley*, 690 F.3d 643, 646 (5th Cir. 2012)); *Air Prods. & Chems., Inc. v. GSA*, 700 F. Supp. 3d 487, 495 (N.D. Tex. 2023) (holding that, "when courts are faced with a preliminary injunction and a motion to dismiss, the 'preliminary injunction motion does not take priority over

defendants' motion to dismiss for lack of jurisdiction'") (quoting *Pa. Mun. Auths. Ass'n v. Horinko*, 292 F. Supp. 2d 95, 101 (D.D.C. 2003)).

**10.    The District Court did not err in consolidating the brothers' cases.**

Bennard states that "[c]onsolidation is not the principal basis on which reversal is sought," but he claims he was prejudiced by the District Court's Order consolidating his case with Alfred's case because he believes it delayed the District Court's consideration of his motions for injunctive relief. Br., at 67-68 [46]. Bennard claims the consolidation "diminish[ed] the urgency and independence of the relief he had sought." *Id*. at 67. His requests for injunctive relief were not "independent" of the causes of action his Complaint purported to state, and this argument presupposes that those motions would have been successful if the District Court had considered them before dismissing his claims. If his claims fail on their face, which they do, he could never show a likelihood of success on the merits.

This Court has made clear that "[f]ederal district courts have very broad discretion in deciding whether or not to consolidate." *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1532 (5th Cir. 1993). Bennard has failed to demonstrate that the District Court abused its discretion in consolidating the actions.

35

## CONCLUSION

The District Court correctly dismissed Bennard's Complaint because it failed to plausibly state a claim against any of the Appellees. This Court should affirm the judgment of the District Court.

THIS, the 26th day of May 2026.

Respectfully submitted,

UNIVERSITY OF MISSISSIPPI, DR. YI YANG, DR. MARIE BARNARD, DR. ANNETTE KLUCK, AND DR. YINAN HUANG

*/s/ Paul B. Watkins, Jr.*
PAUL B. WATKINS, JR. (MB NO. 102348)
MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Telephone: (662) 236-0055
Facsimile: (662) 236-0035
pwatkins@mayomallette.com
*Their Attorney*

36

## **CERTIFICATE OF SERVICE**

I, Paul B. Watkins, Jr., the attorney for Appellee, do certify that I have electronically filed this document in the CM/ECF system with the Clerk of the Court which sent notification of the filing to all attorneys of record and have forwarded a copy of this document via U.S. Mail and E-Mail to the following:

Omokhodion Alfred Eriakha
1802 Jackson Ave. W., Apt. 83
Oxford, MS 38655
eriakhab@gmail.com

Ehiremen Bennard Eriakha
1802 Jackson Ave. W., Apt. 83
Oxford, MS 38655
eriakhabernard@gmail.com


*/s/ Paul B. Watkins, Jr.*
PAUL B. WATKINS, JR.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(B)(i) because this brief contains 8,066 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), according to the word count of the word processing system used to prepare the document.  This brief complies with the typeface requirements of FED. R. APP. R. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, version 16.109.1 in Times New Roman font 14-point type face, except for footnotes, which were prepared in Times New Roman 12-point type face.

 /s/ Paul B. Watkins, Jr.
PAUL B. WATKINS, JR.